Michael E. Reznick, Esq.  State Bar No. 116126
LAW OFFICES OF MICHAEL E. REZNICK
A Professional Corporation
283 Ocho Rios Way
Oak Park, California 91377-5540
Tel:  (818) 437-5630
Email:  reznagoura@aol.com

Attorney for Plaintiffs RICHARD JACKSON, JULIE
BRIGGS, and GREGG BUCHWALTER, Individually
And On Behalf Of All Others Similarly Situated

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD JACKSON, JULIE BRIGGS, and GREGG BUCHWALTER, Individually And On Behalf Of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> TWITTER, INC., a Delaware corporation; GOOGLE, LLC, a limited liability company; ALPHABET, INC., a Delaware corporation; META PLATFORMS, INC., a corporation doing business as "META" and "FACEBOOK, INC."; INSTAGRAM, INC., a Delaware corporation; AMAZON INC. a Delaware corporation; YOU TUBE, INC., a Delaware corporation; APPLE, INC., a Delaware corporation; AMERICAN FEDERATION OF TEACHERS; NATIONAL EDUCATION ASSOCIATION; NATIONAL SCHOOL BOARD ASSOCIATION; DNC SERVICES CORPORATION, a corporation doing business nationwide as "THE DEMOCRATIC NATIONAL COMMITTEE" OR "DNC," <br><br> Defendants. | Case No.: _____ <br><br> **CLASS ACTION COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF FOR:** <br><br> 1) **Violation of 42 U.S.C. Section 1983 (First Amendment) (Censorship and Suppression of Protected Speech)** <br> 2) **Violation of Federal Civil Rights Act of 1964 (Election Interference)** <br> 3) **Violation of the California Unruh Civil Rights Act [Civil Code section 51 et seq.]** <br> 4) **Injunctive Relief** <br> 5) **Declaratory Relief** <br><br> **DEMAND FOR JURY TRIAL** <br><br> **[Fed.R.Civ.P. 38]** |

`

## INTRODUCTION AND NATURE OF THE ACTION

1.  A private entity violates the First Amendment "if the government coerces or induces it

to take action the government itself would not be permitted to do, such as censor expression of a lawful viewpoint." *Biden v. Knight First Amendment Institute at Columbia Univ.*, 141 S. Ct. 1220, 1226 (2021) (Thomas, J., concurring). "The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly." *Id.*

2.   "Private parties [like Defendants herein] act under color of state law if they willfully participate in joint action with state officials to deprive others of constitutional rights.  Private parties involved in such a conspiracy may be liable under section 1983."  *United Steelworkers of America v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540 (9th Cir. 1989).  The question is whether given the circumstances of the case the state has so "significantly involved itself in the private conduct that the private parties may fairly be termed state actors.  Among the factors considered are whether the state subsidized or heavily regulated the conduct, or compelled or encouraged the particular conduct, whether the private actor is performing a function which is normally is performed exclusively by the state, and whether there was a symbiotic relationship rendering the conduct state action."  *Robbins v. Hamburger Home for Girls*, 32 Cal. App. 4th 671, 683 (1995).

3.   At all times herein mentioned, Defendant the Democratic National Committee (the "DNC"), the federal government and in particular, the Biden Administration, aided and abetted by the "mainstream media," colluded with and/or coerced social media companies, internet retailers and distributors, public school teacher unions and school board associations, including the private party defendants named and described herein, to suppress and censor disfavored speakers, viewpoints and content on social media platforms and/or barred them from the public square by falsely labeling content "dis-information," "misinformation," and "mal-information" (hereinafter the "Censorship Scheme").

4.   Plaintiffs allege that the DNC and the Biden Administration's "weaponized" federal

agencies - including the Department of Justice ("DOJ"), Federal Bureau of Investigation ("FBI"), Center for Disease Control ("CDC"), Department of Homeland Security ("DHS"), Department of Health ("DOH"), Department of Education ("DOE"), State Department and Department of Defense ("DOD") – relying on public fear caused by the Covid 19 Pandemic, lockdowns and health concerns – unnecessarily closed public schools, shut down services from essential service providers and other private public businesses and threatened other adverse government action to coerce and direct the private-party defendants herein to do that which the Constitution prohibits the government from doing directly – namely, to censor and suppress lawfully protected speech and communications of disfavored (primarily conservative or Republican Party) speakers, viewpoints, and content on social media platforms.

5.   The vast Censorship Scheme's tentacles have reached as far as the internet retailer defendants, including Apple, Inc. ("Apple") and Amazon, Inc. ("Amazon"), who refused and continue to refuse to distribute books, articles, movies, audios and other communications written or published by conservative or "disfavored" speakers under the direction of the federal government and the Biden Administration's Orwellian guise of "misinformation."

6.   The vast Censorship Scheme has also infiltrated our public schools, as the defendant teacher unions and school board association, under the direction of the unelected President of the American Federation of Teachers' President, Randi Weingarten – in collusion with and aided and abetted by the Biden Administration's weaponized CDC, DOJ, FBI and Departments of Education and Health - made and continue to make policy directives for American public schools and their students.  Specifically, at the request of and in collusion with the Biden Administration, the the teacher unions and school board association similarly unconstitutionally burdened Plaintiffs' First Amendment rights by suppressing, stifling and censoring any and all complaints made or expressed by concerned parents in the public square from October 2020 to the present

about teaching such things as teaching "critical race theory" to students without the knowledge or consent of their parents, the necessity and public health consequences of long school closures, Covid 19 vaccine efficacy, or the adverse effects of teaching five year old children highly sexualized matters, including the availability of gender altering surgery options that students are instructed to conceal from their own parents.  Defendant the National School Board Association ("NSBA") went so far as to recruit the Biden Administration's DOJ to threaten parents who challenged "critical race theory" or voiced any other complaints to school boards about their student's curriculum with criminal prosecution.

7.   Pursuant to and in furtherance of this Censorship Scheme, the DNC actively participated in making it happen in conspiracy and collusion with the federal government, Biden Administration, the "mainstream media," including the internet platform and internet retailer defendants herein, other long-standing traditional Democratic Party stalwarts and allies like the defendant teachers unions and school board association named as defendants herein and most importantly, the DNC's and Democratic Party's leadership, to suppress and censor disfavored speakers, viewpoints and content on social media platforms and/or barred them from the public square by falsely labeling content "dis-information," "misinformation," and "mal-information."

8.   At all times herein mentioned, the DNC's and Democratic Party's leadership actively participating in this fraudulent Censorship Scheme included and still includes:

-   Former Chairs Donna Brazil and Tom Perez;

-   2016 Democratic Party candidate Hillary Clinton ("Clinton"), whose scheme to create a patently false "dossier" to support bogus FISA warrants, the Russian Hoax and the first impeachment of President Trump was disclosed during a prosecution brought by Special Prosecutor John Durham;

-   2016 and 2020 DNC Keynote Address Speaker Michelle Obama (who was recently

outed as the powerful force behind the decision made by Defendant Twitter, Inc. ("Twitter") to permanently ban former President Donald J. Trump ("President Trump") from using Twitter's platform as a result of what happened on January 6, 2021);

- 51 former highly partisan national "intelligence" officers, including John Brennan and James Clapper, who falsely claimed in a letter signed weeks before the 2020 election that a New York Post article written by Miranda Divine about a laptop owned by Hunter Biden, the son of President Joseph R. Biden, Jr. ("President Biden") that the FBI subpoenaed in December 2019 and had under its control – that contained authenticated information and documentary evidence establishing that the Biden Family, including President Biden, have deep financial ties to the Chinese Communist Party and the Ukraine Government;

- Former FBI Chief James Comey;

- Former FBI (and subsequently, Twitter, Inc.) General Counsel James Baker;

- Former FBI Supervisory Agent Timothy Tibolt;

- Former FBI head James Comey;

- Defendant American Federation of Teachers President Randi Weingarten;

- Highly partisan Democratic Party government lawyers (and lovers) Lisa Page and Peter Strzok (who spoke in text messages about the Democratic Party's "insurance policy" ensuring the DNC's ability to "take out" the 45th President of the United States, Donald J, Trump ("President Trump); and

- Other currently unknown and unidentifiable Democratic Party operatives within the so-called "Deep State" whose names will be added to this Complaint as soon as their identities are ascertained.

9.   Whether inside or outside of the federal government, the DNC's and Democratic Party's leadership, aided, abetted and controlled by the Biden Administration and its various "weaponized" federal agencies, including the Department of Justice ("DOJ"), Federal Bureau of Investigation ("FBI"), Department of Education ("ED"), Center for Disease Control ("CDC"), Department of Homeland Security ("DHS") and Census Bureau – conspired, colluded with and/or directed, coerced and controlled the social media internet platform and retailer defendants, as well as other traditional Democratic Party allies and stalwarts, such as the teacher's union and school board association defendants, to unconstitutionally suppress and censor the legally protected speech, opinions, communications and publications of "disfavored" speakers  - namely, Republican Party speakers and users, as well as any other person or organization (such as leading and renowned physicians and scientists during the height of the Covid 19 madness and lockdowns) who dare to challenge, dispute or say anything critical about the Democratic Party, the DNC's "Platform" or the Biden Administration's policy and mandates, pursuant to the Censorship Scheme

10. Pursuant to and in furtherance of this fraudulent Censorship Scheme, Defendants and their Democratic Party leadership allies secretly acted as actual and ostensible agents for the federal government, coordinating and working hand in hand with "weaponized" federal agencies, including the Department of Justice ("DOJ") and its now disgraced Federal Bureau of Investigation ("FBI"), who directed and coordinated with Defendants to suppress and censor anything critical of the Democratic Party's and DNC's platform as a "threat to democracy" or worse.

11. At all times herein mentioned, Defendants, the Biden Administration and their complicit allies and friends in the mainstream media denied and continue to deny that this Censorship Scheme exists, calling out and identifying anyone making such claims "conspiracy theorists,"

"election deniers" or a "threat to democracy" (which they view as "one party [Democratic Party] rule

12. However, in or about December 2022, Elon Musk ("Musk"), the new owner of Defendant Twitter, Inc. ("Twitter"), "outed" the Censorship Scheme when he began a series of public postings of internal Twitter documents by and between Twitter and the Biden Administration (and even a few communications from the Trump-led CDC) that established, disclosed and confirmed not only the existence of the Censorship Scheme, but also that agents of the FBI and other federal agencies, including the DHS, regularly conducted secret weekly meetings with managing agents of Defendants Twitter, Facebook, Inc. ("Facebook") and the other social media and internet retailer giants named as defendants herein for the purpose of identifying for them what speech they should suppress or censor on behalf of the government as "misinformation."

13. Not surprisingly, virtually all of the communications that the FBI directed Defendants to censor and suppress as "misinformation" were truthful, lawfully protected opinions and viewpoints of conservative or Republican Party speakers or platform users.

14. Aided and abetted by the Biden Administration, the Biden Administration led DOJ, FBI, Department of Education, Homeland Security DHS, CDC, other federal agencies and their cabinet secretaries, managers and employees, the Defendants herein, and each of them, also stifled, suppressed and censored lawfully protected speech and opinions of concerned parents at public school board meetings and in communications with the teacher's unions by demanding and directing that the DOJ and FBI threaten and arrest if necessary these parents, whom they falsely asserted were "domestic terrorists," with arrest and prosecution for "sedition" and other "un-American activities."  Attorney General Merritt Garland dutifully complied with the demands of the teacher unions and school board association.

15. As more particularly alleged herein below, Defendants also used their Censorship Scheme to stifle, suppress and censor as "misinformation" any and all truthful facts, opinions or viewpoints from concerned medical doctors and scientists who questioned or dared to challenge or refute the Biden Administration's and DNC's myopic "party line" and policies about vaccines, natural immunity, available drug therapies for treating the disease and related matters pertaining to the Covid 19 Pandemic by threatening them with prosecution simply because they held contrary opinions to those espoused by the Biden Administration, CDC, DNC and Defendants herein.

16. Defendants accomplished their Censorship Scheme under the guise and pretext of falsely labeling Republican Party voices and conservative speech, opinions, viewpoints and contents as "misinformation," "disinformation," "mal-information," "conspiracy theory," and/or calling them all "election deniers."

. In July 2022, Defendants and their allies within and without the federal government went so far as to falsely claim repeatedly that such speech is not only "misinformation," but also "dangerous," and a clear "threat to democracy."  These false and disparaging statements were confirmed by President Joseph R. Biden, Jr. ("President Biden") in his divisive speech to his followers in Philadelphia in October 2022, right before the mid-term election, when he falsely warned them and the rest of the Country from the "bully pulpit" that any and all "MAGA Republicans" (who comprise the "Putative Class" in this case) are a dangerous "threat to democracy" who should never attain public office.

17. Aided and abetted by the Democratic Party's long-standing traditional allies in the mainstream media, the clear intent and likely result of Defendants' unconstitutional and illegal Censorship Scheme was to turn the 2020 and 2022 elections in favor of the Democratic Party and to turn all future elections in favor of the Democratic Party by putting their thumbs on the scale

by using, aiding and abetting private enterprise to illegally and unconstitutionally censor and suppress the viewpoints and opinions of the Biden Administration's political enemies, something that the Biden Administration cannot do for itself because of its patent unconstitutionality.

18. Unless restrained and enjoined by this Court, Defendants will continue to unconstitutionally and illegally engage in censorship and suppression of conservative voices and opinions in a manner that is offensive to the First Amendment to the United States Constitution and contrary to federal and California law.

19. In or about May 2022, Marc Zuckerberg, President of Defendant Facebook, Inc. ("Facebook"), disclosed for the first time that in or about October 2020, weeks before the November 2020 Presidential Election, Facebook was pressured and coerced by the FBI to suppress and censor as "Russian disinformation" an October 2020 article written by Miranda Devine that appeared in the New York Post ("Devine's Laptop Story") that disclosed that the FBI had in fact subpoenaed from a third party "good Samaritan" pawn shop owner a laptop computer owned by President Biden's son, Hunter Biden (the "Laptop").

20. Today, it is beyond dispute that the documentary evidence and other information Contained in the Laptop is authentic and that at best, the documents and information would have been harmful to President Biden's presidential ambitions and the Joe Biden Presidential Campaign if release at that time.  Besides videos showing Hunter Biden engaged in multiple felonies and drug use, the Laptop includes information that establishes that President Biden's "Crime Family," including Biden himself and his brother and son, engaged for years in influence peddling with foreign governments and that President Biden himself has deep financial and political ties to Russia, Ukraine and the Chinese Communist Party ("CCP") that would serve to compromise anyone with a pulse, let alone the President of the United States.  Accordingly, the

Laptop would have been of paramount importance to any of the undecided voters who wanted to cast votes in the upcoming November 2020 for either President Trump or then Senator Biden.

21. Rather than disclosing the existence of the Laptop or any of the authenticated documentary evidence contained therein, the FBI directed Facebook and the other social media defendants herein to censor and suppress the Laptop as if it never existed or alternatively, to dismiss it as "Russian Propaganda" or the result of a "Russian Dis-information Campaign." Consistent with its prior pattern and practice with the FBI, Facebook and the rest of the social media defendants complied with the government's demand, doing that which the government could not do on its own – namely, suppress and censor the Laptop containing authentic information and documents that were clearly harmful to Biden's political ambitions under a false claim of "Russian Disinformation." Pursuant to and in furtherance of the Censorship Scheme, these defendants, and each of them, complied with the federal government's and FBI's dictates and commands in October 2020.

22. Since Musk acquired Twitter in the Fall of 2022, Twitter has released at least 12 public "Twitter Drops:" Public disclosures of formerly concealed information about the inner workings of Twitter that Musk asked several objective reporters to review and edit. These Twitter Drops These Twitter Drops serve to confirm what has already been alleged herein – namely, that Defendants herein worked hand in hand with the federal government and in particular, the Biden Administration and its weaponized federal agencies to censor and suppress any speech that concerned conservative viewpoints, policy directives or anything else that waivered from the Democratic Party, DNC or Biden Administration platforms or the party line.

23. The Twitter Drops and other recent public disclosures further demonstrate that in addition to the individuals and weaponized federal agencies identified above, a number of currently unknown but highly partisan federal bureaucrats served within several administrations

as "Trojan Horses" and continue to serve in that fashion for the purpose of doing the bidding of the Democratic Party under the exclusive direction and control of the DNC and subsequently the Biden Administration.  These Twitter Drops also establish that the federal government and its weaponized federal agencies colluded and or conspired with and or coerced and or directed the defendant social media internet companies and other traditional Democratic Party allies, like the Defendant teacher's unions and school board association, to perpetrate the vast and systemic Censorship Scheme alleged herein and to flip the United States from a Constitutional Republic into a Socialist or Marxist society more akin to the Russian and CCP totalitarian models of one-party rule.  Needless to say, the Twitter drops further establish that Defendants accomplished their Censorship Scheme by deliberately and intentionally suppressing, censoring, "shadow banning" and stifling conservative voices, viewpoints and opinions to frame the public "narrative" in a way that mirrors only the Democratic Party and DNC party line only.

24. Defendants' Censorship Scheme not only purposely suppresses, censors, ignores, "cancels" or excludes any and all opinions and viewpoints of conservatives or anyone else who challenges or opposes the Democratic Party's or Biden Administration's policies and propaganda, it also frames the narrative for public discourse, thereby confirming one-party dogma and rule.

25. In 1783, George Washington warned that if "the Freedom of Speech may be taken away," then "dumb and silent we may be led, like sheep, to the Slaughter." George Washington, Address to the Officers of the Army (March 15, 1783). The freedom of speech in the United States now faces one of its greatest assaults by federal government officials in the Nation's history.

26. 239 years later, Donald J. Trump, the 45th President of the United States ("President Trump"), gave a similar ominous warning to his followers that freedom of speech in the United States now faces one of its greatest assaults by federal government officials that our Nation has

1   ever seen in its history.  In an address to the Nation on December 16, 2022, President Trump

2   explained:

3           "If we don't have free speech, then we just don't have a free country.  It's as

4           simple as that.  If this most fundamental right is allowed to perish then the rest of

5           our rights and liberties will be allowed to topple just like dominoes they'll go

6           down one by one."

7

8   27. President Trump also announced his own plan "to shatter the left-wing censorship regime

9   and to reclaim the right to free speech for all Americans. . . because [these rights] have been taken

10  away."

11      28. Now that Defendants' Censorship Scheme has been "outed" by Musk, President Trump

12  and others, it shows anyone who is not complacent how fragile our "Constitutional Republic"

13  really is as a result of Defendants' actions, as well as the perils the rest of America faces because

14  Musk's early disclosures established that a left-wing censorship regime, led by the DNC, in fact

15  exists – a regime which has enlisted individuals and managers and employees within federal

16  government agencies to "privatize" the First Amendment by teaming up with the "Internet

17  Platform" defendants, teacher union defendants, school board association and their Democratic

18  Party allies in the mainstream media to censor and suppress speech which Defendants and the

19  Biden Administration all know the federal government cannot censor or suppress under the Bill

20  of Rights and First Amendment to the Constitution.

21      29. In 17th-Century England, government controlled speech through its monopoly on printing

22  presses.  *See* L. Levy, *Emergence of a Free Press* (1985).  The first newspapers were also met by

23  licensing prosecutions of unlicensed news-sheet printers and the power of the crown to grant

24  privileges of monopoly.  See also, 2 J. Story, Commentaries on the Constitution of the United

25  States, section 1882 (Fifth Ed. 1891).  Indeed, "history discloses a persistent effort on the part of

26

27

28

the British government to prevent or abridge the free expression of any opinion which seemed to criticize or exhibit in an unfavorable light, however truly, the agencies and operations of the government."  *Grosjean v. American Press Co*., 297 U.S. 233, 245 (1936).

30. The Censorship Scheme alleged herein and the "Twitter Drops" establish that government actors ***actively partnered*** with today's leading and monopolistic "printing presses" – Twitter, Facebook, You Tube, Instagram, Google, and the other internet platforms and internet retailers and distributors of content like Amazon and Apple, to censor speech critical of government policy.  The federal government also actively partnered with the defendant teacher unions and defendant the National School Board Association ("NSBA").  The federal government and Biden Administration have in fact been pulling the strings of these alleged "private party" defendants for years.  Just like citizens who lived under 17th Century British rule, if American citizens like the Plaintiffs herein and Putative Class refuse to "tow the line" set by the Biden Administration and DNC with respect to what they choose to say, read, write or hear, they are punished and burdened as a result and will continue to be punished and burdened and punished by Defendants herein and the Biden Administration as if it were the British Crown itself controlling the output of their content and speech.

31. Plaintiffs and the Putative Class have been irreparably harmed by Defendants' unconstitutional actions and the Censorship Scheme perpetrated on them and the American public by Defendants and the Biden Administration.  They will continue to suffer irreparable harm unless restrained by this Court and the Court restores their right to free speech and the free speech rights of all Americans that have been trampled on by Defendants and the Biden Administration.

32.  The Censorship Scheme, wrongdoing and patent election interference by Defendants and the Biden Administration are also corroborated today by the landmark lawsuit filed by the Attorneys General of the States of Missouri and Louisiana in May 2022 (the "AG Lawsuit").  The

AG Lawsuit asserts direct government censorship by the government against the Biden Administration and its various Executive Agencies, including the DOJ, FBI, CDC, DHS and Department of Education ("DE").

33. Recent victories and court orders obtained in the AG Lawsuit have compelled the belated disclosure and production of documentary evidence by and from the Biden Administration, its Cabinet members and others within the federal Executive Branch that unequivocally establish the existence of the systemic, long-running "Censorship Scheme" described above -- a Censorship Scheme and plan that Eric Schmidt, the Missouri Attorney General, states constitutes "one of the greatest assaults on the First Amendment by federal government officials in the Nation's history.

34. In light of the compelling disclosures that have been and are still being made in the AG Lawsuit and December 2022 Twitter Drops and Defendants' Censorship Scheme, Plaintiffs, the Putative Class and all other Americans have suffered and will continue to suffer irreparable harm that requires the equitable powers of the Court and the issuance of a nationwide injunction that restrains, enjoins and prevents the so-called "private party" internet "platform" and retailer defendants (collectively referred to herein as the "Platform Defendants"), teacher unions and school board associations from continuing to serve as  "lackies" for the Biden Administration and federal government and in particular, to enjoin and restrain Defendants from taking actions that the government itself would not be permitted to do – namely, censoring or suppressing expression of a lawful but "disfavored" viewpoint, opinion, solicitation and/or communication while refusing to censor or suppress (and actively advocate for left-leaning Democrats and Democratic Party causes).

35. Suppression of disfavored speech – namely, speech by conservative or Republican

Party speakers, as well as their viewpoints and content – constitutes government action and violates Plaintiffs' and the Putative Class's freedom of speech in violation of the First Amendment to the United States Constitution.

36. While many conservative leaders and speakers long suspected "shadow banning" and similar censorship by Defendants in 2020, Defendants and the Biden Administration deliberately concealed their Censorship Scheme from Plaintiffs and the Putative Class.  However, in light of the disclosures made in the AG Lawsuit and the December 2022 Twitter Drops, Defendants' Censorship Scheme is now undeniable

37. As a direct and proximate result of Defendants' Censorship Scheme, Plaintiffs and the Putative Class have been damaged and harmed.  Among other things, they lost their right to vote without outside interference in the 2020 and 2022 national elections.  Plaintiffs and the Putative Class have also been irreparably harmed and will continue to be irreparably harmed unless and until Defendants are restrained and enjoined by this Court from engaging in their Censorship Scheme and in particular, restrained and enjoined from any further censorship and suppression of "disfavored" speech under the guise of preventing the spread of "misinformation."  In light of the extreme closeness of the 2020 and 2022 national elections, which were decided by just a handful of votes in four highly contentious "swing states," Defendants and the Biden Administration will once again put their thumb on the scale of public debate and continue to interfere in future elections unless and until the Court restrains and enjoins Defendants' actions and in particular, their Censorship Scheme.

38. Accordingly, Plaintiffs and the Putative Class seek and request a mandatory and/or prohibitive injunction compelling Defendants and the Democratic Party to cease and desist from any further manipulation of the public narrative, or censorship or suppression of what Plaintiffs and the Putative Class choose to see or say on social media, aka as the "public square."

39. As president Trump observed and the Missouri Attorney General and Elon Musk, the new owner of Defendant Twitter, Inc. ("Twitter") have now confirmed, "a sinister group of deep state bureaucrats, Silicon Valley tyrants, left-wing activists and depraved corporate news media – including the Platform Defendants herein and other traditional Democratic Party stalwarts, supporters and leaders, such as Defendants The American Federation of Teachers ("AFT"), National Education Association ("NEA") and National School Board Association ("NSBA") – have been conspiring to manipulate and silence the American people [for years] and have collaborated and colluded to suppress vital information on everything from elections to public health to election fraud and interference to the existence of a Southern Border "crisis," and most seriously, censoring and suppressing the so-called "Hunter Biden Laptop" as "Russian disinformation" two weeks before the 2020 Presidential Election to censor undisputed evidence of fraud and crimes committed by President Biden's son, not to mention potential crimes committed by the Biden Family (and most likely President Biden himself).

40. As Defendant Facebook recently admitted in May 2022 (long after the 2020 election, when it clearly would have made a difference to the electorate), the Hunter Biden Laptop in fact was "authentic" but kept from public's view as a result of the illegal and unconstitutional censorship and suppression of the existence of the laptop by the FBI, or alternatively, by knowingly falsely dismissing it as Russian 'disinformation" by recruiting 51 Democratic Party allies from the national "Intelligence Community" to say it was such - a manufactured story created out of whole cloth by the federal government's intelligence community and the Defendants – but instigated, directed and coerced in secret, weekly meetings between federal FBI agents and the Internet Platform Defendants' management, as well as the censorship teams created with the aid and assistance of the federal government.

41. The federal government and Biden Administration have in fact coerced or induced the

private party defendants herein to take action that the government itself would not be permitted to do - namely, censoring expression of a lawful viewpoint pursuant to the Censorship Scheme that the DNC and federal government have been perpetrating since at least 2019 and in all likelihood earlier, beginning with express and implied threats from government officials and and culminating in the Biden Administration's open and explicit censorship programs. Having threatened and cajoled social-media platforms for years to censor viewpoints and speakers disfavored by the Left, senior government officials in the Executive Branch have moved into a phase of open collusion with social-media companies to suppress disfavored speakers, viewpoints, and content on social-media platforms under the Orwellian guise of halting so-called "disinformation," "misinformation," and "malinformation."

42. The aggressive censorship that Defendants have procured constitutes government action for at least five reasons: (1) absent federal intervention, common-law and statutory doctrines, as well as voluntary conduct and natural free-market forces, would have restrained the emergence of censorship and suppression of speech of disfavored speakers, content, and viewpoint on social media; and yet (2) through Section 230 of the Communications Decency Act (CDA) and other actions, the federal government subsidized, fostered, encouraged, and empowered the creation of a small number of massive social-media companies with disproportionate ability to censor and suppress speech on the basis of speaker, content, and viewpoint; (3) such inducements as Section 230 and other legal benefits (such as the absence of antitrust enforcement) constitute an immensely valuable benefit to social-media platforms and incentive to do the bidding of federal officials; (4) federal officials—including, most notably, certain Defendants herein—have repeatedly and aggressively threatened to remove these legal benefits and impose other adverse consequences on social-media platforms if they do not aggressively censor and suppress disfavored speakers, content, and viewpoints on their platforms;

and (5) Defendants herein, colluding and coordinating with each other, have also directly coordinated and colluded with social-media platforms to identify disfavored speakers, viewpoints, and content and thus have procured the actual censorship and suppression of the freedom of speech. These factors are both individually and collectively sufficient to establish government action in the censorship and suppression of social-media speech, given the inherent power imbalance: not only do the government actors here have the power to penalize noncompliant companies, but they have threatened to exercise that authority.

43. Defendants' Censorship Scheme included and includes the Spring 2022 announcement of the creation of a "Disinformation Governance Board" within the Department of Homeland Security.  While the Spring 2022 "Censorship Board" was disbanded after a substantial public uproar, the DHS is currently using another board within its agency to continue to censor constitutionally protected speech – namely, conservative speech - with the aid and assistance of Defendants herein.

44. "Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." *United States v. Alvarez*, 567 U.S. 709, 728 (2012) (plurality op.). Similarly, our constitutional tradition stands against the idea that we need a "Disinformation Governance Board" within our federal domestic-security apparatus.

45. Email correspondence between the CDC, the Census Bureau, and major social-media platforms including Twitter, Facebook, and YouTube was released that reveals yet more evidence that Defendants are directing social media censorship.

46. As a direct result of these actions, there has been an unprecedented rise of censorship and suppression of free speech—including core political speech—on social-media platforms. Many viewpoints and speakers have been unlawfully and unconstitutionally silenced in the modern

public square. These actions gravely threaten the fundamental right of free speech and free discourse for virtually all citizens in America, both on social media and elsewhere.

47. And these actions have directly impacted the individual Plaintiffs in this case and the Putative Class, all of whom have been censored, banned and "shadow-banned" from the Defendants' platforms entirely, or they have been punished and or have had impermissible burdens placed on them by Defendants as the price they will pay for expressing truthful facts and opinions that are different than the party line espoused by the Biden Administration and DNC.

48.     However, the federal Government continues to take an active and clearly unconstitutional role in coercing and colluding with Defendants herein to censor and suppress lawfully protected speech of conservative and Republican Party speakers and writers.   Among other things, Secretary Alejandro Mayorkas of DHS recently commented that the federal Government's efforts to police private speech on social media are occurring "across the federal enterprise."

49.     Kamala Harris ("Harris") the sitting United States Vice President, made a similar public admission on or about December 21, 2022 when she stated:

> Social media companies should "cooperate and work with us" on
> "protecting our democracy."

50.     What Harris clearly meant by her statement but did not say was that "protecting our democracy" requires Defendants and their Democratic Party allies in the mainstream media to continue to censor and suppress lawfully protected Republican Party and conservative speech, aided, abetted, directed and instructed by the Biden Administration, while creating a false narrative of reality in order to prioritize and gaslight the American people into believing whatever the Democratic Party says the truth is, even when what is said is patently false.

51.     It turns out that the statements made by Myorkis and Harris were and are quite literally true.  What Harris clearly meant by her statement but did not say was that "protecting our democracy" under the current regime requires Defendants and their Democratic Party allies in the mainstream media to continue to censor and suppress lawfully protected Republican Party and conservative speech, as directed and instructed by the Biden Administration, to frame the public narrative in the same way as totalitarian regimes with one-party rule operate their governments.

52.     Aided and abetted by a Trump-hating mainstream media which walks lock-step with the Democratic Party agenda, Defendants have also created and continue to create a false narrative of reality that always favors the Democratic Party in order to prioritize its policy dictates (including its maniacal "climate change" agenda) and to "gaslight" the American people into believing whatever the Democratic Party says or claims the truth is, even when they know that what is being promulgated to the public is patently false.

53..     The Censorship Scheme described herein involves a massive, sprawling federal "Censorship Enterprise," which includes dozens of federal officials across at least eleven federal agencies and components, who communicate with social-media platforms about misinformation, disinformation, and the suppression of private speech on social media—all with the intent and effect of pressuring social-media platforms to censor and suppress private speech that federal officials disfavor.

54.     This Censorship Enterprise is extremely broad, including officials in the White House, HHS, DHS, LISA, the CDC, NIAID, and the Office of the Surgeon General; as well as the Census Bureau, the FDA, the FBI, the State Department, the Treasury Department, and the U.S. Election Assistance Commission, among others. And this effort rises to the highest levels of the U.S. Government, including numerous White House officials overseeing the Censorship Enterprise.

**JURISDICTION AND VENUE**

55.  The Court has subject-matter jurisdiction because the federal claims arise under the Constitution and laws of the United States.  The Court has pendent jurisdiction over Plaintiffs' claims asserted under the California Unruh [Anti-Discrimination] Act, California Civil Code sections 51 et seq.

56.  Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

**THE PARTIES**

**A.**

**INDIVIDUAL PLAINTIFFS**

57.    At all times herein mentioned, Plaintiff RICHARD JACKSON ("Jackson") was and is an individual residing in Los Angeles, California.  Jackson is a registered Republican with conservative viewpoints who considers himself to be a so-called "MAGA Republican."  As a consequence, Jackson is also a member of the similarly situated Putative Class.  Jackson was and continues to be deprived of his First Amendment rights as a result of the Censorship Scheme and in particular, has been unconstitutionally burdened by Defendants' continuing unlawful censorship and suppression of conservative or "disfavored" viewpoints and what he chooses to read, see, say or hear in the public square.

58.    At all times herein mentioned, Plaintiff JULIE BRIGGS ("Briggs") was and is an individual residing in Dallas, Texas.  Briggs is a registered Republican with conservative viewpoints who considers herself to be a so-called "MAGA Republican."  As a consequence, Briggs is also a member of the similarly situated Putative Class.  Briggs was and continues to be deprived of her First Amendment rights as a result of the Censorship Scheme and in particular, has been unconstitutionally burdened by Defendants' continuing unlawful

censorship and suppression of conservative or "disfavored" viewpoints and what he chooses to read, see, say or hear in the public square.

59.     At all times herein mentioned, Plaintiff GREGG BUCHWALTER ("Buchwalter") was and is an individual residing in Los Angeles, California.  Buchwalter is a registered Republican with conservative viewpoints who considers himself to be a so-called "MAGA Republican."  As a consequence, Buchwalter was and continues to be deprived of his First Amendment rights as a result of the Censorship Scheme and in particular, has been unconstitutionally burdened by Defendants' continuing unlawful censorship and suppression of conservative or "disfavored" viewpoints and what he chooses to read, see, say or hear in the public square.

60.   Jackson, Briggs and Buchwalter are not only suing Defendants herein in their individual capacities, but also as members of the "Putative Class" (the "Class") of all other "similarly situated" Plaintiffs, as more particularly described and defined under the heading, "Class Allegations" herein below.  (Jackson, Briggs and Buchwalter and the subject "Class" are sometimes collectively referred to herein as "Plaintiffs").

**B.**

**<u>DEFENDANTS</u>**

61.   At all times herein mentioned, Defendant TWITTER, INC. ("Twitter") was and is a Delaware corporation qualified to do business and doing business in the State of California, County of Los Angeles.  At all times herein mentioned, Twitter was acting under color of law and in particular, engaging in the Censorship Scheme on behalf of the Biden Administration and federal government, as more particularly alleged herein below.

62. GOOGLE, LLC, is a limited liability company qualified to do business and doing

business in the State of California, County of Los Angeles.  At all times herein mentioned,

Google was acting under color of law and in particular, engaging in the Censorship Scheme on

behalf of the Biden Administration and federal government, as more particularly alleged herein

below.

63. At all times herein mentioned, Defendant META PLATFORMS, INC. was and is

a limited liability company qualified to do business and doing business in the State of California,

County of Los Angeles, doing business as "META" or "FACEBOOK, INC.  (hereinafter

"Facebook").  At all times herein mentioned, Facebook  was acting under color of law and in

particular, engaging in the Censorship Scheme on behalf of the Biden Administration and federal

government, as more particularly alleged herein below..

64. At all times herein mentioned, Defendant ALPHABET, INC. ("Alphabet") was and is

a Delaware corporation qualified to do business and doing business in the State of California,

County of Los Angeles, and the corporate parent of Defendant FACEBOOK.

65. At all times herein mentioned, Defendant INSTAGRAM, INC. ("Instagram") was and

is a corporation qualified to do business and doing business in the State of California, County of

Los Angeles.  At all times herein mentioned, Instagram was acting under color of law and in

particular, engaging in the Censorship Scheme on behalf of the Biden Administration and federal

government, as more particularly alleged herein below..

66. At all times herein mentioned, Defendant AMAZON, INC. ("Amazon") was and

is a corporation qualified to do business and doing business in the State of California, County of

Los Angeles.  At all times herein mentioned, Amazon was acting under color of law and in

particular, engaging in the Censorship Scheme on behalf of the Biden Administration and federal

government, as more particularly alleged herein below..

67. Defendant APPLE, INC. ("Apple") was and is a corporation qualified to do business and

doing business in the State of California, County of Los Angeles. At all times herein mentioned, Apple was acting under color of law and in particular, engaging in the Censorship Scheme on behalf of the Biden Administration and federal government, as more particularly alleged herein below.

68. At all times herein mentioned, Defendant YOU TUBE, INC. ("You Tube") was and is a corporation qualified to do business and doing business in the State of California, County of Los Angeles.  At all times herein mentioned, You Tube was acting under color of law and in particular, engaging in the Censorship Scheme on behalf of the Biden Administration and federal government, as more particularly alleged herein below. (The internet platform providers and internet retailer platforms identified above in paragraphs 55-62 of this Complaint are sometimes referred to herein collectively as the "Platform Defendants")

69. At all times herein mentioned, Defendant AMERICAN FEDERATION OF TEACHERS ("AFT") was and is the second largest teacher's union in the United States.  Beginning in 2020, under the direction, control and management of its President, Randi Weingarten, the AFT contributed over $2 million to the Democratic Party in 2020 alone for the purpose of gaining access to meetings with the leaders of the CDC, DOJ and FBI to help formulate, direct and dictate the CDC's and United States' public health policy with respect to mask policies, closing all public schools despite scientific evidence that it was wholly unnecessary and more tragically, how, when and whether public schools would ever reopen again for teaching kids one on one in light of the ongoing "Covid 19 Pandemic."  At all times herein mentioned, AFT was qualified to do business in the State of California and doing business in the County of Los Angeles.

70. At all times herein mentioned, Defendant NATIONAL EDUCATION ASSOCIATION

("NEA") was and is an association of teachers responsible for making and directing national policy for teachers and teacher unions. At all times herein mentioned, NEA was qualified to do business in the State of California and doing business in the County of Los Angeles.

At all times herein mentioned, Defendant NATIONAL SCHOOL BOARD ASSOCIATION ("NSBA") was and is a national policy making and directing association of school boards.  At all times herein mentioned, NSBA was qualified to do business in the State of California and doing business in the County of Los Angeles.

71.  At all times herein mentioned, Defendant DNC SERVICES CORPORATION, doing business as "THE DEMOCRATIC NATIONAL COMMITTEE" (hereinafter the "DNC") was and is a corporation qualified to do business and doing business in the State of California County of Los Angeles.

72. The DNC also coordinates strategy to support Democratic Party candidates throughout the United States for local, state, and national office.  Toward that end, the DNC organizes the Democratic National Convention that is held every four years to nominate a candidate for President of the United States and to formulate a party platform.

73. In 2020, after a tortuous nomination process that avoided personal campaigning in favor of remaining at home in his basement den, the DNC nominated former Senator and Baraak Obama's Vice President Joseph Biden ("Biden") as its Democratic candidate for President to run against incumbent President Donald J. Trump in the November 2020 presidential election.  While the DNC provides support for party candidates, it does not have direct authority over elected officials.  However, the DNC does conduct substantial fundraising to support its activities and in 2020 alone, after Biden was nominated, the DNC reported it had raised more than $250 million in fundraising to support the Democratic Party's candidate for president against the incumbent, President Trump.

74. Having received funds by August 2020 that more than doubled the funds that the DNC raised for the entirety of its 2016 presidential campaign, the DNC and its leaders identified above were motivated by money, power and greed to enter into a conspiracy and agreement to perpetrate the Censorship Scheme with its traditional allies, including the high-tech, Silicon Valley "Platform Defendants"  referenced above, the AFT, NEA and NSBA, capitalizing on the fear and anxiety created by the Covid-19 virus that the CDC and United States government and other renowned scientists, including Stephen Fauci, M.D. ("Dr. Fauci"), the head of the Center for Disease Control ("CDC"), knew but concealed from the public had emanated from a laboratory in Wuhan, China as a result of failed "gain of function" experiments authorized by Dr. Fauci and funded in part by the United States and CDC.  The release of the deadly Covid 19 virus from a laboratory in China, coupled with China's deliberate concealment of the existence, cause and highly infectious nature of this deadly new, man-made virus, which would soon cripple the World economies and claim the lives of millions of victims world-wide

75. Pursuant to their fraudulent, illegal and unlawful Censorship Scheme, Defendants, and each of them, aided, abetted, directed, controlled and coerced by the Biden Administration commenced a vigorous and calculated campaign to censor and suppress accurate and truthful information promulgated by any and all conservative-leaning authors, including President Trump, in violation of the First Amendment and California Unruh Act, as alleged hereinbelow.

76. Pursuant to their fraudulent, illegal and unlawful Censorship Scheme, Defendants illegally and unlawfully used their monopolistic power to control virtually all social media and the internet to skew and distort the public narrative by "de-platforming" any individual with facts, political opinions or views that were inconsistent with the Democratic Party's 2020 Platform.  Defendants also suppressed and stifled and continue to suppress and censor opposing views by promulgating patently false and misleading information, aided and abetted by Biden Administration operatives.

For example, in addition to "de-platforming" opposing views to ensure that only the Democratic Party's Platform and messaging was published on the internet, and in an attempt to manipulate the public narrative and with the Biden Administration's assistance, keeping their collective thumbs on the scale of public debate.

77.   Among other things, Defendants asserted (and continue to assert) that:

- There were no "riots" or property damage that occurred during the Summer of 2020 that were instigated by democratic political organizations known as "Antifa" and "Black Lives Matter" in democratic controlled cities such as Minneapolis and Portland and New York;- just "peaceful protests";

- There was and is no "crisis" at the wide-open Mexican-United States border caused by the Biden Administration's open border policy, which since October 2022 has seen over 500,000 illegal migrants enter this Country illegally, at least 10 percent of whom have Covid 19 at the time they are released;

- Several credible, low-cost therapeutic drugs and medications that have been available for years that could actually lessen Covid 19 symptoms and cure the virus itself.  In fact, defendants called such miracle drugs "disinformation" and delisted any mention of them.  Defendants' censorship and suppression of such critically useful information and the FDA's subsequent direction to pharmacies and doctors that they were not to sell or use such drugs as a result thereof undoubtedly killed thousands of Americans unnecessarily;

- Falsely stating that President Trump and his lawyers provided "no evidence" of election fraud as opposed to truthfully stating that the only Democratic judges willing to hear the matter ruled that the litigants had "no standing."  Accordingly, the fact of the matter is that such judges, by design and proclamation, heard no

evidence at all because no evidence was allowed to be presented.  As the Arizona legislative investigation has revealed, there was rampant fraud in Arizona's election.  Only time will tell whether the other critical "Swing States" also experienced fraud;

- Masks were unnecessary once you were vaccinated twice;

- Vaccinated persons cannot catch Covid 19;

- Unvaccinated persons had a greater chance of death or hospitalization from Covid 19, when in fact the vaccinations themselves are killing people at an alarming rate; and

- Anyone who even suggested that the Platform Defendants, teacher unions, school board association and Biden Administration were not colluding or conspiring to censor or suppress lawfully protected speech of the Biden Administration's political opponents was a "conspiracy theorist."

78. Defendants perpetrated and continue to perpetrate their Censorship Scheme in part by "de-platforming," cancelling or removing from their respective internet sites any possibility of posting messages on social media sites – which are all controlled by the Platform Defendants - or denying authors and publishers the right to distribute and publish and sell their publications on the internet retailer platforms.  The duration of the exile depends on the "seriousness" of the alleged "disinformation" or "misinformation' allegedly communicated – always looked at through the prism of what message the Democratic Party are seeking to convey, effectively silencing any political opposition to the Democratic Party Platform, while hiding behind alleged immunities given to them years ago by a Congress that never intended such a tortured result.

79. Pursuant to and in furtherance of this fraudulent and unlawful Censorship Scheme, the

Platform Defendants -- aided and abetted by Defendant DNC and its political operatives, intentionally and deliberately discriminated against Plaintiffs and the Class in violation of the California Unruh Act (Civil Code section 51) by arbitrarily suppressing, preventing and denying Plaintiffs access to any legitimate, genuine, newsworthy stories, articles or reports that favored President Trump, or featured or spoke about President Trump's undeniable accomplishments that occurred and continue to occur during his first term in office, or alternatively, report any stories or articles that were and are detrimental or potentially detrimental to the Democratic nominee (Biden), such as the recent New York Post article that was unfavorable to Biden and his son, Hunter Biden.  Simply stated, defendants, and each of them, deliberately and intentionally took away any semblance of a level playing field by creating a situation far worse than any stunt that "Pravda" pulled during the Soviet Union's rise and fall.

80. At all times herein mentioned defendants, and each of them, caused irreparable harm to the public at large because the unlevel playing field created by Defendants' discriminatory conduct takes away the public's freedom of choice, not to mention the stigma caused by Defendants' discriminatory acts and being given one side of the story. In either case, the deck has been "stacked" against President Trump, Biden's chief political rival, days before what all pundits ever concluded will be the most important election of our time by virtue of the discriminatory acts taken by defendants, and each of them.

### DOE AND AGENCY ALLEGATIONS

81. The true names and capacities of the defendants named herein as doesh 40, inclusive," are presently unknown to Plaintiffs.  Plaintiffs will amend this FAC to insert their true identities as soon as they are ascertained.

82.  At all times herein mentioned, each defendant was the agent of the other defendants and in doing the wrongful acts complained of herein was acting within the scope of such agency.

**CLASS ACTION ALLEGATIONS**

83. Plaintiffs brings this action on its own behalf and on behalf of all persons similarly situated (the "Putative Class").  Such a representation is necessary and appropriate in order to prevent any further disparate and discriminatory treatment and any future widespread wrongdoing by Defendants, remedy Defendants' past and ongoing pattern and practice of unlawful, unfair and discriminatory practices that have caused, and will continue to cause, economic and other irreparable harm and injury in fact to Plaintiffs and the Putative Class – registered Republicans in the State of California and other states and described by President Biden as "MAGA Republicans," whom President Biden warned in an October 2022 address to the Nation are a "threat to democracy" [or more accurately stated, a threat to continued one-party (Democratic Party) rule.  Such a representation is also necessary and appropriate to obtain an effective nationwide Court order that will be binding on all Defendants and Plaintiffs.

84. This action is brought and may be properly maintained as a class action pursuant to the provisions of Federal Rule of Civil Procedure 23.

85. The "Putative" Class (the "Class") is comprised of more than 72 million United States citizens who voted for former President Donald J. Trump on November 3, 2022 – a class of the Democratic Party's political enemies which current President Joseph Biden, Jr. has and continues to falsely call out as dangerous, anti-American "MAGA Republicans" because the Class does not agree with the direction of the United States of America or its leadership.  In particular, the Class has attempted to challenge the Democratic Party's and Biden Administration's myopic vision for America, propaganda, policy positions, opinions and lies that one-party Democratic rule has fostered and instead seeks to communicate and speak about opinions, policy positions and views that are different than the narrative created by traditional Democratic stalwarts and cronies, including the defendants herein and mainstream media, who are seeking to silence their political

enemies through the Censorship Scheme alleged herein.  The Putative Class can be defined as follows:

> *More than 72 million registered Republicans nationwide – referred to by President Biden and some unenlightened Democrats as "MAGA Republicans" - who voted for someone other than President Biden and suffered and will continue to suffer irreparable harm by the Censorship Scheme alleged herein and in particular, the Defendants' and Biden Administration's past and current suppression and censorship of the opinions and viewpoints of conservative-leaning speakers and/or MAGA Republicans who choose to dispute, disagree or challenge Democratic Party policies, dogma and propaganda.*

86. The members of the class are so numerous that joinder of all members is impracticable.

87. While the exact number of class members is unknown to Plaintiffs at this time and can only be ascertained through discovery, Plaintiffs are informed and believe that there are more than 72 million members of the proposed class.

88. here is a well-defined community of interest among the members of the proposed class.

89. Plaintiffs, like all other members of the class, were and are treated by Defendants and each of them, disparately, in a discriminatory fashion, in violation of 42 U.S.C Section 1983, the Civil Rights Act of 1964 and the California Unruh Act (California Civil Code section 51). Moreover, the factual bases of Defendants' actions and misconduct, as alleged herein, are common to all members of the class and represent a common practice of wrongful conduct resulting in disparate and discriminatory treatment and harm to all members of the proposed class.

90. There are numerous questions of law and fact common to Plaintiffs and the members of

the class and those questions predominate over any questions that may affect individual members of the class, including whether Defendants, and each of them, entered into a secret, unlawful and illegal Censorship Scheme with the federal government to deny the class and is members them access to genuine, newsworthy, facts, publications and communications that favored candidate other than the candidate of the Democratic Party.

91. Plaintiffs' claims are typical to the claims of the other members of the class.

92.  All the members of the class have sustained economic damage arising out of the common course of conduct alleged herein, as well as irreparable harm that can only be remedied by injunctive relief.

93.  Plaintiffs will fairly and adequately represent and protect the interests of the class.

94.  Plaintiffs have retained counsel with substantial experience in prosecuting class actions, discriminatory practices and related claims.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the class and have the financial resources necessary to do so.  Neither Plaintiffs nor its counsel has any interest adverse to those of the class.

95.  A class action is superior to other available methods for the fair and efficient Adjudication of this controversy since individual joinder of all members of the class is impracticable.  Further, individualized litigation would present the potential for inconsistent or contradictory judgments and would magnify the delay and expense to all parties and the court system in multiple trials of identical factual issues.  By contrast, the conduct of this action as a class action presents fewer management difficulties, conserves the resources of the parties and the court system and protects the rights of each class member.

**DOCUMENTARY AND OTHER EVIDENCE**

**JUSTIFYING THE ISSUANCE OF A NATIONWIDE INJUNCTION[1]**

96. Dr. Jayanta Bhattacharya is a former Professor of Medicine and current Professor of Health Policy at Stanford University School of Medicine and a research associate at the National Bureau of Economic Research. He is also Director of Stanford's Center for Demography and Economics of Health and Aging. He holds an M.D. and Ph.D. from Stanford University. He has published 161 scholarly articles in peer-reviewed journals in the fields of medicine, economics, health policy, epidemiology, statistics, law, and public health, among others. His research has been cited in the peer-reviewed scientific literature more than 13,000 times. He was one of the coauthors of the Great Barrington Declaration, a statement criticizing government-mandated COVID restrictions, which was co-signed by over 930,000 people, including over 62,000 scientists and healthcare professionals. Dr. Bhattacharya and his audiences have experienced significant censorship and suppression of his speech on social-media caused by Defendants.

97. Dr. Martin Kulldorff is an epidemiologist, a biostatistician and a former Professor of Medicine at Harvard University and Brigham and Women's Hospital, from 2015 to November 2021. Before that, he was Professor of Population Medicine at Harvard University from 2011 to 2015. He holds a Ph.D. from Cornell University. He has published over 200 scholarly articles in peer-reviewed journals in the fields of public health, epidemiology, biostatistics and medicine, among others. His research has been cited in the peer-reviewed scientific literature more than 25,000 times. He was one of the co-authors of the Great Barrington Declaration, a statement criticizing government-mandated COVID restrictions, which was co-signed by over 930,000 people, including over 62,000 scientists and healthcare professionals. Dr. Kulldorff and his

---

[1]     These facts are culled from the Second Amended Complaint filed in the AG Lawsuit and are incorporated into this Complaint by reference as though fully set forth at length herein.

audiences have experienced significant censorship and suppression of his speech on social-media caused by Defendants.

98. Dr. Aaron Kheriaty earned his M.D. from Georgetown University, and completed residency training in psychiatry at the University of California Irvine. For many years, he was a Professor of Psychiatry at UCI School of Medicine and the Director of the Medical Ethics Program at UCI Health, where he chaired the ethics committee. He also chaired the ethics committee at the California Department of State Hospitals for several years. He is now a Fellow at the Ethics & Public Policy Center in Washington, DC, where he directs the program on Bioethics and American Democracy. He has authored numerous books and articles for professional and lay audiences on bioethics, social science, psychiatry, religion, and culture. His work has been published in the Wall Street Journal, the Washington Post, Arc Digital, The New Atlantis, Public Discourse, City Journal, and First Things. He has conducted print, radio, and television interviews on bioethics topics with The New York Times, the Los Angeles Times, CNN, Fox News, and NPR. He maintains social-media accounts, including the Twitter account @akheriaty, which has over 158,000 followers. Dr. Kheriaty and his audiences have experienced significant censorship and suppression of his speech on social-media caused by Defendants,

99. Jim Hoft is the founder, owner, and operator of the popular news website The Gateway Pundit. He resides in St. Louis, Missouri. The Gateway Pundit is one of the most popular conservative news sites in the country, with over 2.5 million web searches per day. Mr. Hoft maintains and operates The Gateway Pundit's social-media accounts, including a Facebook account with over 650,000 followers, an Instagram account with over 205,000 followers, and (until its recent permanent suspension) a Twitter account with over 400,000 followers. Mr. Hoft and his audiences have experienced extensive government-induced censorship on social-media platforms, including of his speech on COVID-19 issues and election security issues.

100.     Jill Hines is a resident of Louisiana. She is the Co-Director of Health Freedom Louisiana, a consumer and human rights advocacy organization. She also launched, in 2020, a grassroots effort called Reopen Louisiana. She maintains social-media accounts for both Health Freedom Louisiana and Reopen Louisiana with approximately 13,000 followers. Ms. Hines and her audiences have experienced extensive government-induced censorship of her speech on social media, including her speech related to COVID-19 restrictions.

101.     The U.S. Department of Justice ("DOJ") is a Cabinet-level agency within the Government of the United States.

102.     The Federal Bureau of Investigation ("FBI") is an investigative agency of the federal Government within the U.S. Department of Justice. The Foreign Influence Task Force ("FITF") is a task force within the FBI that purportedly investigates and/or addresses foreign influences within the United States. The FTIF's website states: "The FBI is the lead federal agency responsible for investigating foreign influence operations. In the fall of 2017, Director Christopher Wray established the Foreign Influence Task Force (FITF) to identify and counteract malign foreign influence operations targeting the United States."
https://www.fbi.gov/investigate/counterintelligence/foreign-influence.

103.     Elvis M. Chan is Supervisory Special Agent of Squad CY-1 in the San Francisco Division of the FBI. On information and belief, he has authority over cybersecurity issues for FBI in that geographical region, which includes the headquarters of major social-media platforms, and he plays a critical role for FBI and FITF in coordinating with social-media platforms relating to censorship and suppression of speech on their platforms.

104.     The U.S. State Department operates a "Global Engagement Center" within the State Department that conducts counter-"disinformation" activities. According to the State Department's website, the Global Engagement Center's mission is "[t]o direct, lead, synchronize,

integrate, and coordinate efforts of the Federal Government to recognize, understand, expose, and counter foreign state and non-state propaganda and disinformation efforts aimed at undermining or influencing the policies, security, or stability of the United States, its allies, and partner nations." As alleged further herein, the Global Engagement Center is involved in procuring the censorship of private speech on social media, including of U.S. citizens. The State Department also maintains an Office of Cyber Coordinator, a.k.a. Office of the Coordinator for Cyber Issues, that has, on information and belief, also been involved in federal social-media censorship activities.

105.     The U.S. Department of the Treasury ("Treasury") is a Cabinet-level agency within the Government of the United States.

106.     The U.S. Election Assistance Commission ("EAC") is an independent agency within the Government of the United States. According to its website, the EAC "was established by the Help America Vote Act of 2002 (HAVA). The EAC is an independent, bipartisan commission charged with developing guidance to meet HAVA requirements, adopting voluntary voting system guidelines, and serving as a national clearinghouse of information on election administration."

## . **GENERAL ALLEGATIONS**

### **A. Freedom Of Speech Is the Bedrock of American Liberty.**

107.     The First Amendment of the U.S. Constitution states that "Congress shall make no law ... abridging the freedom of speech, or of the press..." U.S. CONST. amend. I.

108.     The State of California and all other State Constitutions likewise protect the freedom of speech as a fundamental right of the first order.

109.    The freedom of speech and expression guaranteed by the First Amendment is one of the greatest bulwarks of liberty. These rights are fundamental and must be protected against government interference.

### 1. Government Officials Lack Authority To

### Censor  Or Suppress Disfavored Speakers and Viewpoints.

110.  If the President or Congress enacted a law or issued an order requiring the suppression of certain disfavored viewpoints or speakers on social media, or directing social media to demonetize, shadow-ban, or expel certain disfavored speakers, such a law or order would be manifestly unconstitutional under the First Amendment.

111.    "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). 99. "[T]he First Amendment means that government has no power- to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (quotations omitted).

112.    "In light of the substantial and expansive threats to free expression posed by content-based restrictions," the Supreme "Court has rejected as `startling and dangerous' a `free-floating test for First Amendment coverage ... [based on] an ad hoc balancing of relative social costs and benefits." *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality op.) (quoting *United States v. Stevens*, 559 U.S. 460, 470 (2010)

### 2. Merely Labeling Speech "Misinformation" Or

### "Disinformation" Does Not Strip Away First Amendment Protections

113.    Labeling disfavored speech "misinformation" or "disinformation" does not strip it of First Amendment protection. "Absent from those few categories where the law allows content-based regulation of speech is any general exception to the First Amendment for false statements. This comports with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee." Id. at 718.

114. The Supreme Court has thus rejected the argument "that false statements, as a general rule, are beyond constitutional protection." Id.

115. "Permitting the government to decree this speech to be a criminal offense, whether shouted from the rooftops or made in a barely audible whisper, would endorse government authority to compile a list of subjects about which false statements are punishable. That governmental power has no clear limiting principle. Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." Id. at 723 (citing G. ORWELL, NINETEEN EIGHTY— FOUR (1949) (Centennial ed. 2003)).

116. "Were the Court to hold that the interest in truthful discourse alone is sufficient to sustain a ban on speech ... it would give government a broad censorial power unprecedented in this Court's cases or in our constitutional tradition. The mere potential for the exercise of that power casts a chill, a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom." Id. at 723.

### 3. Counter-Speech, Not Censorship, Is The
### Proper Response To Supposed "Misinformation"

117. When the Government believes that speech is false and harmful, "counter-speech," not censorship, must "suffice to achieve its interest." Id. at 726. The First Amendment presumes that "the dynamics of free speech, of counter-speech, of refutation, can overcome the lie." Id.

118. "The remedy for speech that is false is speech that is true. This is the ordinary course in a free society. The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straightout lie, the simple truth." Id. at 727.

119. "The theory of our Constitution is `that the best test of truth is the power of the thought to get itself accepted in the competition of the market." Id. at 728 (quoting Abrams v. United States, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)).

120. "The First Amendment itself ensures the right to respond to speech we do not like, and for good reason. Freedom of speech and thought flows not from the beneficence of the state but from the inalienable rights of the person. And suppression of speech by the government can make exposure of falsity more difficult, not less so. Society has the right and civic duty to engage in open, dynamic, rational discourse. These ends are not well served when the government seeks to orchestrate public discussion through content-based mandates." Id. at 728.

**4. Americans Have A First Amendment Right To Be Exposed To A Free Flow Of Speech, Viewpoints And Content, Free From Censorship By Government Officials.**

121. The First Amendment also protects the right to receive others' thoughts, messages, and viewpoints freely, in a free flow of public discourse. "[W]here a speaker exists ..., the protection afforded is to the communication, to its source and to its recipients both." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 756 (1976).

122. The right to receive information is "an inherent corollary of the rights to free speech and press that are explicitly, guaranteed by the Constitution," because "the right to receive ideas follows ineluctably from the sender's First Amendment right to send them." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982). "The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider

them. It would be a barren marketplace of ideas that had only sellers and no buyers." *Lamont v. Postmaster Gen.*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring).

123. "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017).

124. "[A]ssuring that the public has access to a multiplicity of information sources is a governmental purpose of the highest order, for it promotes values central to the First Amendment." *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 663 (1994). Indeed, "the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." *United States v. Midwest Video Corp.*, 406 U.S. 649, 668 n.27 (1972) (plurality op.) (quotations omitted).

**5. Government Officials May Not Circumvent The First Amendment By Inducing, Threatening, And/Or Colluding With Private Entities To Suppress Protected Speech**

125. It is "axiomatic" that the government may not "induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (quotations omitted).

126. A private entity violates the First Amendment "if the government coerces or induces it to take action the government itself would not be permitted to do, such as censor expression of a lawful viewpoint." *Knight First Amendment Institute*, 141 S. Ct. at 1226 (Thomas, J., concurring). "The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly." Id.

127. Threats of adverse regulatory or legislative action, to induce private actors to censor third parties' speech, violate the First Amendment. See *Hammerhead Enters. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983) ("Where comments of a government official can reasonably be

interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request, a valid claim can be stated."); see also *Bantam Books v. Sullivan*, 372 U.S. 58, 68 (1963) (holding that a veiled threat of prosecution to pressure a private bookseller to stop selling disfavored books could violate the First Amendment).

128. The unprecedented control over private speech exercised by social-media companies gives government officials an unprecedented opportunity to circumvent the First Amendment and achieve indirect censorship of private speech. "By virtue of its ownership of the essential pathway," a social media platform "can . . . silence the voice of competing speakers with a mere flick of the switch." *Turner*, 512 U.S. at 656; see also *Knight First Amendment Inst*., 141 S. Ct. at 1224 (Thomas, J., concurring). "The potential for abuse of this private power over a central avenue of communication cannot be overlooked." Turner, 512 U.S. at 656.

### B. The Dominance of Social Media As
### A Forum For Public Information And Discourse.

123. Social media has become, in many ways, "the modern public square." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017). Social media platforms provide "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." Id. 118. "Today's digital platforms provide avenues for historically unprecedented amounts of speech, including speech by government actors. Also unprecedented, however, is the concentrated control of so much speech in the hands of a few private parties." *Knight First Amendment Institute*, 141 S. Ct. at 1221. 119. The "concentration" of power in social media companies "gives some digital platforms enormous control over speech." Id. at 1224. Defendants have not hesitated to exploit this power.

123.1  For example, on information and belief, Facebook has close to 3 billion registered users worldwide and over 124 million users in the United States, including millions of Californians and millions of citizens of other States.

124. On information and belief, Twitter has more than 340 million users worldwide, including approximately 70 million users in the United States. Approximately 500 million tweets are posted on Twitter every day, and they are accessible to non-Twitter users on the internet. Moreover, Twitter users include large numbers of politicians, journalists, public figures, and others with a disproportionately large impact on public discourse in other forums, so Twitter's impact on public discourse is even larger than its numbers alone reflect.

125. On information and belief, YouTube has more than 4 billion hours of video views every month. Videos on YouTube channels are visible to both YouTube users and to the general public on the internet. An estimated 500 hours of video content are uploaded to YouTube every minute.

126. YouTube is extremely popular among politicians and public figures in reaching their audiences. On information and belief, in 2020, approximately 92 percent of U.S. Senators and 86 percent of U.S. Representatives uploaded content on YouTube.

127.  According to a recent Pew Research study, 66 percent of U.S. adults use Facebook, and 31 percent of U.S. adults say they get news regularly on Facebook. Walker et al., News Consumption Across Social Media in 2021, PEW RESEARCH CENTER (Sept. 20, 2021), at https://www.pewresearch.org/journalml202 1/09/20/news-consumption-across-social-media-in2021 /.

128. According to the same study, 72 percent of U.S. adults say that they use YouTube, and 22 percent of U.S. adults say that they regularly get news on YouTube. Id.

129. According to the same study, 23 percent of U.S. adults say that they use Twitter, and 13 percent of U.S. adults say they regularly get news on Twitter. Id. This comprises 55 percent of Twitter users. Id.

130. According to the same study, 41 percent of U.S. adults say that they use Instagram, and 11 percent of U.S. adults say they regularly get news on Instagram. Id. 128. The free flow of information and expression on social media directly affects nonusers of social media as well. Social-media users who are exposed to information, ideas, and expression through social media communicate the same information, ideas, and expression with non-social-media users. News, information, messages, narratives, and storylines that originate on social media are frequently replicated in other forums, such as television, print media, and private discourse. Further, much content posted on social-media is directly available to non-social-media users. For example, posts on Twitter are directly accessible on the internet to non-Twitter-users, and content on YouTube is available to the general public on the internet as well.

131.  In the aggregate, these numbers of Americans who (1) use social-media platforms, and (2) regularly use social-media platforms to obtain news and information about matters of public interest, comprise hundreds of millions of Americans, including millions of Caliofornians, and very substantial segments of the populations of every other State.

132. There are also many ways for social-media companies to censor or suppress speech on social-media platforms. Some of these methods are immediately known to the speaker and/or his or her audience, and some are not visible to them. Censorship, therefore, can occur without the knowledge of the speaker and/or his or her audience. These methods include, but are not limited to, terminating speakers' accounts, suspending accounts, imposing warnings or strikes against accounts to chill future disfavored speech, "shadow banning" speakers, demonetizing content, adjusting algorithms to suppress or de-emphasize speakers or messages, promoting or

demoting content, placing warning labels on content, suppressing content in other users' feeds, promoting negative comments on disfavored content, and requiring additional click-through(s) to access content, among many others. Many methods, moreover, have a chilling effect on social media speech, as the threat of censorship (such as suspension, demonetization, or banning) drives speakers to self-censor to avoid making statements that might be deemed to violate the social media companies' vague, ever-changing, often-hidden, and inconsistently enforced standards for censoring and suppressing speech. Collectively herein, all these methods of suppressing and/or censoring speech on social media are called "censorship" and/or "suppression" of social-media speech.

133. The censorship and suppression of free speech on social media functions in most cases as a prior restraint on speech, both through its direct effect and its chilling effects. A prior restraint is the most severe form of restriction on freedom of expression.

**C. Public And Private Attempts To Police "Misinformation" Or "Disinformation" On Social Media Have Proven Embarrassingly Inaccurate**.

134. Yesterday's "misinformation" often becomes today's viable theory and tomorrow's established fact. "Even where there is a wide scholarly consensus concerning a particular matter, the truth is served by allowing that consensus to be challenged without fear of reprisal. Today's accepted wisdom sometimes turns out to be mistaken." *Alvarez*, at 752 (Auto, J., dissenting) (emphasis added). This prediction has proven true, again and again, when it comes to suppressing "misinformation" and "disinformation" on social media.

**1. The Hunter Biden Laptop Story**

. 135. Perhaps most notoriously, social-media platforms aggressively censored an October 14, 2020 New York Post expose about the contents of the laptop of (then-Candidate Biden's son) Hunter Biden, which had been abandoned in a Delaware repair shop and contained compromising

photos and email communications about corrupt foreign business deals. As the New York Post reported at the time, "[b]oth Twitter and Facebook took extraordinary censorship measures against The Post on Wednesday over its exposes about Hunter Biden's emails ... The Post's primary Twitter account was locked as of 2:20 p.m. Wednesday because its articles about the messages obtained from Biden's laptop broke the social network's rules against `distribution of hacked material,' according to an email The Post received from Twitter," even though there were "zero claims that [Hunter Biden's] computer had been hacked." Twitter, Facebook censor Post over Hunter Biden expose, N.Y. POST (Oct. 14, 2020), at ttps://nypost.com/2020/10/14/facebook-twitter-block-the-post-from-posting/.

136.   "Twitter also blocked users from sharing the link to The Post article indicating that Hunter Biden introduced Joe Biden to the Ukrainian businessman, calling the link `potentially harmful." Id.

137. As the Wall Street Journal Editorial Board reported, "nearly all of the media at the time ignored the story or `fact-checked' it as false. This ... was all the more egregious given other evidence supporting the Post's scoop. Neither Hunter Biden nor the Biden campaign denied that the laptop was Hunter's. And Hunter's former business partner, Tony Bobulinski, went public with documents backing up some of the laptop's contents." Editorial Board, Hunter Biden 's Laptop Is Finally News Fit to Print, WALL ST. J. (March 18, 2022).

138. Biden, his allies, and those acting in concert with them falsely attacked the Hunter Biden laptop story as "disinformation." Id. Fifty "intelligence officials—headlined by former Obama spooks James Clapper and John Brennan—circulated a statement peddling the Russian `disinformation' line—even as they admitted they had no evidence. Th[e] result was a blackout of the Hunter news, except in a few places...." Id. Parroting the Biden campaign's false line, both

social media platforms and major news organizations treated the story as "disinformation" and aggressively censored it.

139. In early 2022—over a year and a half later—major news organizations finally admitted that the Hunter Biden laptop story was truthful and rested on reliable sourcing and information. Id. The Washington Post and the New York Times quietly acknowledged the truth and reliability of the story "17 months" later, in mid-March 2022. Id.

140. Free-speech advocate Glenn Reynolds aptly described this embarrassing episode as one that permanently damaged the credibility and reputation for fairness of social-media platforms and major media outlets: "Twitter and other tech giants banned The Post's reporting, since admitted to be accurate, on Hunter Biden's laptop and the damaging information it contained. Many social-media giants banned any links to the story, and Twitter even went so far as to stop its users from sharing the story one-on-one through direct messages. (CEO Jack Dorsey later admitted that was a `total mistake.') Their purpose was to affect the election's outcome in favor of the Democrats, and they probably did." Glenn H. Reynolds, `Censorship is free speech' is the establishment's Orwellian line on Elon Musk's Twitter crusade, N.Y. POST (Apr. 15, 2022), https://nypost.com/2022/04/ 14/the-establishments-orwellian-line-on-elon-musks-twittercrusade/.

**2. Speech About The Lab-Leak Theory Of COVID-19's Origins.**

141. Likewise, beginning in February 2020, social-media platforms censored speech advocating for the lab-leak theory of the origins of SARS-CoV-2, the virus that causes COVID19. The lab-leak theory postulates that the virus did not originate naturally in bats or other animals, but leaked from a biotech laboratory in Wuhan, China, operated by the Wuhan Institute of Virology.

142. On information and belief, Defendant Dr. Anthony Fauci, a senior federal government official, coordinating with others, orchestrated a campaign to discredit the lab-leak

hypothesis in early 2020. As director of NIAID, Dr. Fauci had funded risky "gain-of-function" research at the Wuhan Institute of Virology through intermediaries such as Eco Health Alliance, headed by Dr. Peter Daszak. Thus, if the lab-leak theory were established, Dr. Fauci and Dr. Daszak could be potentially implicated in funding the research on viruses that caused the COVID19 pandemic and killed millions of people worldwide.

143. During the same time frame as he was orchestrating a campaign to falsely discredit the lab-leak theory, Dr. Fauci was exchanging emails with Mark Zuckerberg, the CEO of Facebook, regarding public messaging and the dissemination of COVID-19 information on social media. On information and belief, Dr. Fauci coordinated directly with Facebook and/or other social-media firms to suppress disfavored speakers and content of speech on social media.

144. Not surprisingly, social-media platforms like Facebook promptly accepted Dr. Fauci's initiative to discredit the lab-leak theory, and they engaged in an aggressive campaign to censor speech advocating for the lab-leak theory on social media on the ground that it was supposedly disinformation. Facebook "expand[ed] its content moderation on Covid-19 to include `false' and `debunked' claims such as that `COVID-19 is man-made or manufactured." Editorial Board, Facebook's Lab-Leak About-Face, WALL ST. J. (May 27, 2021), https://www.wsj.com/articles/facebooks-lab-leak-about-face-11622154198. This included suppressing speech by highly credentialed and well-respected writers, such as "science journalist Nicholas Wade," id., and scientist Alina Chan. Other social-media platforms likewise censored speech advocating for the lab-leak hypothesis.

145. By 2021, however, "the circumstantial evidence" favoring the lab-leak theory "finally permeated the insular world of progressive public health," id., and Fauci and other Biden Administration officials were forced to admit the theory's inherent plausibility. After a long

period of censorship, in May 2021, Facebook and other platforms announced that they would no longer censor social-media speech advocating for the lab-leak theory.

146.  The Wall Street Journal noted the close link between government and social-media platforms in censoring this speech: "Facebook acted in lockstep with the government," indicating that "[w]hile a political or scientific claim is disfavored by government authorities, Facebook will limit its reach. When government reduces its hostility toward an idea, so will Facebook." Id. "Free speech protects the right to challenge government. But instead of acting as private actors with their own speech rights, the companies are mandating conformity with existing government views." Id.

147. There had long been credible—even compelling—evidence of the plausibility of the lab-leak theory, long before social-media companies stopped censoring it. See, e.g., House Foreign Affairs Committee Minority Staff Report, The Origins of COVID-19: An Investigation of the Wuhan Institute of Virology (Aug. 2021), https://gop-foreignaffairs.house.gov/wpcontent/uploads/2021/08/ORIGINS-OF-COVID-I9-REPORT.pdf (detailing evidence available long before censorship lifted); Nicholas Wade, The origin of COVID: Did people or nature open Pandora's box at Wuhan?, BULL. ATOMIC SCIENTISTS (May 5, 2021), https://thebulletin.org/2021 /05/the-origin-of-covid-did-people-or-nature-open-pandoras-box-atwuhan/; ALINA CHAN, VIRAL: THE SEARCH FOR THE ORIGIN OF COVID-19 (Sept. 3, 2021).

148. Facebook's decision to stop censoring the lab-leak theory did not come until "after almost every major media outlet, and ... even the British and American security services, finally confirmed that it is a feasible possibility." Freddie Sayers, How Facebook censored the lab leak theory, UNHERD (May 31, 2021), https://unherd.com/2021/05/how-facebook-censored-the-

lableak-theory/. Facebook admitted that its decision to end censorship was made "in consultation with" government officials, i.e., "public health experts." Id.

149. The reach of Facebook's censorship alone (to say nothing of other platforms that censored the lab-leak theory) was enormous. Facebook "displayed `warnings" on such supposed COVID-19-related misinformation, and claimed that "[w]hen people saw those warning labels, 95% of the time they did not go on to view the original content." Id. "Moreover, if an article is rated `false' by their `fact checkers', the network will `reduce its distribution'. This means that, while an author or poster is not aware that censorship is taking place, the network could be hiding their content so it is not widely disseminated." Id.

150. Ironically, while admitting that it had erroneously censored speech on the lab-leak theory for over a year, Facebook announced that it was "now extending its policy of `shadow-banning' accounts that promote misinformation. `Starting today, we will reduce the distribution of all posts in News Feed from an individual's Facebook account if they repeatedly share content that has been rated by one of our fact-checking partners.' So now, if you share something deemed to contain misinformation multiple times, your account could be silenced; you won't be informed, you won't know to what degree your content will be hidden and you won't know how long it will last—all thanks to group of `fact-checkers' whose authority cannot be questioned." Id. It is astonishing that "this announcement was made on the very same day as Facebook's admission of error" on the lab-leak theory. Id.

**3. Speech About The Efficacy Of Mask Mandates And COVID-19 Lockdowns.**

151. Social-media platforms also aggressively censored speech questioning the efficacy of masks and lockdowns as COVID-19 mitigation measures. Yet evidence revealed that concerns about the efficacy of these measures were well-founded

. 152. For example, on information and belief, Twitter's "COVID-19 misleading

information policy," as of December 2021, noted that Twitter will censor (label or remove)

speech claiming that "face masks ... do not work to reduce transmission or to protect against

COVID19," among many other restrictions. See Twitter, Covid-19 misleading information policy,

https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy. On information and

belief, both Twitter and other social-media platforms have imposed similar policies, imposing

censorship on speech questioning the efficacy of masks and the efficacy of lockdowns as

COVID19 mitigation measures.

153. On April 8, 2021, YouTube "deleted a video in which Florida Gov. Ron DeSantis

and a handful of medical experts," including Plaintiffs Bhattacharya and Kulldorff, "questioned

the effectiveness of having children wear masks to stop the spread of COVID-19." YouTube

Purges Ron DeSantis Video Over Claims Children Don't Need to Wear Masks, THE WRAP

(Apr. 8, 2021), https://www.thewrap.com/youtube-purges-florida-governor-video-over-

claimschildren-dont-need-to-wear-masks/.

154.  On August 10, 2021, "YouTube barred Sen. Rand Paul (R-Ky.) from uploading new

videos to the site for seven days, after the ophthalmologist posted a video last week arguing that

most masks `don't work' against the coronavirus." Rand Paul Suspended from YouTube Over

Covid Claims, FoRSES (Aug. 10, 2021),

https://www.forbes.com/sites/joewalsh/2021/08/10/randpaul-suspended-from-youtube-over-

covid-claims/?sh=31 fl d4e01971.

155. "When Scott Atlas, a member of the Trump White House's coronavirus task force,

questioned the efficacy of masks last year, Twitter removed his tweet. When eminent scientists

from Stanford and Harvard recently told Florida Gov. Ron DeSantis that children should not be

forced to wear masks, YouTube removed their video discussion from its platform." How

Facebook uses fact-checking' to suppress scientific truth, N.Y. PosT (May 18, 2021),

https://nypost.coml2021 /05/ 18/how-facebook-uses-fact-checking-to-suppress-scientific-truth/.

156. In the same vein, Facebook suppressed a scientist for citing a peer-reviewed study "by a team of researchers in Germany who established an online registry for thousands of parents to report on the impact of masks on their children. More than half of those who responded said that masks were giving their children headaches and making it difficult for them to concentrate. More than a third cited other problems, including malaise, impaired learning, drowsiness and fatigue." Id.

157. On November 21, 2020, "[t]wo leading Oxford University academics ... accused Facebook of `censorship' after it claimed an article they wrote on face masks amounted to `false information'." Two top Oxford academics accuse Facebook of censorship for branding their article on whether masks work false information', DAILY MAIL (Nov. 21, 2020) https://www.dailymail.co.uk/news/article-8973631 /Two-Oxford-academics-accuse-Facebookcensorship-article-warning.html.

158. No convincing evidence supported the efficacy of mask mandates, while compelling evidence contradicted it, both before and after their implementation. Tracking the aggregate case numbers in States with and without mask mandates over the course of the COVID19 pandemic, in a "natural experiment," demonstrates that mask mandates made "zero difference." John Tierney, The Failed COVID Policy of Mask Mandates, CITY J. (April 19, 2022), https://www.city journal.org/the-failed-covid-policy-of-mask-mandates. Both case rates and mortality rates were "virtually identical." Id. Indeed, "mask mandates were implemented without scientific justification," and "they failed around the world." Id. "In their pre-Covid planning strategies for a pandemic, neither the Centers for Disease Control nor the World Health Organization had recommended masking the public—for good reason. Randomized clinical trials involving flu

viruses had shown, contrary to popular wisdom in Japan and other Asian countries, that there was `no evidence that face masks are effective in reducing transmission,' as the WHO summarized the scientific literature." Id. "Anthony Fauci acknowledged this evidence early in the pandemic, both in his public comments (`There's no reason to be walking around with masks,' he told 60 Minutes) and in his private emails (`I do not recommend you wear a mask,' he told a colleague, explaining that masks were too porous to block the small Covid virus)." Id. "Instead of carefully analyzing the effects of masks, the CDC repeatedly tried to justify them by misrepresenting short-term trends and hyping badly flawed research, like studies in Arizona and Kansas purporting to show that infections had been dramatically reduced by the mask mandates imposed in some counties. But in each state, ... infection rates remained lower in the counties that did not mandate masks." Id.; see also, e.g., IAN MILLER, UNMASKED: THE GLOBAL FAILURE OF COVID MASK MANDATES (Jan. 20, 2022).

159. Ironically, Plaintiff Kulldorff was suspended on Twitter for several weeks for posting that masks endow vulnerable individuals with a false sense of security, because they actually do not work well to protect against viral infection. This exemplifies the danger of government involvement in social media censorship: preventing a world-renowned epidemiologist from conveying to the public that vulnerable people should not rely on masks for protection could indirectly cause great harm.

160. Likewise, no convincing evidence supported the efficacy of lockdowns. Quite the contrary. In January 2022, a Johns Hopkins meta-analysis reviewed the efficacy of lockdowns as a COVID-19 mitigation measure and found that they had minimal impact, if any, on COVID-19 mortality rates. The study reached "the conclusion that lockdowns have had little to no effect on COVID-19 mortality... [L]ockdowns in Europe and the United States only reduced COVID-19 mortality by 0.2% on average.... While this meta-analysis concludes that lockdowns have had

little to no public health effects, they have imposed enormous economic and social costs where they have been adopted. In consequence, lockdown policies are ill-founded and should be rejected as a pandemic policy instrument." Herby et al., A Literature Review and Meta-Analysis of the Effects of Lockdowns on COVID-19 Mortality, STUDIES IN APPLIED ECONOMICS (Jan. 2022), available at https://sites.krieger.jhu.edu/iae/files/2022/01 /A-Literature-Review-and-MetaAnalysis-of-the-Effects-of-Lockdowns-on-COVID-19-Mortality.pdf.

161. On December 21, 2021, Dr. Leana Wen, a CNN medical commentator and strong advocate for COVID-19 restrictions, tweeted that "cloth masks are little more than facial decorations." CNN's Leana Wen: `Cloth Masks Are Little More Than Facial Decorations', REASON, at https://reason.com/2021/1 2/21 /lean-wen-cloth-mask-facial-decorations-covid-cdcguidance/. Twitter did not censor this tweet, even though it undermined the efficacy of mask mandates that permitted the use of cloth masks (i.e., virtually all of them)—undoubtedly because it was advocating for more aggressive mitigation measures (i.e., higher-quality masks than cloth masks), not less.

162. "On September 26, 2021, CDC Director Walensky cited an Arizona study to claim that schools without mask mandates were 3.5 times more likely to experience COVID-19 outbreaks. However, the study is so flawed that experts have said it `should not have entered into the public discourse' and that you `can't learn anything' about mask rules from the study." March 11, 2022 Letter of U.S. Rep. Cathy McMorris Rodgers, et al., to Surgeon General Murthy, at https://republicans-energycommerce.house.gov/wp-content/uploads/2022/03/3.11.22-Letter-toSurgeon-General-Murthy-Final.pdf. Yet Director Walensky's statement circulated widely on social media without being censored.

**4. Speech About Election Integrity And The Security Of Voting By Mail.**

163. In or around 2020, social-media platforms began aggressively censoring speech that raised concerns about the security of voting by mail, a major election-security issue. Notoriously, social-media platforms aggressively censored core political speech by then-President Trump and the Trump campaign raising concerns about the security of voting by mail in the runup to the November 2020 presidential election.

164. This censorship is ironic because, for many years before 2020, it was a common left-wing talking point to claim that fraud occurred in voting by mail. In opposing photo-ID requirements for in-person voting, Democrats and their allies frequently claimed that photo IDs for in-person voting were pointless because voting by mail, not in-person voting, presented the real opportunities for fraud.

165. These Democratic claims of fraud in voting by mail were widely parroted in mainstream media for many years. For example, in 2012, the New York Times wrote that "votes cast by mail are less likely to be counted, more likely to be compromised and more likely to be contested than those cast in a voting booth, statistics show," in an article headlined "Error and Fraud at Issue as Absentee Voting Rises." https://www.nytimes.com/20I2/10/07/us/politics/asmore-vote-by-mail-faulty-ballots-could-impact-elections.html. In 2012, The Washington Post published an articles stating that "[i]t may still be possible to steal an American election, if you know the right way to go about it," citing a case in which "[c]onspirators allegedly bought off absentee voters" and "faked absentee ballots." https://www.washingtonpost.com/politics/decision2012/selling-votes-is-common-type-ofelection-fraud/2012/10/01/f8f5045a-071d-11e2-81ba-ffe35a7b6542 story.html. In 2014, MSNBC claimed: "Indeed, election experts say absentee ballot fraud is the most common form of organized voter fraud, since, because of the secret ballot, there's no way to ensure that an in-person voter is voting

for the candidate he promised to." https://www.msnbc.com/msnbc/greg-abbottbogus-voter-fraud-crusade-msna291356. In 2016, Slate claimed, in a piece titled, "Voter Fraud Exists. Republican Restrictions Won't Stop It," that "[t]he vast majority of voter fraud prosecutions touted by conservative groups like the Heritage Foundation involve absentee ballots that were illegally cast. And the only voting fraud schemes with the potential to actually swing elections involved mail-in ballots." https://slate.com/news-and-politics/2016/09/voter-fraudexists-through-absentee-ballots-but-republicans-wont-stop-it.html.

166. Many other authorities confirm the reasonableness of concerns about security of voting by mail. For example, in *Crawford v. Marion County Election Board*, the U.S. Supreme Court held that fraudulent voting "perpetrated using absentee ballots" demonstrates "that not only is the risk of voter fraud real but that it could affect the outcome of a close election." *Crawford v. Marion County Election Bd*., 553 U.S. 181, 195-96 (2008) (opinion of Stevens, J.) (emphasis added). 164. The bipartisan Carter-Baker Commission on Federal Election Reform—co-chaired by former President Jimmy Carter and former Secretary of State James A. Baker—determined that "[a]bsentee ballots remain the largest source of potential voter fraud." BUILDING CONFIDENCE IN U.S. ELECTIONS: REPORT OF THE COMMISSION ON FEDERAL ELECTION REFORM, at 46 (Sept. 2005), at https://www.legislationline.org/download/id/1472/file/3b50795b2d0374cbef5c29766256.pdf. According to the Carter-Baker Commission, "[a]bsentee balloting is vulnerable to abuse in several ways." Id. "Blank ballots mailed to the wrong address or to large residential buildings might be intercepted." Id. "Citizens who vote at home, at nursing homes, at the workplace, or in church are more susceptible to pressure, overt and subtle, or to intimidation." Id. "Vote buying schemes are far more difficult to detect when citizens vote by mail." Id. Thus, the Commission noted that "absentee balloting in other states has been a major source of fraud." Id. at 35. It

emphasized that voting by mail "increases the risk of fraud." Id. And the Commission

recommended that "States ... need to do more to prevent ... absentee ballot fraud." Id. at 165. The

U.S. Department of Justice's 2017 Manual on Federal Prosecution of Election Offenses, published

by its Public Integrity Section, states: "Absentee ballots are particularly susceptible to fraudulent

abuse because, by definition, they are marked and cast outside the presence of election officials

and the structured environment of a polling place." U.S. Dept of Justice, Federal Prosecution of

Election Offenses 28 (8th ed. Dec. 2017), at

https://www.justice.gov/criminal/file/1029066/download. This Manual reports that "the more

common ways" that election-fraud "crimes are committed include ... [o]btaining and marking

absentee ballots without the active input of the voters involved." Id. at 28. And the Manual notes

that "[a]bsentee ballot frauds" committed both with and without the voter's participation are

"common" forms of election fraud. Id. at 29.

167. Thus, social-media censorship that has occurred since 2020 to suppress speech

raising concerns about the security of voting by mail would, if applied even-handedly, suppress

statements about the risks of fraud in mail-in voting by the United States Supreme Court, the

Carter-Baker Commission co-chaired by President Jimmy Carter, and the U.S. Department of

Justice's prosecution manual for election-integrity crimes. One would not be able to quote Justice

Stevens' opinion for the Supreme Court in *Crawford* on social media if it followed its own rules.

Raising concerns about election integrity, and questioning the security of voting by mail, became

unspeakable on social media only after it became expedient for the Democratic Party and the

political Left to suppress these ideas, viewpoints, and concerns.

167.1 This censorship of speech, speakers, and viewpoints on such topics and concerns

continues to this day, at Defendants' instigation, as alleged further herein.

168. There is a common theme to all these examples of wrong-headed censorship: Each involved censoring truthful or reliable information that contradicted left-wing political narratives. What led to the censorship was not the fact that the speech was supposedly false, but that the message was politically inconvenient for Democratic officials and government-preferred narratives. As a result, the ability of politicians and social-media platforms to reliably identify actual "misinformation" and "disinformation" has been proven false, again and again.

**D. Defendants, Using Their Official Authority, Have Threatened, Cajoled, And Colluded With Social-Media Companies To Silence Disfavored Speakers And Viewpoints.**

169. On information and belief, the named private-party Defendants and those acting in concert with them – including the federal government, Biden Administration and mainstream media - have conspired and colluded to suppress Americans' First Amendment and analogous state-law rights to freedom of expression on social-media platforms, and to be exposed to free expression on such platforms, and they have taken many overt actions to achieve this goal.

**1. Section 230 Of The CDA Subsidized, Protected, And Fostered The Creation Of Speech Censorship Policies In A Small, Concentrated Group Of Social-Media Firms.**

170. First, the Defendants did not act in a vacuum. For decades, the federal government has artificially encouraged, protected, fostered, and subsidized the aggregation of control over speech, including the specific power of censorship, by a small group of powerful social-media firms, in particular, the Platform Defendants.

171. In particular, Section 230 of the Communications Decency Act (CDA) artificially empowered and subsidized the growth of social-media companies and their censorship policies by effectively immunizing much censorship on social media from liability. Section 230's unique liability shield fostered the aggregation of power in the field into a concentrated cluster of powerful social-media firms, and it directly fostered, protected, and encouraged the development

of speech censorship policies. This process was greatly accelerated and enhanced by the social-media platforms' success in convincing courts to adopt ever-broadening interpretations of Section 230 immunity, which stray beyond the statutes' text

172. "Historically, at least two legal doctrines limited a company's right to exclude." *Knight First Amendment Institute*, 141 S. Ct. at 1222 (Thomas, J., concurring). "First, our legal system and its British predecessor have long subjected certain businesses, known as common carriers, to special regulations, including a general requirement to serve all comers." Id. "Second, governments have limited a company's right to exclude when that company is a public accommodation. This concept—related to common-carrier law—applies to companies that hold themselves out to the public but do not `carry' freight, passengers, or communications." Id. Absent the artificial immunity created by the overly expansive interpretations of Section 230 immunity, these legal doctrines, and free-market forces, would impose a powerful check on content- and viewpoint-based censorship by social-media platforms. See id.

173. The CDA was enacted in 1996 for the purpose of promoting the growth of internet commerce and protecting against the transmission of obscene materials to children over the internet. It was intended to "offer a forum for a true diversity of political discourse," 47 U.S.C. § 230(a)(3), but in recent years Defendants have exploited it to produce the opposite effect.

174. Section 230 of the CDA, 47 U.S.C. § 230, provides unique liability protections for internet publishers of information, such as social-media companies, which are not available to other publishers, such as those of printed media. Section 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). In other words, social-media firms are generally protected from liability for what their users post.

175. Section 230(c)(2), however, also provides that: "No provider or user of an interactive computer service shall be held liable on account of (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." 47 U.S.C. § 230(c)(2)(A) (emphasis added). Courts have interpreted Section 230 broadly—beyond its plain textual import—to shield social-media platforms from liability for censoring anything they deem "objectionable," even if it is constitutionally protected speech.

176. This reading is unreasonable and exceeds what Congress authorized. Viewpoint and content-based discrimination—now widely practiced by social-media platforms—are the antithesis of "good faith." Id. Moreover, Congress intended the "otherwise objectionable" material in § 230(c)(2)(A) to refer only to content similar to "obscene, lewd, lascivious, filthy, excessively violent, [and] harassing" content referred to in the same list. Id. But social-media companies have interpreted this liability shield unreasonably broadly, and have convinced courts to adopt overbroad interpretations of Section 230 immunity. See, e.g., *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 15 (2020) (statement of Thomas, J., respecting the denial of certiorari) ("[C]ourts have extended the immunity in § 230 far beyond anything that plausibly could have been intended by Congress."); id. at 15-18 (discussing and criticizing the overbroad reading of § 230 liability that has shielded social-media firms).

177. These platforms, therefore, have the best of both worlds: They claim that they are exempt from liability if they leave even atrocious content posted, but they are also exempt from liability if they censor anything they deem "objectionable, whether or not such material is constitutionally protected." 47 U.S.C. § 230(c)(2)(A).

178. Further, Section 230 of the CDA purportedly shields such platforms from liability for colluding with other social-media platforms on how to censor speech: "No provider or user of an interactive computer service shall be held liable on account of... (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1)." 47 U.S.C. § 230(c)(2)(B). On information and belief, social-media platforms do, in fact, extensively coordinate with one another in censoring socialmedia speech.

179. Section 230 also purports to preempt any state law to the contrary: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3).

180. On information and belief, the immunity provided by Section 230 of the CDA directly contributed to the rise of a small number of extremely powerful social-media platforms, who have now turned into a "censorship cartel." The liability shield provided by the federal government artificially subsidized, fostered, and encouraged the viewpoint and content-based censorship policies that those platforms have adopted at Defendants' urging.

181. On information and belief, social-media firms greatly value the immunity provided by § 230 of the CDA, which continues to provide them with artificial liability protections, and credible threats to amend or repeal that immunity are powerful motivators to those platforms. Defendants are aware of this.

182. On information and belief, the largest and most powerful social-media firms are also greatly concerned about antitrust liability and enforcement, given their dominance in the social-media market(s), and credible threats to impose antitrust liability and/or enforcement are powerful motivators to those platforms as well. Defendants are aware of this too.

**2. The Campaign Of Threats Against Social-Media**

**Companies To Demand Censorship.**

183. Defendant Biden, his political allies, and those acting in concert with him have a long history of threatening to use official government authority to impose adverse legal consequences against social-media companies if such companies do not increase censorship of speakers and messages disfavored by Biden and his political allies. Common threats of adverse legal and/or regulatory consequences include the threat of antitrust enforcement or legislation, and the threat of amending or repealing the liability protections of Section 230 of the Communications Decency Act (CDA), among others, if social-media companies fail to engage in more aggressive censorship of viewpoints, content, and speakers disfavored by Defendants. These threats are effective because they address legal matters of critical concern to dominant social-media firms.

184. The Biden Administration and its executive agencies have leveraged these threats to secure such increased censorship of speakers, content, and viewpoints that they disfavor on social-media platforms [and the Biden CDC and DOJ have extracted the same commitment from the teachers unions and NSBA]; and they have now moved into a phase of open collusion with the threatened companies, cooperating with them directly to censor speech, speakers, and viewpoints that Defendants and the Biden Administration (and Democratic and Left-leaning mainstream media) disfavor.

185. Threats from Biden, senior government officials in the Biden administration, and those acting in concert with them come in the context of a history of such threats from senior federal officials politically allied with them. These threats have routinely linked (1) the prospect of official government action in the form of adverse legislation, regulation, or agency action—especially threats of antitrust legislation and/or enforcement and calls to amend or repeal Section 230 of the CDA, among others—with (2) calls for more aggressive censorship and suppression of

speakers, viewpoints, and messages that these officials disfavor. Recent examples include, but are by no means limited to, the following:

• Speaker Nancy Pelosi, April 12, 2019: "I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it. And it is not out of the question that that could be removed." Nancy Pelosi warns tech companies that Section 230 is `in jeopardy', TECH CRUCH (April 12, 2019), at https://techcrunch.com/2019/04/12/nancy-pelosi-section-230/ ("When asked about Section 230, Pelosi referred to the law as a `gift' to tech companies that have leaned heavily on the law to grow their business.... `It is a gift to them and I don't think that they are treating it with the respect that they should, and so I think that that could be a question mark and in jeopardy... I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it. And it is not out of the question that that could be removed.").

• Senator Mark Warner, Oct. 28, 2020: "It saddens me that some of my colleagues have joined in the Trump Administration's cynical and concerted effort to bully platforms into allowing dark money groups, right-wing militias and even the President himself to continue to exploit social media platforms to sow disinformation, engage in targeted harassment, and suppress voter participation. We can and should have a conversation about Section 230—and the ways in which it has enabled platforms to turn a blind eye as their platforms are used to facilitate discrimination and civil rights violations, enable domestic terrorist groups to organize violence in plain sight, assist in stalking and networked harassment campaigns, and enable online frauds targeted at vulnerable users...." Statement of U.S. Sen. Mark R. Warner on Section 230 Hearing (Oct. 28, 2020), at https:!/www.warner.senate.gov/public/index.cfml2o2o/l 0/statement-of-sen-mark-rwarner-on-facebook-s-decision-to-finally-ban-qanon-from-its-platforms.

• Then-Senator Kamala Harris, Sept. 30, 2019: "Look, let's be honest, Donald Trump's Twitter account should be suspended." Kamala Harris says Trump's Twitter account should be

suspended, CNN.com (Sept. 30, 2019), at https://www.cnn.com/2019/09/30/politics/kamala-harris-trump-twitter-cnntv/index.html; see also https://twitter.com/kamalaharris/status/1179810620952207362. Then-Senator Kamala Harris, Oct. 2, 2019: "Hey @jack [i.e., Twitter CEO Jack Dorsey]. Time to do something about this," providing picture of a tweet from President Trump. https://twitter.com/kamalaharris/status/ 1179193225325826050.

• Senator Richard Blumenthal, Nov. 17, 2020: "I have urged, in fact, a breakup of tech giants. Because they've misused their bigness and power. ... And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad and victims of their harms deserve a day in court." Breaking the News: Censorship, Suppression, and the 2020 Election Before the S. Comm. on Judiciary, 116th Cong. at 36:10-15 (2020) (statement of Sen. Richard Blumenthal).

• Senator Mazie Hirono, Feb. 5, 2021: "Sec 230 was supposed to incentivize internet platforms to police harmful content by users. Instead, the law acts as a shield allowing them to turn a blind eye. The SAFE TECH ACT brings 230 into the modern age and makes platforms accountable for the harm they cause." https://twitter.com/maziehirono/status/ 1357790558606024705?lang=bg. • March 2021 Joint Hearing of the Communications and Technology Subcommittee, Joint Statement of Democratic Committee Chairs: "This hearing will continue the Committee's work of holding online platforms accountable for the growing rise of misinformation and disinformation. ... For far too long, big tech has failed to acknowledge the role they've played in fomenting and elevating blatantly false information to its online audiences. Industry self-regulation has failed. We must begin the work of changing incentives driving social media companies to allow and even promote misinformation and disinformation." See Yael Eisenstat & Justin Hendrix, A Dozen Experts with Questions Congress Should Ask the Tech CEOs—On Disinformation and Extremism, JUST SECURITY (Mar. 25, 2021),

https://www.justsecurity.org/75439/questions-congress-should-ask-the-tech-ceos-ondisinformation-and-extremism/.

• On April 20, 2022, twenty-two Democratic members of Congress sent a letter to Mark Zuckerberg of Facebook (n/k/a "Meta Platforms, Inc."), demanding that Facebook increase censorship of "Spanish-language disinformation across its platforms." The letter claimed that "disinformation" was a threat to democracy, and it made explicit threats of adverse legislative action if Facebook/Meta did not increase censorship: "The spread of these narratives demonstrate that Meta does not see the problem of Spanish-language disinformation in the United States as a critical priority for the health of our democracy. The lack of Meta's action to swiftly address Spanish-language misinformation globally demonstrates the need for Congress to act to ensure Spanish-speaking communities have fair access to trustworthy information." The letter demanded information about Facebook's censorship policies on election-related speech for the upcoming elections: "How is Meta preparing to proactively detect and address foreign disinformation operations targeted at Spanish-speaking communities for future elections within the United States, including the 2022 primaries and general election? ... [W]hat new steps has Meta taken to ensure the effectiveness of its algorithmic content detection policies to address disinformation and hatespeech across different languages?" April 20, 2022 Letter of Rep. Tony Cardenas, et al., at https://cardenas.house.gov/imo/media/doc/Meta%20RT%20and%20Spanish%20Language%20Disinformation%20Congressional%20Letter%20Final.pdf.

186. Comments from two House Members summarize this campaign of pressure and threats: "In April 2019, Louisiana Rep. Cedric Richmond warned Facebook and Google that they had `better' restrict what he and his colleagues saw as harmful content or face regulation: `We're going to make it swift, we're going to make it strong, and we're going to hold them very accountable.' New York Rep. Jerrold Nadler added: `Let's see what happens by just pressuring

them." Vivek Ramaswamy and Jed Rubenfeld, Editorial, Save the Constitution from Big Tech: Congressional threats and inducements make Twitter and Facebook censorship a free-speech violation, WALL ST. J. (Jan. 11, 2021), https://www.wsj.coni/articles/save-the-constitution-frombig-tech-11610387 105. 187. Defendants' political allies have repeatedly used congressional hearings as forums to advance these threats of adverse legislation if social-media platforms do not increase censorship of speakers, speech, content, and viewpoints they disfavor. They have repeatedly used such hearings to berate social-media firm leaders, such as Mark Zuckerberg of Facebook, Jack Dorsey of Twitter, and Sundar Pichai of Google and YouTube, and to make threats of adverse legal consequences if censorship is not increased. Such hearings include, but are not limited to, those cited above, as well as an antitrust hearing before the House Judiciary Committee on July 29, 2020; a Senate Judiciary Committee hearing on November 17, 2020; and a House Energy and Commerce Hearing on March 25, 2021. 188. The flip side of such threats, of course, is the implied "carrot" of retaining Section 230 immunity and avoiding antitrust scrutiny, allowing the major social-media platforms to retain their legally privileged status that is worth billions of dollars of market share. 189. Starting in or around 2020, if not before, social-media firms have responded to these threats by engaging in increasingly more aggressive censorship of speakers, messages, and viewpoints disfavored by Defendants, senior government officials, and the political left. "With all the attention paid to online misinformation, it's easy to forget that the big [social-media] platforms generally refused to remove false content purely because it was false until 2020." Gilead Edelman, Beware the Never-Ending Disinformation Emergency, THE WIRED (March 11, 2022), at https://www.wired.com/story/youtube-rigged-election-donald-trump-moderationmisinformation/.

186.1  On information and belief, it was in response to such threats of adverse legal consequences that social-media companies ramped up censorship in 2020, disproportionately

targeting speakers and viewpoints on the political right. On information and belief, the examples of censorship of truthful and reliable speech in 2020, cited above, were motivated in whole or in part by such threats.

187. Then-candidate and now-President Biden has led this charge. He has tripled down on these threats of adverse official action from his colleagues and allies in senior federal government positions. His threats of adverse government action have been among the most vociferous, and among the most clearly linked to calls for more aggressive censorship of disfavored speakers and speech by social-media companies.

188. For example, on January 17, 2020, then-candidate Biden stated, in an interview with the New York Times editorial board, that Section 230 of the CDA should be "revoked" because social-media companies like Facebook did not do enough to censor supposedly false information in the form of political ads criticizing him—i.e., core political speech. He stated: "The idea that it's a tech company is that Section 230 should be revoked, immediately should be revoked, number one. For Zuckerberg and other platforms." He also stated, "It should be revoked because it is not merely an internet company. It is propagating falsehoods they know to be false.... There is no editorial impact at all on Facebook. None. None whatsoever. It's irresponsible. It's totally irresponsible." N.Y. Times Editorial Board, Joe Biden (Jan. 17, 2020), at https://www. nytimes. com/interactive/2020/01 / 17/opinion/j oe-biden-nytimes-interview. html. These claims were specifically linked to Facebook's alleged failure to censor core political speech—i.e., political ads on Facebook criticizing candidate Biden. Id.

189. Candidate Biden also threatened that Facebook CEO Mark Zuckerberg should be subject to civil liability and even criminal prosecution for not censoring such core political speech: "He should be submitted to civil liability and his company to civil liability.... Whether he engaged in something and amounted to collusion that in fact caused harm that would in fact be

equal to a criminal offense, that's a different issue. That's possible. That's possible it could happen." Id. In other words, Biden's message—not long before he became President of the United States—was that if Facebook did not censor political ads against him, Zuckerberg should go to prison. These two threats echoed the same threats made by numerous political allies of the President since 2019, cited above.

190. During the presidential campaign, now-Vice President Harris made similar threats against social-media firms to pressure them to engage in more aggressive censorship of speakers, content, and viewpoints she disfavors. For example, in addition to the statements cited above, she stated in 2019: "We will hold social media platforms responsible for the hate infiltrating their platforms, because they have a responsibility to help fight against this threat to our democracy. And if you profit off of hate—if you act as a megaphone for misinformation or cyberwarfare, if you don't police your platforms—we are going to hold you accountable as a community." Kamala Harris Wants to Be Your Online Censor-in-Chief, REASON.COM (May 7, 2019), at https://reason.com/2019/05/07/kamala-harris-promises-to-pursue-online-censorship-aspresident/.

191. In or around June 2020, the Biden campaign published an open letter and online petition (ironically, on Facebook) calling for Facebook to engage in more aggressive censorship of core political speech and viewpoints that then-Candidate Biden disfavored. The open letter complained that Facebook "continues to allow Donald Trump to say anything — and to pay to ensure that his wild claims reach millions of voters. Super PACs and other dark money groups are following his example. Trump and his allies have used Facebook to spread fear and misleading information about voting.... We call for Facebook to proactively stem the tide of false information by no longer amplifying untrustworthy content and promptly fact-checking election-related material that goes viral. We call for Facebook to stop allowing politicians to hide behind paid misinformation in the hope that the truth will catch up only after Election Day. There should be a

two-week pre-election period during which all political advertisements must be fact-checked before they are permitted to run on Facebook. ... Anything less will render Facebook a tool of misinformation that corrodes our democracy." Biden-Harris, Our Open Letter to Facebook (last visited May 5, 2022), https://joebiden.com/2961-2/.

192. The online petition demanded that Facebook "[p]romote real news, not fake news," "[q]uickly remove viral misinformation," and "[e]nforce voter suppression rules against everyone—even the President [Trump]." The petition complained that Facebook "continues to amplify misinformation and lets candidates pay to target and confuse voters with lies." It demanded that Facebook "promote authoritative and trustworthy sources of election information, rather than rants of bad actors and conspiracy theorists," "promptly remove false, viral information," and "prevent political candidates and PACs from using paid advertising to spread lies and misinformation — especially within two weeks of election day." Biden-Harris, #Movefastfixit (last visited May 5, 2022), https://joebiden.com/facebook/.

193. On September 28, 2020, the Biden-Harris campaign sent a letter to Facebook accusing it of propagating a "storm of disinformation" by failing to censor the Trump campaign's political speech, including social-media political ads. Sept. 28, 2020 Biden-Harris Letter, at https://www.documentcloud.org/documents/7219497-Facebook-Letter-9-28.html. The letter accused Facebook of allowing "hyper-partisan" and "fantastical" speech to reach millions of people, and it demanded "more aggressive" censorship of Trump. Id.

194. A federal lawsuit filed in 2021 alleged that "before and after the November, 2020 election," California government officials "contracted with partisan Biden campaign operatives to police speech online. The secretary of state of California then sent these flagged tweets to Twitter, Instagram, YouTube and other platforms for their removal." Hammeet Dhillon: Biden White House flags' Big Tech — here's why digital policing is so dangerous, Fox NEWS (July 16, 2021),

at https://www.foxnews.com/opinion/biden-white-house-flags-big-tech-digital-policing-harmeetdhillon. Once in power, Biden and those acting in concert with him would continue this same course of conduct of "flagging" content for censorship by private social-media firms, now using the authority of the federal government to "flag" specific speech and speakers for censorship and suppression.

195.  On December 2, 2020—during the presidential transition—Biden's former chief of staff and top technical advisor, Bruce Reed, publicly stated that "it's long past time to hold the social media companies accountable for what's published on their platforms." Biden Tech Advisor: Hold Social Media Companies Accountable for What Their Users Post, CNBC.com (Dec. 2, 2020), at https://www.cnbc.com/2020/12/02/biden-advisor-bruce-reed-hints-that-section-230- needs-reform.html. This comment specifically referred to the amendment or repeal of Section 230 of the Communications Decency Act. See id. Thus, the threat of adverse legal consequences for social-media companies that did not censor opposing political viewpoints was at the forefront of the incoming Biden Administration's public messaging.

196. Coming into the new Administration, with now-President Biden's political allies in control of both Houses of Congress, social-media companies were on clear notice that the federal government's involvement in social-media censorship was likely to escalate, and their threats of adverse legislation, regulation, and legal action became more ominous. On information and belief, this caused a chilling effect on speech by prompting social-media companies to ramp up their own censorship programs against disfavored speech and speakers, to preempt the risk of adverse action against them by the Government.

197.  Once in control of the Executive Branch, Defendants promptly capitalized on these threats by pressuring, cajoling, and openly colluding with social-media companies to actively suppress particular disfavored speakers and viewpoints on social media.

198. Defendants, those acting in concert with them, and those allied with them routinely seek to justify overt censorship of disfavored speakers and viewpoints by wrapping it in the monikers "misinformation," "disinformation," and/or "malinformation." Their standard tactic is to label speech that contradicts their preferred political narratives "misinformation," "disinformation," and "malinformation" to justify suppressing it. Other common buzzwords include calls for a "healthy information ecosystem," "healthy information environment," or "healthy news environment," among others. This is the Orwellian vocabulary of censorship. It is deployed aggressively to undermine fundamental First Amendment rights.

199.  As noted above, these labels have proven extremely unreliable. Defendants' and the political Left's ability to accurately identify "misinformation" and "disinformation" is unreliable because they apply such labels, not based on actual truth or falsity, but based on their current preferred political narrative. This has resulted, again and again, in the suppression of truthful information under the name of "disinformation" and "misinformation."

### 3. White House And HHS Officials Collude With

### Social-Media Firms To Suppress Speech

200. Before the Biden Administration took office, on information and belief, coordination and collusion between senior HHS officials and social-media companies to censor viewpoints and speakers was already underway. Once in office, senior officials in the Biden Administration—in the White House, in HHS, and elsewhere—capitalized and greatly expanded on these efforts.

201. On information and belief, beginning on or around January or February 2020, if not before, Defendant Dr. Anthony Fauci, a senior federal government official, coordinated with social-media firms to police and suppress speech regarding COVID-19 on social media.

202. Prior to 2020, as head of NIAID, Dr. Fauci had overseen funding of risky gain-of-function research on viruses, including research at the Wuhan Institute of Virology. This included

research funded through intermediaries such as Dr. Peter Daszak and the EcoHealth Alliance, among others.

203. In late January and early February 2020, Dr. Fauci received information from colleagues that suggested that the COVID-19 virus may have originated in a laboratory in Wuhan, China. This revelation threatened to implicate Dr. Fauci in the virus's origins, as he had funded the risky research that, under this theory, led to the virus's origin. Soon thereafter, Dr. Fauci participated in a conference call with scientists and science-funding authorities intended to discredit and suppress this lab-leak theory. After the conference call, influential individuals signed public statements that were placed in science journals in attempt to discredit the lab-leak theory.

204. In the same time frame, Dr. Fauci communicated with Facebook CEO Mark Zuckerberg directly regarding public messaging and the flow of information on social media about the government's COVID-19 response. For example, in a series of emails produced in response to FOIA requests dated from March 15 to 17, 2020, Zuckerberg invited Fauci to make public statements to be posted for viewing by all Facebook users regarding COVID-19, and also made another proposal that is redacted in FOIA-produced versions but was treated as a high priority by Fauci and NIH staff.

205. In an email on March 15, 2020, Zuckerberg proposed coordinating with Fauci on COVID-19 messaging to "make sure people can get authoritative information from reliable sources," and suggested including a video message from Fauci because "people trust and want to hear from experts." Zuckerberg proposed including this content in a "hub" that "we're going to put at the top of Facebook" to reach "200+ million Americans, 2.5 billion people worldwide."

206. In the same email, Zuckerberg made a three-line proposal to Fauci that was redacted

by the federal government before the email was produced in a FOIA request. 210. The next day, NIH's communications director emailed Fauci and strongly recommended that he do the videos for Facebook. Regarding the redacted proposal from Zuckerberg, she stated: "But an even bigger deal is his offer [REDACTED]. The sooner we get that offer up the food-chain the better." She also stated that her staff was "standing by to discuss this with HHS and WH comms," and requested authority to "determine who the best point of contact would be so the Administration can take advantage of this officer, soonest." Fauci responded that "I will write or call Mark and tell him that I am interested in doing this. I will then tell him that you will get for him the name of the USG [on information and belief, shorthand for "U.S. Government"] point of contact."

207.  Fauci responded by email to Zuckerberg on March 17, 2020, agreeing to the collaboration that Zuckerberg proposed and describing his redacted proposal as "very exciting."

208. As alleged above, around the same time frame as the Zuckerberg-Fauci emails, Facebook and other social-media companies censored and suppressed speakers and speech advocating for the lab-leak theory of COVID-19's origins, despite the overwhelming circumstantial evidence favoring that theory. This censorship directly implemented the plan, orchestrated by Fauci and others in early 2020, to discredit and suppress the lab-leak theory.

209. In the same timeframe, Facebook and other social-media companies began an ever increasing campaign of monitoring, censorship, and suppression of speech and speakers about COVID-19 and issues related to COVID-19. This campaign would dramatically escalate with the advent of the Biden Administration.

210. On information and belief, those firms coordinated directly with Fauci, CDC, and other government officials regarding censorship and suppression of disfavored speech and speakers.

211. For example, Facebook's "COVID and Vaccine Policy" states that Facebook "does not allow false claims about the vaccines or vaccination programs which public health experts have advised us could lead to COVID-19 vaccine rejection." Facebook, COVID-19 and Vaccine Policy Updates & Protections, https://www.facebook.com/help/230764881494641 (emphasis added).

212. On information and belief, Fauci and CDC officials are included among those "public health experts" who "advise[]" Facebook on what to censor. Facebook also censors COVID-19 information as "false," not based on actual truth or falsity, but based on whether the claim contradicts or challenges the pronouncements of Fauci and the CDC. Id. This includes strongly supported claims such as "[c]laims that wearing a face mask properly does not help prevent the spread of COVID-19," along with an elaborate list of additional disfavored content and viewpoints subject to censorship. Id.

213. On information and belief, other social-media firms have similar policies and similar practices of coordinating with Fauci and the CDC and with each other, directly or indirectly, on the suppression of disfavored speakers and speech.

214. Such collusion between HHS officials and social-media companies on the censorship of disfavored speakers and speech accelerated once the Biden Administration took office.

215. On May 5, 2021, Defendant Psaki gave a White House press conference at which she stated that "[t]he President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections. And we've seen that over the past several months, broadly speaking.... we've seen it from a number of sources." White House, Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom Vilsack,

May 5, 2021, at https://www.whitehouse.gov/briefing-room/pressbriefings/2021/05/05/press-briefing-by-press-secretary jen-psaki-and-secretary-of-agriculturetom-vilsack-may-5-2021 /.

216. Echoing Biden's past threats to social-media firms, Psaki immediately went on to state that President Biden "supports better privacy protections and a robust anti-trust program." Id. (emphasis added). She linked the threat of anti-trust enforcement to the demand for more aggressive censorship by social-media platforms, stating that the President's "view is that there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public." Id.

217. At a White House press briefing with Psaki on July 15, 2021, Surgeon General Vivek Murthy announced that "health misinformation" constitutes an "urgent public health threat," stating that he had "issued a Surgeon General's Advisory on the dangers of health misinformation. Surgeon General Advisories are reserved for urgent public health threats. And while those threats have often been related to what we eat, drink, and smoke, today we live in a world where misinformation poses an imminent and insidious threat to our nation's health." The White House, Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy, July 15, 2021, at https://www.whitehouse.gov/briefing-room/press-briefings/2021 /07/ 15/press-briefing by-press-secretary jen-psaki-and-surgeon-general-dr-vivek-h-murthy July-15-2021/.

218. Surgeon General Murthy stated that "[m]odern technology companies have enabled misinformation to poison our information environment with little accountability to their users. They've allowed people who intentionally spread misinformation — what we call `disinformation' — to have extraordinary reach." Id. He accused their algorithms of "pulling us deeper and deeper into a well of misinformation." Id.

219. Surgeon General Murthy explicitly called for more aggressive censorship of social media speech, stating that "we're saying we expect more from our technology companies. ....

74

We're asking them to monitor misinformation more closely. We're asking them to consistently

take action against misinformation super-spreaders on their platforms." Id. "

220. He also stated that "technology companies have a particularly important role" to play

in combating "misinformation." He stated: "We know that the dramatic increase in the speed —

speed and scale of spreading misinformation has, in part, been enabled by these platforms. So

that's why in this advisory today, we are asking them to step up. We know they have taken some

steps to address misinformation, but much, much more has to be done. And we can't wait longer

for them to take aggressive action because it's costing people their lives." Id.

221. He also stated: "we are asking technology companies to help lift up the voices of

credible health authorities.... [T]hey have to do more to reduce the misinformation that's out there

so that the true voices of experts can shine through." Id.

222. At the same press briefing, after the Surgeon General spoke, Defendant Psaki stated:

"[W]e are in regular touch with these social media platforms, and those engagements typically

happen through members of our senior staff, but also members of our COVID-19 team, given, as

Dr. Murthy conveyed, this is a big issue of misinformation, specifically on the pandemic." Id.

(emphasis added). She added, "We're flagging problematic posts for Facebook that spread

disinformation." Id. (emphasis added). She stated, "we have recommended—proposed that they

create a robust enforcement strategy," i.e., a more aggressive censorship program. Id.

223. Psaki called on social-media companies to censor particular disfavored speakers,

stating: "[T]here's about 12 people who are producing 65 percent of anti-vaccine misinformation

on social media platforms. All of them remain active on Facebook, despite some even being

banned on other platforms, including Facebook — ones that Facebook owns." Id. And she called

on Facebook and other social-media companies to censor disfavored content and disfavored

viewpoints: "[I]t's important to take faster action against harmful posts. As you all know,

information travels quite quickly on social media platforms; sometimes it's not accurate. And Facebook needs to move more quickly to remove harmful, violative posts — posts that will be within their policies for removal often remain up for days. That's too long. The information spreads too quickly." Id.

224. She stated that "[w]e engage with them [i.e., social-media companies] regularly and they certainly understand what our asks are." Id. (emphasis added). She stated that, "we've made a calculation to push back on misinformation," and that "we are working to combat misinformation that's traveling online." Id.

225. The same day, the Surgeon General released his advisory regarding "health misinformation." It defined "health misinformation" as "information that is false, inaccurate, or misleading according to the best available evidence at the time. Misinformation has caused confusion and led people to decline COVID-19 vaccines, reject public health measures such as masking and physical distancing, and use unproven treatments." Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment, at 4 (July 15, 2021), at https://www.hhs.gov/sites/default/files/surgeon-generalmisinformation-advisory.pdf.

226. The Surgeon General's advisory called for social-medial companies to "make meaningful long-term investments to address misinformation, including product changes," to "[r]edesign recommendation algorithms to avoid amplifying misinformation," to "build in `frictions'— such as suggestions and warnings—to reduce the sharing of misinformation," and to "make it easier for users to report misinformation." Id. at 12. It called on social-media companies to "[s]trengthen the monitoring of misinformation," and to censor disfavored speakers swiftly and aggressively: "Prioritize early detection of misinformation `super-spreaders' and repeat offenders. Impose clear consequences for accounts that repeatedly violate platform policies." Id.

227. Facebook responded by stating that it was, in fact, aggressively censoring "health misinformation," and coordinating with the Government to do so. "A Facebook spokesperson said the company has partnered with government experts, health authorities and researchers to take `aggressive action against misinformation about COVID-19 and vaccines to protect public health." White House Slams Facebook as Conduit for COVID-19 Misinformation, REUTERS (July 15, 2021), at https://www.reuters.com/world/us/us-surgeon-general-warns-over-covid-l9-misinformation-2021-07-15/ (emphasis added). "So far we've removed more than 18 million pieces of COVID misinformation, [and] removed accounts that repeatedly break these rules...,' the spokesperson added." Id.

228. Facebook stated that it "has introduced rules against making certain false claims about COVID-19 and its vaccines." Id.

229. The next day, July 16, 2021, a reporter asked President Biden what he thought of COVID misinformation on social media, and he responded, referring to platforms like Facebook, by stating: "They're killing people." They're Killing People: Biden Denounces Social Media for Virus Disinformation, N.Y. TIMES (July 16, 2021), at https://www.nytimes.com/2021/07/16/us/politics/biden-facebook-social-media-covid.html. The New York Times reported that "this week, White House officials went further and singled out social media companies for allowing false information to proliferate. That came after weeks of failed attempts to get Facebook to turn over information detailing what mechanisms were in place to combat misinformation about the vaccine, according to a person familiar with the matter." Id.

230. The same day, July 16, 2021, Psaki explicitly called for social-media companies to coordinate with each other in censoring disfavored speakers, to ensure that such speakers are completely muzzled. "You shouldn't be banned from one platform and not others ... for providing misinformation out there." White House, Press Briefing by Press Secretary Jen Psaki, July 16,

2021, at https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/16/press-briefingby-press-secretary jen-psaki July-16-2021/.

231.  On information and belief, social-media companies have heeded this demand, and they do, in fact, coordinate extensively with each other in censorship of disfavored speakers, speech, and viewpoints on social media.

232. Psaki also demanded that social-media companies "create robust enforcement strategies," "takee] faster action against harmful posts," and "promot[e] quality information algorithms"—which is a euphemism for algorithms that suppress disfavored messages. Id. When asked whether Facebook's already-aggressive censorship—it claimed to have suppressed 18 million pieces of COVID-19-related "misinformation"—was "sufficient," she responded, "Clearly not, because we're talking about additional steps that should be taken." Id.

233. Four days later, July 20, 2021, the White House explicitly threatened to amend or repeal the liability protections of § 230 of the Communications Decency Act if social-media companies did not increase censorship of disfavored speakers and viewpoints. `They Should Be Held Accountable': White House Reviews Platforms' Misinformation Liability, USA TODAY (July 20, 2021), at https://www.usatoday.com/story/news/politics/202 1/07/20/white-house-reviewssection-230-protections-covid-misinformation/80242 10002/. The White House communications director announced that "[t]he White House is assessing whether social media platforms are legally liable for misinformation spread on their platforms." Id. "We're reviewing that, and certainly, they should be held accountable," she said. Id.

234.  She "specified the White House is examining how misinformation fits into the liability protections granted by Section 230 of the Communications Decency Act, which shields online platforms from being responsible for what is posted by third parties on their sites." Id. Media reported that, in connection with this threat, "Relations are tense between the Biden

administration and social media platforms, specifically Facebook, over the spread of misinformation online." Id.; see also, e.g., White House says social media networks should be held accountable for spreading misinformation, CNBC.com (July 20, 2021), at https://www.cnbc.com/2021 /07/20/white-house-social-networks-should-be-held-accountable for spreading-misinfo.html. When asked whether the President is "open to amending 230 when Facebook and Twitter and other social media outlets spread false information that cause Americans harm, shouldn't they be held accountable in a real way?" White House Communications Director Bedingfield responded, "We're reviewing that and certainly they should be held accountable. And I think you heard the president speak very aggressively about this. He understands that this is an important piece of the ecosystem." Id.

235. After this series of public statements, responding to "White House pressure," Facebook censored the accounts of the 12 specific disfavored speakers whom Psaki accused of spreading health misinformation. Facebook takes action against `disinformation dozen' after White House pressure, CNN.com (Aug. 18, 2021), at https://www.cnn.com/2021/08/18/tech/facebook-disinformation-dozen/index.html. Psaki had "hammered the platform in July for allowing the people identified in the report to remain on its platform." Id. After they were singled out for censorship by the White House, Facebook "removed over three dozen Pages, groups and Facebook or Instagram accounts linked to these 12 people, including at least one linked to each of the 12 people, for violating our policies." Id

236. In the same time frame, Twitter permanently suspended the account of prominent lockdown critic Alex Berenson, despite repeated reassurances from high-level Twitter executives that his account was safe, just days after Dr. Fauci singled him out as a danger for suggesting young people might reasonably decline the vaccine.

237. On October 29, 2021, the Surgeon General tweeted from his official account (as opposed to his personal account, which remains active), in a thread: "We must demand Facebook and the rest of the social media ecosystem take responsibility for stopping health misinformation on their platforms. The time for excuses and half measures is long past. We need transparency and accountability now. The health of our country is at stake." See https://twitter.com/Surgeon_ General/status/ 1454181191494606854. 240. Defendants' response to this censorship was to demand still more censorship by social-media platforms, including but not limited to Facebook. "[A]fter Facebook's action against the `disinformation dozen,' a White House spokesperson continued to strongly criticize the company." Id. "In the middle of a pandemic, being honest and transparent about the work that needs to be done to protect public health is absolutely vital, but Facebook still refuses to be straightforward about how much misinformation is circulating—and being actively promoted— on their platform,' a White House spokesperson told CNN Business. `It's on everyone to get this right so we can make sure the American people are getting accurate information to protect the health of themselves and their loved ones -- which is why the Administration will continue to push leaders, media outlets, and leading sources of information like Facebook to meet those basic expectations,' the spokesperson added." Id.

238. On February 1, 2022, Psaki was asked at a White House press conference whether the Administration was satisfied with Spotify's decision to affix advisory warnings to Joe Rogan's immensely popular podcast, which featured speakers that contradicted the Administration's messaging about COVID-19 and vaccines, or whether the government "think[s] that companies like Spotify should go further than just, you know, putting a label on" disfavored viewpoints and speakers. Psaki responded by demanding that Spotify and other platforms "do[] more" to block disfavored speech: "[O]ur hope is that all major tech platforms ... be vigilant to ensure the American people have access to accurate information on something as significant as COVID-19.

So, this disclaimer — it's a positive step. But we want every platform to continue doing more to call out ... mis- and disinformation while also uplifting accurate information." She stated that Spotify's advisory warnings are "a good step, it's a positive step, but there's more that can be done." White House, Press Briefing by Press Secretary Jen Psaki, February 1, 2022 (emphases added), at https://www.whitehouse.gov/briefing-room/press-briefings/2022/02/01/press-briefingby-press-secretary j en-psaki-february-1-2022/.

239.  On March 3, 2022, the Surgeon General issued a formal "Request for Information" on the "Impact of Health Misinformation" on social media. HHS, Impact of Health Misinformation in the Digital Information Environment in the United States Throughout the COVID-19 Pandemic Request for Information (RFI), 87 Fed. Reg. 12,712-12,714 (March 2, 2022).

240.  In the RFI, "[t]he Office of the Surgeon General requests input from interested parties on the impact and prevalence of health misinformation in the digital information environment during the COVID-19 pandemic." Id. at 12,712. The RFI states that "the speed, scale, and sophistication with which misinformation has been spread during the COVID-19 pandemic has been unprecedented," and it implies that social-media companies are to blame, carrying a clear threat of future regulation: "This RFI seeks to understand both the impact of health misinformation during the COVID-19 pandemic and the unique role that technology and social media platforms play in the dissemination of critical health information during a public health emergency." Id. at 12,713.

241. The RFI seeks specific information about health "misinformation" on such socialmedia platforms: "Information about how widespread COVID-19 misinformation is on individual technology platforms including: General search engines, content sharing platforms,

social media platforms, e-commerce platforms, crowd sourced platforms, and instant messaging systems." Id.

242. The RFI seeks: "Any aggregate data and analysis on how many users were exposed, were potentially exposed, or otherwise engaged with COVID-19 misinformation," where "[e]xposure is defined as seeing content in newsfeeds, in search results, or algorithmically nominated content," and "[p]otential exposure is the exposure users would have had if they could see all the content that is eligible to appear within their newsfeeds." Id. at 12,714. It also seeks "[i]nformation about COVID-19 misinformation policies on individual technology platforms," including "[a]ny aggregate data and analysis of technology platform COVID-19 misinformation policies including implementation of those policies and evaluations of their effectiveness." Id.

243. Media reports aptly described Murthy as "demand[ing]" information about the major sources of COVID-19 misinformation by May 2, 2022. Brad Dress, Surgeon General Demands Data on COVID-19 Misinformation from Major Tech Firms, THE HILL (March 3, 2022), at https://thehill.com/policy/healthcare/596709-surgeon-general-demands-data-on-covid-l9-misinformation-from-major-tech/. "In a formal notice, Murthy requested major tech platforms submit information about the prevalence and scale of COVID-19 misinformation on their sites, from social networks, search engines, crowdsourced platforms, e-commerce platforms and instant messaging systems." Id. "In his notice to major tech platforms, Murthy is requesting specific information on demographics affected by misinformation as well as sources of misinformation and `exactly how many users saw or may have been exposed to instances of Covid-19 misinformation." Id.

244. On or around July 27, 2022, a limited number of emails between CDC officials and representatives of social-media platforms from late 2020 and early months of 2021 became publicly available, over a year after they had been requested under FOIA. These newly revealed

emails—allegations of collusion between HHS officials and social-media platforms to censor disfavored speech, speakers, and viewpoints, as alleged herein.

245. These emails indicate that Defendant Carol Y. Crawford of CDC and other CDC officials frequently communicated and coordinated with social-media platforms, including Facebook/Meta, Twitter, Google/YouTube, and Instagram, regarding the censorship of speech on social-media platforms, including flagging specific content for censorship. During 2021, Crawford organized "Be On the Lookout" or "BOLO" meetings on "misinformation" with representatives of social-media platforms—including Twitter, Facebook/Meta, and Google/YouTube—in which she and other federal officials colluded and/or collude with those platforms about speech to target for suppression. These meetings include Crawford and other federal officials flagging specific social-media posts for censorship and providing examples of the types of posts to censor. Crawford emailed "slides" from the "BOLO" meetings to participants afterwards. These slides included repeated examples of specific posts on social-media platforms flagged for censorship. The slides called for "all" social-media platforms to "Be On the Lookout" for such posts. Crawford cautioned the meeting participants, with respect to these slides, "[p]lease do not share outside your trust and safety teams."

246. Officials of the Census Bureau participated and/or participate in these BOLO meetings, including Defendant Jennifer Shopkorn and Christopher Lewitzke, who is a Senior Digital Marketing Associate with Reingold, a communications firm that was, on information and belief, acting on behalf of the Census Bureau. Crawford's emails indicate that the Census Bureau and its officials and agents, such as Lewitzke and Shopkorn, play an important, active, and ongoing role in colluding with social-media platforms to censor disfavored speech. On March 18, 2021, Crawford emailed Twitter officials and stated that "[w]e are working on a project with Census to leverage their infrastructure to identify and monitor social media for vaccine

misinformation," and stated that "[w]e would like the opportunity to work with your trust team on a regular basis to discuss what we are seeing." She also noted that "I understand that you did this with Census last year as well." Twitter responded by stating, "With our CEO testifying before Congress this week is tricky," but otherwise agreed to the collusive arrangement. Likewise, in subsequent emails to Twitter (on May 6) and Facebook (on May 10), Crawford noted to the social-media platform officials that "[o]ur census team," i.e., Lewitzke and Shopkom, who were cc'ed on the emails, "has much more info on it if needed" regarding "some example posts" of "misinfo" that she flagged for censorship.

247. Defendants Crawford and others, including the Census officials and agents Lewitzke and Shopkorn, took other steps to procure the censorship of disfavored speech on social media. For example, on May 10, 2021, Crawford emailed Twitter officials to flag "two issues that we are seeing a great deal of misinfo about," noting that Lewitzke and Shopkorn "ha[ve] much more info on it if needed." The same email included 13 specific Twitter posts as examples of the sort of posts to be censored. On May 6, 2021, Crawford sent a similar email to Meta/Facebook officials, also copying Lewitzke and Shophorn and stating that they have "much more info" about the issue; this email included 16 specific posts from Facebook and Instagram as examples of posts to be targeted for censorship. On May 12, 2021, Crawford emailed Facebook officials to flag "some new info on myths your misinfo folks might be interested in," with links to specific issues of "misinformation" for Facebook to censor. On April 9, 2021, Crawford agreed with a Twitter official that CDC would provide "examples of problematic content" posted on Twitter, and the Twitter official noted that "all examples of misinformation are helpful." Calendar invites from early 2021 indicate that Crawford, Jay Dempsey, and other CDC officials participated in Facebook's "weekly sync with CDC," with "CDC to invite other agencies as needed."

248. In another exchange of emails, Crawford agreed with Facebook officials that CDC would participate in a COVID-19 "misinfo reporting channel," and arranged for CDC officials to have training on the use of Facebook's "misinfo reporting channel." On information belief, Crawford's "team" at CDC, as well as Shopkom and Lewitzke from Census, were "onboarded" onto Facebook's "misinfo reporting channel." A calendar invite in May 2021 included Crawford, Lewitzke, Shopkorn, other CDC officials, and other Reingold employees who were, on information and belief, acting on behalf of the Census Bureau, to participate in the "onboarding" onto Facebook's "misinfo reporting channel."

249.  Crawford's communications with Facebook indicate that CDC, the Census Bureau, and other government agencies collaborate with Facebook to flag speech regarding both COVID19 and elections for censorship using "CrowdTangle," which Facebook describes as "a Facebook tool that tracks how content spreads online." An email from a Facebook official to Crawford stated that, using CrowdTangle, "[w]hen health departments flag potential vaccine misinformation on Facebook and Instagram, we review and remove the content if it violates our policies... This is similar to how governments and fact-checkers use CrowdTangle ahead of elections...." (Emphasis added.)

250.  Additional communications between CDC and social-media platforms [produced and compelled by Court orders] reflect an ongoing, close, and continuing collaboration, effectively amounting to a joint enterprise, on censorship of COVID-19 "misinformation" and related issues. For example, the communications reflect close coordination on creating and publishing content on behalf of CDC on social-media platforms, and artificially "amplifying" government messaging on social-media to the suppression of private messaging, including a gift of $15 million in Facebook ad credits from Facebook to CDC. They also reflect close coordination on amplifying CDC's content and other related issues.

**4. White House And DHS Officials Collude**

**With Social-Media Firms To Suppress Speech.**

251. On information and belief, senior officials in the Biden Administration and the Department of Homeland Security are also colluding with social-media companies to suppress disfavored speakers and viewpoints. These efforts include censorship of disfavored content and viewpoints about election integrity and COVID-19, among other topics, under the guise of suppressing "misinformation" and "domestic terrorism." These efforts culminated with the Orwellian announcement of the creation of a "Disinformation Governance Board" within DHS. 255. A direct forum for government officials to call for social-media censorship of election-related "misinformation" was already in place during the general election cycle of 2020.

252. In August 2020, social-media firms "met with federal government officials to discuss how to handle misinformation during this month's political conventions and election results this fall." Ingram et al., Big Tech met with govt to discuss how to handle election results, NBC News (Aug. 20, 2022), at https://www.nbcnews.com/tech/tech-news/big-tech-met-gov-tdiscuss-how-handle-election-results-n 1236555.

253. This was one of a "series" of meetings between major social-media companies and government officials about the suppression of election-related "misinformation": "We held the latest in a series of meetings with government partners today where we each provided updates on what we're seeing on our respective platforms and what we expect to see in the coming months,' companies including Google, Facebook, Twitter and Reddit said in a joint statement after the meeting." Id. "The statement also included Microsoft, Verizon Media, Pinterest, LinkedIn and the Wikimedia Foundation, which operates Wikipedia and other sites." Id.

254. The discussion was reported as "one in a series of monthly meetings between the government and tech companies" and involved "back-and-forth conversation on a variety of

topics." Id. Neither the "topics" of the "conversation" nor the particular participants on behalf of the government were disclosed. Id. "According to the industry statement, participants in Wednesday's meeting also included representatives from the FBI's foreign influence task force, the Justice Department's national security division, the Office of the Director of National Intelligence and the Cybersecurity and Infrastructure Security Agency." Id. "The companies said they would continue to meet regularly before the November election." Id.

255. On September 28, 2020, the Biden-Harris campaign sent a letter to Facebook demanding that Facebook take "more aggressive" action to censor statements by President Trump and the Trump campaign that raised concerns about election security and the security of voting by mail. Sept. 28, 2020 Biden-Harris Letter, https://www.documentcloud.org/documents/7219497-Facebook-Letter-9-28.html. The letter accused Facebook of being a "propagator of disinformation" for refusing to censor the rival campaign's core political speech, thus promoting "distrust in our democracy" and threatening to "undermine democracy." Id. The Biden-Harris campaign described the Trump campaign's political speech as "dangerous claptrap" and argued that "[r]emoving this video should have been the easiest of calls." Id. The letter demanded that Facebook "remove Mr. Trump's posts, which violate your policies." Id. (underline in original). 260. The same letter complained that Facebook's "algorithm" permitted Trump's political speech to reach millions of people. It complained about the successful reach on Facebook of political speech that it opposed, bemoaning the fact that "a hyperpartisan propaganda organ like the Daily Wire is Facebook's top web publisher." Id. The Biden-Harris campaign accused Facebook of allowing speech that it favored "to be drowned out by a storm of disinformation." Id. 75 And it concluded, "We will be calling out those failures [to censor Trump's political speech] as they occur over the coming 36 days," i.e., until the November 2020 general election. Id.

256. On information and belief, responding to prior threats from Defendants and those acting in concert with them, Facebook complied with this demand and did engage in "more aggressive" censorship of the Trump campaign's core political speech from then on, resulting in an aggressive campaign to suppress President Trump and his campaign's political speech, especially on issues related to election security. In the wake of the Biden-Harris letter, Facebook declared that it "won't allow ads with content that seeks to delegitimize the outcome of an election," and it ramped up censorship of Trump's political speech thereafter.

257. As one commentator noted, "It's no surprise that Facebook's policy change happened the same week that the Biden campaign demanded Trump's Facebook posts be censored." Alexander Hall, Liberal Media Used to Warn Against Mailing Votes; Now Big Tech, Left Are Protecting It (Oct. 30, 2020), at https://www.newsbusters.org/blogs/freespeech/alexander-hall/2020/ 10/30/liberal-media-used-warn-against-mailing-votes-now-big. 263. At the same time, "Twitter also modified its rules, stating: `we may label and reduce the visibility of Tweets containing false or misleading information about civic processes in order to provide additional context' in its Civic integrity policy." Id.

258. Both platforms ramped up censorship of core political speech of President Trump and his campaign, as well as core political speech by others favoring their messages and campaigns, in the critical final month before the 2020 general election, resulting in egregious acts of censorship. These acts of censorship included suppression of expressions of concern about election security as a result of the massive increase in voting by mail during the 2020 general election.

259. In another exchange of emails, Crawford agreed with Facebook officials that CDC would participate in a COVID-19 "misinfo reporting channel," and arranged for CDC officials to have training on the use of Facebook's "misinfo reporting channel." On information belief,

Crawford's "team" at CDC, as well as Shopkom and Lewitzke from Census, were "onboarded" onto Facebook's "misinfo reporting channel." A calendar invite in May 2021 included Crawford, Lewitzke, Shopkorn, other CDC officials, and other Reingold employees who were, on information and belief, acting on behalf of the Census Bureau, to participate in the "onboarding" onto Facebook's "misinfo reporting channel."

260.  Crawford's communications with Facebook indicate that CDC, the Census Bureau, and other government agencies collaborate with Facebook to flag speech regarding both COVID19 and elections for censorship using "CrowdTangle," which Facebook describes as "a Facebook tool that tracks how content spreads online." An email from a Facebook official to Crawford stated that, using CrowdTangle, "[w]hen health departments flag potential vaccine misinformation on Facebook and Instagram, we review and remove the content if it violates our policies... This is similar to how governments and fact-checkers use CrowdTangle ahead of elections...." (Emphasis added.) 253. Additional communications between CDC and social-media platforms reflect an ongoing, close, and continuing collaboration, effectively amounting to a joint enterprise, on censorship of COVID-19 "misinformation" and related issues. For example, the communications reflect close coordination on creating and publishing content on behalf of CDC on social-media platforms, and artificially "amplifying" government messaging on social-media to the suppression of private messaging, including a gift of $15 million in Facebook ad from Facebook to CDC. They also reflect close coordination on amplifying CDC's content and other related issues.

**4. White House And DHS Officials Collude**

**With Social-Media Firms To Suppress Speech.**

261. On information and belief, senior officials in the Biden Administration and the Department of Homeland Security are also colluding with social-media companies to suppress disfavored speakers and viewpoints. These efforts include censorship of disfavored content and viewpoints about election integrity and COVID-19, among other topics, under the guise of suppressing "misinformation" and "domestic terrorism." These efforts culminated with the Orwellian announcement of the creation of a "Disinformation Governance Board" within DHS. 255. A direct forum for government officials to call for social-media censorship of election-related "misinformation" was already in place during the general election cycle of 2020.

262. In August 2020, social-media firms "met with federal government officials to discuss how to handle misinformation during this month's political conventions and election results this fall." Ingram et al., Big Tech met with govt to discuss how to handle election results, NBC News (Aug. 20, 2022), at https://www.nbcnews.com/tech/tech-news/big-tech-met-gov-tdiscuss-how-handle-election-results-n 1236555.

263. This was one of a "series" of meetings between major social-media companies and government officials about the suppression of election-related "misinformation": "We held the latest in a series of meetings with government partners today where we each provided updates on what we're seeing on our respective platforms and what we expect to see in the coming months,' companies including Google, Facebook, Twitter and Reddit said in a joint statement after the meeting." Id. "The statement also included Microsoft, Verizon Media, Pinterest, LinkedIn and the Wikimedia Foundation, which operates Wikipedia and other sites." Id.

264. The discussion was reported as "one in a series of monthly meetings between the government and tech companies" and involved "back-and-forth conversation on a variety of

topics." Id. Neither the "topics" of the "conversation" nor the particular participants on behalf of the government were disclosed. Id. "According to the industry statement, participants in Wednesday's meeting also included representatives from the FBI's foreign influence task force, the Justice Department's national security division, the Office of the Director of National Intelligence and the Cybersecurity and Infrastructure Security Agency." Id. "The companies said they would continue to meet regularly before the November election." Id.

265.  On September 28, 2020, the Biden-Harris campaign sent a letter to Facebook demanding that Facebook take "more aggressive" action to censor statements by President Trump and the Trump campaign that raised concerns about election security and the security of voting by mail. Sept. 28, 2020 Biden-Harris Letter, https://www.documentcloud.org/documents/7219497-Facebook-Letter-9-28.html. The letter accused Facebook of being a "propagator of disinformation" for refusing to censor the rival campaign's core political speech, thus promoting "distrust in our democracy" and threatening to "undermine democracy." Id. The Biden-Harris campaign described the Trump campaign's political speech as "dangerous claptrap" and argued that "[r]emoving this video should have been the easiest of calls." Id. The letter demanded that Facebook "remove Mr. Trump's posts, which violate your policies." Id. (underline in original).

266.  The same letter complained that Facebook's "algorithm" permitted Trump's political speech to reach millions of people. It complained about the successful reach on Facebook of political speech that it opposed, bemoaning the fact that "a hyperpartisan propaganda organ like the Daily Wire is Facebook's top web publisher." Id. The Biden-Harris campaign accused Facebook of allowing speech that it favored "to be drowned out by a storm of disinformation." Id. And it concluded, "We will be calling out those failures [to censor Trump's political speech] as they occur over the coming 36 days," i.e., until the November 2020 general election. Id.

267.  On information and belief, responding to prior threats from Defendants and those acting in concert with them, Facebook complied with this demand and did engage in "more aggressive" censorship of the Trump campaign's core political speech from then on, resulting in an aggressive campaign to suppress President Trump and his campaign's political speech, especially on issues related to election security. In the wake of the Biden-Harris letter, Facebook declared that it "won't allow ads with content that seeks to delegitimize the outcome of an election," and it ramped up censorship of Trump's political speech thereafter.

268. As one commentator noted, "It's no surprise that Facebook's policy change happened the same week that the Biden campaign demanded Trump's Facebook posts be censored." Alexander Hall, Liberal Media Used to Warn Against Mailing Votes; Now Big Tech, Left Are Protecting It (Oct. 30, 2020), at https://www.newsbusters.org/blogs/freespeech/alexander-hall/2020/ 10/30/liberal-media-used-warn-against-mailing-votes-now-big.

269. At the same time, "Twitter also modified its rules, stating: `we may label and reduce the visibility of Tweets containing false or misleading information about civic processes in order to provide additional context' in its Civic integrity policy." Id.

270. Both platforms ramped up censorship of core political speech of President Trump and his campaign, as well as core political speech by others favoring their messages and campaigns, in the critical final month before the 2020 general election, resulting in egregious acts of censorship. These acts of censorship included suppression of expressions of concern about election security as a result of the massive increase in voting by mail during the 2020 general election.

271. In perhaps the most notorious example, as noted above, Twitter, Facebook, and other social-media companies censored the New York Post's entirely truthful and carefully sourced article about Hunter Biden's laptop on October 14, 2020, as discussed further above. This

censorship included locking the New York Post's social-media accounts for weeks until after the election.

272.  According to one survey, sixteen percent of Biden voters polled stated that they would have changed their votes if they had known about the Hunter Biden laptop story before the election, which could have changed the outcome of the election.

273. This censorship required deliberate, aggressive action by social-media firms. "Facebook moderators had to manually intervene to suppress a controversial New York Post story about Hunter Biden, according to leaked moderation guidelines seen by the Guardian." Facebook leak reveals policies on restricting New York Post's Biden story, THE GUARDIAN (Oct. 30, 2020), at https://www.theguardian.com/technology/2020/oct/30/facebook-leak-reveals-policiesrestricting-new-york-post-biden-story.

274.  At the time, Facebook claimed that the censorship of the Hunter Biden laptop story was "part of our standard process to reduce the spread of misinformation. We temporarily reduce distribution pending factchecker review." Id. But this was not true. In fact, Facebook imposed "special treatment" on the New York Post to suppress the story, which included "manually overrid[ing]" Facebook's own guidelines for suppressing so-called "misinformation." Id.

275.  On December 10, 2020, nine Democratic House Members in the so-called "Congressional Task Force on Digital Citizenship" (a group of exclusively Democratic members of Congress) sent a letter to President-elect Biden, calling for the incoming Administration to create task forces that would increase censorship of "disinformation and misinformation" on social media. Dec. 10, 2020 Letter of Rep. Wexton, et al., at https://wexton.house.gov/uploadedfiles/12. 10.20_house_democrats_disinformation_roadmapto_president-elect_biden.pdf.

276.  The letter decried the rise of "news environments online, which report vastly different information and do not offer the same editorial standards to protect against disinformation and misinformation that traditional news media do." Id. It criticized social-media platforms for failing to censor "disinformation" more aggressively: "As social media platforms post record revenues from engagement, they seldom act as responsible information gatekeepers and, in fact, have financial incentives to direct users to posts that are false, misleading, or emotionally manipulative." Id.

277. The letter called on President-elect Biden to "[s]upport collaboration between government and civic organizations to combat dangerous propaganda." Id. The letter acknowledged that "social media platforms have taken some steps to limit the spread of harmful disinformation and misinformation over the past year," but urged that these steps were not nearly enough, arguing that "we can still see how easily this content is posted and amplified by bad actors and unknowing citizens," that "platforms have financial incentives for engaging posts to reach larger audiences, regardless of the content," and that "computer algorithms still make up a majority of content moderation, and platforms have at times refused to take action against accounts and groups promoting violence and hate speech." Id.

278.  The letter called for President-elect Biden to deploy the U.S. Department of Justice and the Department of Homeland Security to combat "disinformation," and it called for more direct government involvement in policing the content of political speech on social media platforms, in order to "build citizen resilience to disinformation and support a healthy information ecosystem"— which is Newspeak for viewpoint- and content-based censorship.

279.  In announcing the letter, its lead signer, Rep. Wexton, openly stated that Americans lack the sophistication to make their own judgments about truth and falsity of online speech, and that government-approved "gatekeepers" of information should be imposed: "In the letter, the

Members recognize that, while a growing number of people in the U.S. are getting their news from social media platforms, many Americans are ill-equipped to recognize and sift through false, misleading, or emotionally manipulative posts. Additionally, there exists a lack of effective information gatekeepers to protect against disinformation threats online." See Dec. 10, 2020 News Release, https://wexton.house.gov/news/documentsingle.aspx?DocumentID=431.

280.  Consistent with this letter, the Biden Administration launched several initiatives designed to inject the power and authority of federal agencies like DHS into policing "disinformation" and "misinformation" online—which, all too often, means censoring core political speech disfavored by government officials.

281.  On information and belief, DHS and its officials are actively engaged in this project of procuring the censorship of disfavored speakers, content, and viewpoints in speech about election integrity.

282.  On May 3, 2021, it was reported that DHS intended to "partner with private firms," i.e., social-media companies, to monitor disfavored speech online. Biden team may partner with private firms to monitor extremist chatter online, CNN.com (May 3, 2021), at https://www.cnn.com/2021 /05/03/politics/dhs-partner-private-firms-surveil-suspected-domesticterrorists/index.html. The purpose of these "partnerships" was to evade legal, constitutional, and ethical problems with DHS's direct surveillance of online speech: "The Department of Homeland Security is limited in how it can monitor citizens online without justification and is banned from activities like assuming false identities to gain access to private messaging apps." Id. "Instead, federal authorities can only browse through unprotected information on social media sites like Twitter and Facebook and other open online platforms." Id. "The plan being discussed inside DHS, according to multiple sources, would, in effect, allow the department to circumvent those limits." Id. "Outsourcing some information gathering to outside

firms would give DHS the benefit of tactics that it isn't legally able to do in-house, such as using false personas to gain access to private groups used by suspected extremists, sources say." Id.

283.  As noted above, on May 5, 2021, Defendant Psaki stated at a White House press conference that "[t]he President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections." White House, Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom Vilsack, May 5, 2021 (emphasis added), at https://www.whitehouse.gov/briefing-room/pressbriefings/2021/05/05/press-briefing-by-press-secretary jen-psaki-and-secretary-of-agriculturetom-vilsack-may-5-2021/. Psaki immediately went on to state that President Biden "supports better privacy protections and a robust anti-trust program." Id. (emphasis added). And she stated that the President's "view is that there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public." Id.

284. In the same press conference, Psaki notoriously went on to state, "We're flagging problematic posts for Facebook that spread disinformation." Id. On information and belief, especially in light of Psaki's earlier reference to speech about "elections," this statement "flagging problematic posts" referred not just to social-media speech about COVID-19, but also social-media speech about election integrity. See, e.g., White House says social media platforms should not amplify `untrustworthy' content, REUTERS (May 5, 2021), at https://www.reuters.com/article/ctech-us-trump-facebook-biden-idCAKBN2CMIXU-OCATC. 279. In June 2021, the National Security Council released its "National Strategy for Countering Domestic Terrorism." See The White House, National Strategy for Countering Domestic Terrorism (June 2021), at https://www.whitehouse.gov/wpcontent/uploads/2021 /06/National-

Strategy-for-Countering-Domestic-Terrorism.pdf. The "National Strategy" repeatedly claimed that "disinformation and misinformation" are important elements of "domestic terrorism." Id. at 9. It claimed that the "ideologies" of domestic terrorists "connect and intersect with conspiracy theories and other forms of disinformation and misinformation." Id. (emphasis added). It stated that such "elements" of domestic terrorism "can combine and amplify threats to public safety," "[e]specially on Internet-based communications platforms such as social-media." Id. (emphasis added). It stated that DHS and others "are currently funding and implementing or planning" programs to "strengthen user resilience to disinformation and misinformation online for domestic audiences." Id. at 20. The Strategy memo identified, as its "broader priority," the task of "enhancing faith in government and addressing the extreme polarization, fueled by a crisis of disinformation and misinformation often channeled through social media platforms, which can tear Americans apart...." Id. at 29 (emphasis added). And it called for DHS and others to "accelerat[e] work to contend with an information environment that challenges healthy democratic discourse," and to "find[] ways to counter the influence and impact" of online disinformation. Id.

280. On July 26, 2021, the Global Internet Forum to Counter Terrorism (GIFCT), an "organization formed by some of the biggest U.S. tech companies including Facebook and Microsoft," which includes DHS on its board of advisors, announced that it is "significantly expanding the types of extremist content shared between firms in a key database," to move from images and videos to content-based speech tracking. Facebook and tech giants to target attacker manifestos, far-right militias in database, REUTERS (July 26, 2021), at https://www.reuters.com/technology/exclusive-facebook-tech-giants-target-manifestos-militiasdatabase-2021-07-26/.

285.  GIFCT ... was created in 2017 under pressure from U.S. and European governments," and "its database mostly contains digital fingerprints of videos and images related to groups on the U.N. Security Council's consolidated sanctions list and a few specific livestreamed attacks." Id. "Until now, the Global Internet Forum to Counter Terrorism's (GIFCT) database has focused on videos and images from terrorist groups on a United Nations list," but now the group announced that it would move into content-based speech tracking. Id. On information and belief, DHS officials including Defendants have access to such database(s) as tools to advance censorship of online speech.

286. Shortly thereafter, on August 2, 2021, DHS Secretary Mayorkas announced that DHS was working directly with social-media companies to censor disfavored speech on socialmedia platforms. "On [a] broadcast of MSNBC's `Andrea Mitchell Reports,' DHS Secretary Alejandro Mayorkas stated that the department is working with tech companies `that are the platform for much of the disinformation that reaches the American public, how they can better use their terms of use to really strengthen the legitimate use of their very powerful platforms and prevent harm from occurring." Mayorkas: We're Working with Platforms on `How They Can Better Use' Their Terms to `Prevent Harm' from Misinformation, BREITBART NEWS (Aug. 2, 2021), at https://www.breitbart.com/clips/2021/08/02/mayorkas-were-workgin-with-platformson-how-they-can-better-use-their-terms-to-prevent-harm-from-misinformation/.

287. Echoing Psaki's comments at the July 15, 2021 news conference with Surgeon General Murthy, Mayorkas stated: "So, we're working together with them. We're working with the tech companies that are the platform for much of the disinformation that reaches the American public, how they can better use their terms of use to really strengthen the legitimate use of their very powerful platforms and prevent harm from occurring." Id. On information and belief, the reference to "us[ing] their terms of use to really strengthen the legitimate use of their very

98

powerful platforms and prevent harms from occurring" refers to government-induced censorship of disfavored viewpoints, speakers, and content.

288. Mayorkas added that there was a federal-government-wide effort to police speech on social media, stating: "[T]he connectivity between speech and violence, the connectivity between active harm and speech is something that we're very focused on, and it's a difficult challenge. But we're working on it and meeting that challenge, again, because of the great personnel of the Department of Homeland Security and across the federal enterprise." Id. (emphasis added). 285. Soon after Mayorkas's August 2, 2021 comments, DHS officials began plotting to create a "Disinformation Governance Board" within DHS. On September 13, 2021, senior DHS officials Robert Silvers and Samantha Vinograd sent a memorandum to Secretary Mayorkas recommending the creation of the Disinformation Governance Board. The opening sentence of the Memorandum noted that the Board's purpose would be to combat "[t]he spread of disinformation" regarding "[c]onspiracy theories about the validity and security of elections," including "disinformation surrounding the validity of the 2020 election," and "[d]isinformation related to the origins and effects of COVID19 vaccines or the efficacy of masks," which "undercut[] public health efforts to combat the pandemic." Id. at 19.

289. The same Memorandum noted that CISA was involved in flagging content for censorship on social-media platforms: "Leading up to the 2020 election, CISA relayed reports of election disinformation from election officials to social media platform operators." Id. at 20. The Memorandum called for the Board to perform "partner engagement" with "private sector entities [and] tech platforms." Id. at 22. 287. In a subsequent Memorandum dated January 31, 2022, DHS officials indicated that the Board's activities would oversee extensive social-media censorship activities by other federal officials and agencies: "The Board will also support and coordinate ... MDM work with other departments and agencies, the private sector, and non-government actors."

Id. at 24. This Memorandum attached the Board's Charter, which stated that its mission was to "guide and support the Department's efforts to address mis-, dis-, and mal-information." Id. at 27. It also stated that the Board would "harmonize and support coordination with ... the private sector." Id. The Charter called for the Board to "coordinate, deconflict, and harmonize departmental efforts to address MDM," including between "DHS Components" and "interagency partners," and "serving as the Department's internal and external point of contact for coordination with ... the private sector ... regarding MDM." Id. at 28-29.

290. Under continuous pressure from federal officials, including Defendants herein, social-media firms have imposed increasingly draconian censorship on core political speech about election integrity. For example, in March 2022, YouTube imposed a one-week suspension on The Hill, a well-known political publication covering Congress, for posts that included clips of former President Trump's speech at the CPAC conference and interview on Fox News, which included claims that fraud changed the outcome of the 2020 presidential election. Gilead Edelman, Beware the Never-Ending Disinformation Emergency, THE WIRED (March 11, 2022), at https://www.wired.com/story/youtube-rigged-election-donald-trump-moderationmisinformation/. YouTube relied on its "Elections misinformation policy," under which it censors "Content that advances false claims that widespread fraud, errors, or glitches changed the outcome of select past national elections, after final election results are officially certified." YouTube, Elections Misinformation Policy, https://support.google.com/youtube/answer/10835034?hl=en.

291. This policy is openly content- and viewpoint-based—it applies only to "select" past national elections, and "[u]nder the policy, you can only include those claims if you explicitly debunk or condemn them." Edelman, supra. On information and belief, this policy is also selective in application, as it is not applied to censor widespread, false Democratic claims that supposed "collusion" between the Trump campaign and Russia changed the outcome of the 2016

presidential election. And "by asking news hosts to explicitly denounce any mention of election fraud, YouTube isn't just making its own content decisions; it's injecting itself into the editorial processes of actual media outlets." Id. 290. On November 10, 2021, the Cybersecurity and Infrastructure Security Agency (LISA), an agency within DHS, announced that it was "beefing up its disinformation and misinformation team in the wake of a divisive presidential election that saw a proliferation of misleading information online." Cyber agency beefing up disinformation, misinformation team, THE HILL (Nov. 10, 2021), at https://thehill.com/policy/cybersecurity/580990-cyber-agencybeefing-up-disinformation-misinformation-team/. "I am actually going to grow and strengthen my misinformation and disinformation team,' CISA Director Jen Easterly said." Id. Defendant Easterly said that so-called "disinformation" and "misinformation" pose "a top threat for CISA, which is charged with securing critical infrastructure, to confront." Id.

292. Indulging in a bit of Newspeak of her own, Easterly claimed that social-media speech is a form of "infrastructure," and that policing speech online by the federal government falls within her agency's mission to protect "infrastructure," stating that CISA is "in the business of critical infrastructure, and the most critical infrastructure is our cognitive infrastructure, so building that resilience to misinformation and disinformation, I think, is incredibly important." Id.

293. Easterly announced that CISA was working directly with unnamed "partners in the private sector" and other government agencies to police online speech: "We are going to work with our partners in the private sector and throughout the rest of the government and at the department to continue to ensure that the American people have the facts that they need to help protect our critical infrastructure." Id.

294. With specific reference to hotly disputed election-integrity issues, which comprise core political speech, Easterly stated that Americans should not be allowed to "pick [their] own

facts" and make their own decisions about what is true, especially regarding election security: "We now live in a world where people talk about alternative facts, post-truth, which I think is really, really dangerous if you get to pick your own facts, and it's particularly corrosive when you talk about matters of election security." Id. Instead, she indicated, federal officials like herself should intervene to help Americans "pick" the right "facts." Id.

295. CISA appears to be the focus of many of DHS's attempts to police the content of speech and viewpoints on social media. On information and belief, CISA maintains a number of task forces, working groups, and similar organizations as joint government-private enterprises which provide avenues for government officials to push for censorship of disfavored viewpoints and speakers online.

296. In a 2020 document entitled "2020 Election Infrastructure Subsector-Specific Plan," at https://www.cisa.gov/sites/default/files/publications/election_infrastructure_subsector_specific_plan.pdf, CISA stated that it had partnered to "promote" interaction between election officials and the Center for Technology and Civic Life, the now-notorious nonprofit funded by Mark Zuckerberg that engaged in egregious election interference by injecting hundreds of millions of private dollars and personnel into local election offices in heavily Democratic-favoring areas.

297. CISA routinely expands the definitions of "misinformation" and "disinformation" to include "malinformation," i.e. truthful information that the government believes is presented out of context to contradict left-wing political narratives. CISA defines "malinformation" as information that is "based on fact, but used out of context to mislead, harm, or manipulate." See, e.g., CISA, We're in This Together. Disinformation Stops with You. (last visited May 5, 2022), https://www.cisa.gov/sites/default/files/publications/SLTTCOVIDToolkit_FINAL_508.pdf. 297. CISA's same publication decries the spreading of "false treatment and prevention measures [for

COVID-19], unsubstantiated rumors regarding the origin of the virus, and more." Id. (emphasis added). On information and belief, "unsubstantiated rumors regarding the origin of the [COVID-19] virus" refers to the lab-leak theory of COVID-19's origins, which (as noted above) is supported by compelling circumstantial evidence, both scientific and historical.

298. CISA's "Mis-, Dis-, and Malinformation [MDM] Planning and Incident Response Guide for Election Officials," at https://www.cisa.gov/sites/default/files/publications/mdmincident-response-guide_508.pdf, calls for constant policing of speech regarding election integrity, stating that "election infrastructure related MDM occurs year-round," and "[f]alse narratives erode trust and pose a threat to democratic transitions, especially, but not limited to, narratives around election processes and the validity of election outcomes." Id. The Guide defines MDM to include "[n]arratives or content that delegitimizes election results or sows distrust in the integrity of the process based on false or misleading claims." Id.

299. On February 7, 2022, DHS issued a National Terrorism Advisory Bulletin, available at https://www.dhs.gov/ntas/advisory/national-terrorism-advisory-system-bulletinfebruary-07-2022. It begins by stating: "The United States remains in a heightened threat environment fueled by several factors, including an online environment filled with false or misleading narratives and conspiracy theories, and other forms of mis- dis- and mal-information (MDM)." Id. The first critical "factor" contributing to a "heightened threat environment," according to the Bulletin, is "(1) the proliferation of false or misleading narratives, which sow discord or undermine public trust in U.S. government institutions." Id. Again, the first "[k]ey factor contributing to the current heightened threat environment" identified in the Bulletin is "[t]he proliferation of false or misleading narratives, which sow discord or undermine public trust in U.S. government institutions: For example, there is widespread online proliferation of false or misleading

narratives regarding unsubstantiated widespread election fraud and COVID-19. Grievances associated with these themes inspired violent extremist attacks during 2021." Id. (emphasis added). The Bulletin stated that DHS is directly coordinating with social-media platforms to address so-called "MDM": "DHS is working with public and private sector partners, as well as foreign counterparts, to identify and evaluate MDM, including false or misleading narratives and conspiracy theories spread on social media and other online platforms that endorse or could inspire violence." Id. And it specifically stated that CISA likewise "works with public and private sector partners ... [to] increase nationwide cybersecurity resilience."

300. This February 7, 2022 Bulletin echoed statements from prior bulletins indicating that so-called COVID-19 "misinformation" and election-related "misinformation" are domestic terror threats. For example, DHS's January 27, 2021 National Terrorism Advisory System Bulletin, available at https://www.dhs.gov/ntas/advisory/national-terrorism-advisory-systembulletin January-27-2021, stated that "Domestic Violent Extremists" are "motivated by a range of issues, including anger over COVID-l9 restrictions [and] the 2020 election results...." Id. Similarly, DHS's August 13, 2021 National Terrorism Advisory System Bulletin, available at https://www.dhs.gov/ntas/advisory/national-terrorism-advisory-system-bulletin-august-13-2021, stated that "violent extremists ... may seek to exploit the emergence of COVID-19 variants by viewing the potential re-establishment of public health restrictions across the United States as a rationale to conduct attacks." Id. It stated that "domestic threat actors ... continue to introduce, amplify, and disseminate narratives online that promote violence," and included therein "conspiracy theories on perceived election fraud ... and responses to anticipated restrictions relating to the increasing COVID cases." Id.

301. On April 12, 2022, CISA published another bulletin announcing that it was coordinating directly with social-media platforms to police "Mis, Dis, Malinformation" (which it

calls "MDM"). CISA, Mis, Dis, Malinformation, at https://www.cisa.gov/mdm. The bulletin states that, "False or misleading information can evoke a strong emotional reaction that leads people to share it without first looking into the facts for themselves, polluting healthy conversations about the issues and increasing societal divisions." Id. CISA reported that its Countering Foreign Influence Task Force's "mission evolved" during the Biden Administration to address the new "information environment," which (on information and belief) is code speak for ramping up online censorship: "In 2021, the CFITF officially transitioned into CISA's MDM team, and the mission evolved to reflect the changing information environment." Id. CISA stated that it coordinates directly with social media firms to address "MDM": "The MDM team continues to work in close coordination with interagency and private sector partners, social media companies, academia, and international partners on a variety of projects to build resilience against malicious information activities." Id. (emphasis added).

302. On information and belief, the April 12, 2022, CISA bulletin indicates that CISA works directly with social-media companies to flag content for censorship: "The MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms...." Id. CISA boasts that it has "expanded the breadth of reporting [MDM] to include ... more social media platforms," and that "[t]his activity leverages the rapport the MDM team has with the social media platforms to enable shared situational awareness." Id. On information and belief, these statements reflect and express on ongoing practice by government officials of directly colluding with social-media platforms to suppress disfavored speech, viewpoints, content, and speakers on social media. Again, these statements echo Psaki's statement that the Biden Administration is "flagging problematic posts for Facebook," and Mayorkas's statement that DHS is "working with the tech companies that are the platform for much of the disinformation that reaches the American public" to address so-called misinformation and disinformation.

303. The same bulletin suggests that CISA is directly involved in such "flagging" related to COVID-19 "misinformation." It states that "COVID-19-related MDM activities seek to undermine public confidence and sow confusion," and claims that "the rapid evolution of accurate information makes older, dated information a potential catalyst of confusion and distrust as well." Id. Thus, it claims, "[t]he MDM team supports the interagency and private sector partners' COVID-19 response efforts via regular reporting and analysis of key pandemic-related MDM trends." Id. On information and belief, these "private sector partners" include social-media firms, and the "reporting and analysis" includes flagging disfavored content for censorship.

304. On April 27, 2022, Mayorkas announced that DHS was creating a "Disinformation Governance Board" within DHS to combat so-called "misinformation" and "disinformation." Biden Administration creates `Disinformation Governance Board' under DHS to fight 'misinformation, ' THE POST MILLENIAL (April 27, 2022), at https://thepostmillennial.com/breaking-biden-administration-creates-disinformation-governanceboard-under-dhs-to-fight-misinformation. "The Department of Homeland Security is setting up a new board designed to counter misinformation related to homeland security, with a focus specifically on Russia and irregular migration. The board will be called the `Disinformation Governance Board,' and will be headed by executive director Nina Jankowicz." Id. During congressional testimony, Mayorkas described the endeavor as a "just recently constituted Misinformation/Disinformation Governance Board." Id. (video link at 1:40). He stated: "The goal is to bring the resources of the Department together to address this threat." Id.

305. Jankowicz has called for more aggressive censorship of election-related speech by social-media platforms, and has implied that social-media censorship of election-related speech should never relent or be reduced, stating on Twitter: "Considering the long-term damage these lies do to our democracy, I'm dismayed about this decision [not to censor election-related speech

more aggressively]. I say this about foreign disinformation and it applies to domestic disinfo too: Elections aren't an end point. They're an inflection point. Policies need to reflect that." Id.

306. On information and belief, DHS's new "Disinformation Governance Board" is intended to be used, and will be used, to increase DHS's efforts to induce and procure the censorship of disfavored content, viewpoints, and speakers on social-media platforms.

307. From its inception, the DGB was envisioned as an agency for suppressing core political speech about election security and COVID-19 restrictions. In the internal memo to Secretary Mayorkas advocating for the DGB's creation, the very first two topics of "disinformation" to be targeted were "conspiracies about the validity and security of elections," and "disinformation related to the origins and effects of COVID-19 vaccines or the efficacy of masks."

308. Internal documents of DHS, provided by whistleblowers to U.S. Senators, indicate that the "Disinformation Governance Board" was formulated to create a stronger bureaucratic structure to federal social-media censorship policies and activities that were already in full force, both within DHS and across other federal agencies. The whistleblower documents make clear that the DGB's task was not to establish a censorship program, but to oversee the massive censorship program against free speech on these topics that already exists—both within DHS, and across the federal government.

309. On information and belief, Defendants Robert Silvers and Samantha Vinograd played and play a central role in DHS's censorship activities, including but not limited to the formulation and creation of the "Disinformation Governance Board." The whistleblower documents cited above strongly support this conclusion. Silvers and Vinograd co-signed the September 13, 2021 "Memorandum for the Secretary" re "Organizing DHS Efforts to Counter Disinformation" that provided an overview of DHS's disinformation activity and recommended the creation of the

DGB. As noted above, the opening lines of this memo state that "[t]he spread of disinformation presents serious homeland security risks," especially "[c]onspiracy theories about the validity and security of elections" and "[d]isinformation related to the origins and effects of COVID-19 vaccines or the efficacy of masks." The memo reflects detailed knowledge active oversight of DHS's "misinformation" and "disinformation" activities. Further, Defendant Silvers authored the January 31, 2022 memo to the Secretary seeking his "approval of the charter for the Disinformation Governance Board," and he authored a separate memorandum to DHS's general counsel seeking the same approval. Silvers also is listed as a participant in the April 28, 2022 meeting with Twitter executives Nick Pickles and Yoel Roth organized by Nina Jankowicz, discussed below.

310. On April 28, 2022, Jankowicz arranged for a meeting between Secretary Mayorkas and/or other senior DHS officials, including Undersecretary Robert Silvers, and "Twitter executives Nick Pickles, Head of Policy, and Yoel Roth, Head of Site Integrity," to discuss "public-private partnerships, MDM, and countering DVE. The meeting is off the record and closed press." ECF No. 10-1, at 31 (Glenn Decl. Ex. 1, at 18). This was to be a cozy meeting: Jankowicz, who drafted the meeting brief, noted that "Nick and Yoel both know DGB Executive Director Nina Jankowicz." Id. The meeting was to be "an opportunity to discuss operationalizing public-private partnerships between DHS and Twitter." Id. In the meeting, DHS was to "Propose that Twitter become involved in Disinformation Governance Board Analytic Exchanges on Domestic Violent Extremism (DVE) and Irregular Migration," and to "Thank Twitter for its continued participation in the CISA Analytic Exchange on Election Security." Id. DHS was also to "Ask what types of data or information would be useful for Twitter to receive in Analytic Exchanges or other ways the Department could be helpful to Twitter's counter-MDM efforts." Id.

**5. The Biden Administration And Its Executive**

**Agencies Reinforce Their Threats And Admit Further**

**Colluding With The Private Party Defendants To Censor Free Speech**

311. On or around April 25, 2022—two days before DHS announced the creation of its "Disinformation Governance Board"—it was reported that free-speech advocate Elon Musk would acquire Twitter and make it a privately held company. Left-wing commentators widely decried this news on the ground that free speech on Twitter would allow the spread of so-called "misinformation" and "disinformation."

312. On April 25, 2022, Psaki was asked at a White House press briefing to respond to the news that Elon Musk would acquire Twitter, and asked "does the White House have any concern that this new agreement might have President Trump back on the platform?" White House, Press Briefing by Press Secretary Jen Psaki, April 25, 2022, at https://www.whitehouse.gov/briefing-room/press-briefings/2022/04/25/press-briefing-by-presssecretary jen-psaki-april-25-2022/.

313. Psaki responded by reiterating the threats of adverse legal consequences to Twitter and other social media platforms, specifically referencing antitrust enforcement and Section 230 repeal: "No matter who owns or runs Twitter, the President has long been concerned about the power of large social media platforms ... [and] has long argued that tech platforms must be held accountable for the harms they cause. He has been a strong supporter of fundamental reforms to achieve that goal, including reforms to Section 230, enacting antitrust reforms, requiring more transparency, and more. And he's encouraged that there's bipartisan interest in Congress." Id.

314. At the same press briefing, Psaki was asked: "Are you concerned about the kind of purveyors of election misinformation, disinformation, health falsehoods, sort of, having more of an opportunity to speak there on Twitter?" She responded by specifically linking the legal threats to the social-media platforms' failure to more aggressively censor free speech: "We've long talked

about and the President has long talked about his concerns about the power of social media platforms, including Twitter and others, to spread misinformation, disinformation; the need for these platforms to be held accountable."

315. Psaki was then asked a question that noted that "the Surgeon General has said that misinformation about COVID amounts to a public health crisis," and then queried, "would the White House be interested in working with Twitter like it has in the past to continue to combat this kind of misinformation? Or are we in a different part of the pandemic where that kind of partnership is no longer necessary?" Id.

316. Psaki responded by reaffirming that senior officials within the White House and/or the Administration are continuing to coordinate directly with social-media platforms to censor disfavored speakers and content on social media, and directly linking these efforts to the repeated threat of adverse legal action: "we engage regularly with all social media platforms about steps that can be taken that has continued, and I'm sure it will continue. But there are also reforms that we think Congress could take and we would support taking, including reforming Section 230, enacting antitrust reforms, requiring more transparency. And the President is encouraged by the bipartisan support for — or engagement in those efforts." Id.

**6. Defendants Have Successfully Procured The Censorship Of Core Political Speech.**

317. As a direct result of the conduct alleged herein, Defendants have achieved a great deal of success in procuring the censorship of disfavored speakers, viewpoints, and content on social media, as alleged further herein—including core political speech.

318. Among other things, they have achieved astonishing success in muzzling public criticism of President Biden. A recent review by the Media Research Center identified 646 instances over the last two years where social-media firms censored public criticism of then Candidate and now-President Biden. See Joseph Vasquez and Gabriela Pariseau, Protecting the

President: Big Tech Censors Biden Criticism 646 Times Over Two Years (April 21, 2022), at

https://censortrack.org/protecting-president-big-tech-censors-biden-criticism-646-times-overtwo-years.

319. "The Media Research Center found more than 640 examples of bans, deleted content and other speech restrictions placed on those who criticized Biden on social media over the past two years." Id. "MRC Free Speech America tallied 646 cases in its Censor Track database of pro-Biden censorship between March 10, 2020, and March 10, 2022. The tally included cases from Biden's presidential candidacy to the present day." Id.

320. "The worst cases of censorship involved platforms targeting anyone who dared to speak about any subject related to the New York Post bombshell Hunter Biden story. ... Big Tech's cancellation of that story helped shift the 2020 election in Biden's favor. Twitter locked the Post's account for 17 days. In addition, Twitter slapped a `warning label' on the GOP House Judiciary Committee's website for linking to the Post story." Id. "CensorTrack logged 140 instances of users—including lawmakers, organizations, news outlets and media personalities—censored for sharing anything related to the bombshell Hunter Biden laptop story." Id.

321. "Twitter was the most aggressive censor when it came to the Biden laptop story. CensorTrack entries show that users could not tweet the story or pictures of the Post story." 322. "Big Tech even axed those who blamed the current inflation crisis on Biden. For example, Facebook censored Heritage Action, the advocacy arm of the conservative Heritage Foundation, on March 15, simply for posting a video quoting Biden's embarrassing statements on energy policy. Facebook placed an interstitial, or filter, over Heritage Action's video, suppressing the post's reach. The video showed Biden and officials in his administration explaining how his policies would cause gas prices to rise." Id.

323. "[T]he largest category by far included users who dared to call out Biden's notoriously creepy, touchy-feely behavior around women and children. The 232 cases of comedic memes, videos, or generic posts about Biden's conduct composed more than one-third of CensorTrack's total instances of users censored for criticizing the president." Id.

324. "Big Tech even went after posts that quoted Biden's own words and made him look awful in retrospect." Id.

325. "The list of censorship targets included an array of prominent influencers on social media: Trump; lawmakers like Sen. Ted Cruz (R-TX) and House Minority Leader Kevin McCarthy (R-CA); news outlets like the New York Post, The Washington Free Beacon and The Federalist; satire site The Babylon Bee; celebrities like Donald Trump Jr. and James Woods, and media personalities like Daily Wire host Candace Owens, Salem radio host Sebastian Gorka and radio host Dana Loesch." Id.

326. Most recently, social-media platforms are beginning to censor criticisms of the Biden Administration's attempt to redefine the word "recession" in light of recent news that the U.S. economy has suffered two consecutive quarters of reduction in GDP. See, e.g., Economist slams Facebook for `absolutely Owwellian 'fact-check upholding Biden's recession denial, Fox News (Aug. 1, 2022), at https://www.foxnews.com/media/economist-slams-facebook-absolutelyorwellian-fact-check-upholding-bidens-recession-denial.

327. Thus, Defendants' conduct alleged herein has created, with extraordinary efficacy, a situation where Americans seeking to exercise their core free-speech right to criticize the President of the United States are subject to aggressive prior restraint by private companies acting at the bidding of government officials. This situation is intolerable under the First Amendment.

**7.   Federal Officials Open New Fronts In Their**

**War For Censorship Of Disfavored Speech.**

328. Since the AG Lawsuit was filed in May 2022, federal officials and traditional Democratic Party allies and agents, including the private party defendants herein, have expanded their social-media censorship activities and opened new fronts in their war against the freedom of speech on social media. The frontiers of government-induced censorship are thus expanding rapidly.

329. For example, on June 14, 2022, White House National Climate Advisor Gina McCarthy spoke at an Axios event titled "A conversation on battling misinformation." See Alexander Hall, Biden climate advisor demands tech companies censor `disinformation' to promote `benefits of clean energy', Fox NEWS (June 14, 2022), at https://www.foxnews.com/media/biden-climate-advisor-tech-companies-censor-disinformationpromote-benefits-clean-energy (video of her comments embedded in link). McCarthy publicly demanded that social-media platforms engage in censorship and suppression of speech that contradicts federal officials' preferred narratives on climate change.

330. During the event, "McCarthy skewered Big Tech companies for `allowing' disinformation and cheered Congress for `taking action' to enact more censorship last Thursday." Id. "Axios political reporter Alexi McCammond asked McCarthy how so-called `rampant misand-disinformation around climate change online and in other platforms' has `made your job harder?" Id. "McCarthy responded by slamming social media companies: `We have to get tighter, we have to get better at communicating, and frankly, the tech companies have to stop allowing specific individuals over and over again to spread disinformation." Id. (emphasis added). "She suggested further that `we have to be smarter than that and we need the tech companies to really jump in." Id. (emphasis added). "McCammond responded by asking: `Isn't misinformation and disinfo

around climate a threat to public health itself?' McCarthy asserted that it `absolutely' is: `Oh, absolutely." Id.

331. Following the Administration's now-familiar playbook, McCarthy explicitly tied these demands for censorship of climate-change-related speech to threats of adverse legislation: "McCarthy also praised Congress directly for pushing social media companies to censor Americans: `We do see Congress taking action on these issues, we do see them trying to tackle the misinformation that's out there, trying to hold companies accountable." Id.

332. Two days later, the White House announced a new task force to address, among other things, "gendered disinformation" and "disinformation campaigns targeting women and LGBTQI+ individuals who are public and political figures, government and civic leaders, activists, and journalists." White House, Memorandum on the Establishment of the White House Task Force to Address Online Harassment and Abuse (June 16, 2022), at https://www.whitehouse.gov/briefing-room/presidential-actions/2022/06/ 16/memorandum-onthe-establishment-of-the-white-house-task-force-to-address-online-harassment-and-abuse/.

333. The June 16 Memorandum decries "online harassment and abuse"—vague terms that, on information and belief, are deliberately adopted to sweep in constitutionally protected speech. In particular, the Memorandum defines "online harassment and abuse" to include "gendered disinformation," a deliberately broad and open-ended term. Id. § 1. The Memorandum announces plans to target such "gendered disinformation" directed at public officials and public figures, including "women and LGBTQI+ political leaders, public figures, activists, and journalists." Id. The Memorandum creates a Task Force co-chaired by the Assistant to the President for National Security Affairs, which includes the Secretary of Defense, the Attorney General, and the Secretary of Homeland Security, among others. Id.

334. The Task Force is charged with "developing programs and policies to address ... disinformation campaigns targeting women and LGBTQI+ individuals who are public and political figures, government and civic leaders, activists, and journalists in the United States and globally." Id. § 4(a)(iv) (emphasis added). The Memorandum calls for the Task Force to consult and coordinate with "technology experts" and "industry stakeholders," i.e., social-media firms, to achieve "the objectives of this memorandum," id. § 4(b). Those "objectives," of course, include suppressing so-called "disinformation campaigns" against "public and political figures." Id. § 4(a)(iv).

335. The Memorandum again threatens social-media platforms with adverse legal consequences if they do not censor aggressively enough to suit federal officials: "the Task Force shall .. . submit periodic recommendations to the President on policies, regulatory actions, and legislation on technology sector accountability to address systemic harms to people affected by online harassment and abuse." Id. § 5(c) (emphasis added).

336. On June 17, 2022, twenty-one Democratic U.S. Senators and Representatives sent a letter to Sundar Pichai, the CEO of Alphabet Inc., which owns Google, demanding that Google censor, suppress, and de-boost search results and Google Maps results for pro-life pregnancy resource centers. June 17, 2022 Letter of Sen. Mark Warner, et al., available at https://reason.com/wp-content/uploads/2022/06/26F26BB28841042A7931 EEC58AC80E08.antiabortion-letter-to-google-final.pdf. The letter's co-signers included many of the Members of Congress who have previously made threats of adverse legal consequences if social-media platforms do not increase censorship—such as Senators Mark Warner, Amy Klobuchar, and Richard Blumenthal. Id. The letter cited "research by the Center for Countering Digital Hate (CCDH)," id.—the same organization that Jen Psaki and the White House coordinated with to demand the censorship of the so-called "Disinformation Dozen," and that

coordinated the demonetization of Plaintiff Hoft from Google. The letter describes pro-life pregnancy resource centers as "fake clinics," and demands that Google proactively censor search results, mapping results, and advertisements relating to such clinics. Id. The letter demands that Google "limit the appearance of anti-abortion fake clinics or so-called `crisis pregnancy centers' in Google search results, Google Ads, and on Google Maps"; that Google "add user-friendly disclaimers that clearly indicate whether or not a search result does or does not provide abortions"; and that Google take "additional steps to ensure that users are receiving accurate information when they search for health care services like abortion on Google Search and Google Maps." Id.

337. Defendants swiftly doubled down on this demand for social-media censorship of pro-life pregnancy resource centers. On July 8, 2022, the President signed an Executive Order "aimed at protecting abortion rights." Sandhya Raman, Biden issues executive order responding to abortion ruling, Roll Call (July 8, 2022), at https://rollcall.com/2022/07/08/biden-issuesexecutive-order-responding-to-abortion-ruling/. The order directs HHS, DOJ, and the FTC "to examine ways to ... curb the spread of misinformation related to abortion." Id. The order is entitled "Executive Order on Protecting Access to Reproductive Healthcare Services," available at https://www.whitehouse.gov/briefing-room/presidential-actions/2022/07/08/executive-orderon-protecting-access-to-reproductive-healthcare-services/. Section 4(b)(iv) of the order states: "The Secretary of Health and Human Services shall, in consultation with the Attorney General and the Chair of the FTC, consider options to address deceptive or fraudulent practices related to reproductive healthcare services, including online, and to protect access to accurate information." Id. 8. Discovery reveals a massive federal Censorship Enterprise including all Defendants.

338. Based on documents produced by Defendants in the AG Lawsuit and the December 2022 Twitter Drops and other recent public disclosures, senior federal officials have placed

intensive oversight and pressure to censor private speech on social-media platforms. All Defendants have been involved in the Censorship Scheme in various ways, and these censorship activities continue to the present and continue to directly cause Plaintiffs irreparable harm. Representative examples of such federal censorship activities are set forth herein, but these do not identify all the federally induced acts of censorship by any means.

339.  After President Biden publicly stated (about Facebook) on July 16, 2021, that "They're killing people," a very senior executive at Meta (Facebook and Instagram) reached out to Surgeon General Murthy to engage in damage control and appease the President's wrath. Soon thereafter, the same Meta executive sent a text message to Surgeon General Murthy, noting that "it's not great to be accused of killing people," and expressing that he was "keen to find a way to deescalate and work together collaboratively."

340. Such "de-escalation" and "working together collaboratively," naturally, involved increasing censorship on Meta's platforms. One week after President Biden's public accusation, on July 23, 2021, that senior Meta executive sent an email to Surgeon General Murthy stating, "I wanted to make sure you saw the steps we took just this past week to adjust policies on what we are removing with respect to misinformation, as well as steps taken to further address the `disinfo dozen': we removed 17 additional Pages, Groups, and Instagram accounts tied to the disinfo dozen...."

341. Again, on August 20, 2021, the same Meta executive emailed Murthy to assure him that Facebook "will shortly be expanding our COVID policies to further reduce the spread of potentially harmful content on our platform. These changes will apply across Facebook and Instagram," and they included "increasing the strength of our demotions for COVID and vaccine related content," and "making it easier to have Pages/Groups/Accounts demoted for sharing COVID and vaccine-related misinformation."

343. In addition, that senior Meta executive sent a "Facebook bi-weekly covid content report" to Surgeon General Murthy and to White House official Andrew Slavitt, evidently to reassure these federal officials that Facebook's suppression of COVID-19 "misinformation" was aggressive enough for their preferences.

344. In another, similar exchange, on October 31, 2021, Deputy Assistant to the President Rob Flaherty emailed a contact at Meta with a link to a Washington Post article complaining about the spread of COVID "misinformation" on Facebook. The email contained only the link to that story with the subject line, "not even sure what to say at this point." The Facebook official defended Facebook's practices, and assured Mr. Flaherty that Facebook's internal studies were intended to "improve our defenses against harmful vaccine misinformation," and that Facebook had, in fact, "improved our policies," i.e., increased censorship of online speech. Id.

345. Likewise, Alex Berenson disclosed internal Twitter communications revealing that senior "WH" officials including Andrew Slavitt specifically pressured Twitter to de-platform Berenson, an influential vaccine critic—which Twitter did. This pressure to de-platform Berenson evidently occurred on April 21, 2021, when four Twitter employees participated in a Zoom meeting with at least three White House officials and one HHS official intended to allow the White House to "partner" with Twitter in censoring COVID-related "misinfo." The meeting invitation stated: "White House Staff will be briefed by Twitter on vaccine misinfo. Twitter to cover trends seen generally around vaccine misinformation, the tangible effects seen from recent policy changes, what interventions are currently being implemented in addition to previous policy changes, and ways the White House (and our COVID experts) can partner in product work." (Emphasis added).

346. The next day, April 22, Twitter employees noted in internal communications that the White House officials had posed "tough" questions during this meeting, including "one really

tough question about why Alex Berenson hasn't been kicked off the platform." See

https://alexberenson. substack. comp/the-white-house-privately-demanded.

347. On July 11, 2021, Dr. Fauci publicly described Berenson's public statements on

vaccines as "horrifying." Soon thereafter, after President Biden's subsequent statement that

"They're killing people" by not censoring vaccine "misinformation," Twitter caved to federal

pressure and permanently suspended Berenson.

348. Such communications from the White House impose maximal pressure on social

media companies, which clearly yields the sought-after results. And federal officials are fully

aware that such pressure is necessary to induce social-media platforms to increase censorship of

views that diverge from the government's. CISA Director Jen Easterly, for example, texted with

Matthew Masterson about "trying to get us in a place where Fed can work with platforms to better

understand the mis/dis trends so relevant agencies can try to prebunk/debunk as useful," and

complained about the Government's need to overcome the social-media platforms' "hesitation" to

working with the government: "Platforms have got to get more comfortable with gov't. It's really

interesting how hesitant they remain."

349. In fact, such pressure from government officials on social-media companies, along

with the many public statements alleged in the Complaint, have succeeded on a grand scale. A

veritable army of federal bureaucrats are involved in censorship activities "across the federal

enterprise." There are so many, in fact, that CISA Director Easterly and Matthew Masterson

complained in text messages that "chaos" would result if all federal officials were

"independently" contacting social-media platforms about so-called misinformation: "Not our

mission but was looking to play a coordinated role so not every D/A is independently reaching

out to platforms which could cause a lot of chaos." On information and belief, as alleged above,

the "Disinformation Governance Board" was created to impose a bureaucratic structure on the

enormous censorship activities already occurring involving dozens of federal officials and many federal agencies.

350. These federal bureaucrats have leveraged their clout and pressure on social-media platforms to become deeply embedded in a joint enterprise with social-media companies to procure the censorship of private citizens' speech on social media. Officials at HHS, including Defendants herein, routinely flag content for censorship, for example, by organizing weekly "Be On The Lookout" meetings to flag disfavored content; sending lengthy lists of examples of disfavored posts to be censored; serving as privileged "fact checkers" whom social-media platforms consult about censoring private speech; and receiving detailed reports from social-media companies about so-called "misinformation" and "disinformation" activities online; among others.

351. These efforts go back as far as very early 2020, and they continue through the present day, as evidenced by Facebook employees writing to high-level officials in HHS and the State Department informing them of new attempts to "control information and misinformation related to Corona virus [sic] which includes links to WHO page as well as removal of misinformation."

352. A Facebook employee wrote to Defendants Slavitt, Flaherty, Peck, and Humphrey on March 2, 2021, updating the White House on "vaccine intent" and "shar[ing] survey based data on intent to vaccinate," and relaying the ways that the company was combatting "misinformation." These methods included "improving the effectiveness of our existing enforcement systems (particularly focusing on entities that repeatedly post vaccine misinformation)" and "mitigating viral content that could lead to vaccine hesitancy" while "promoting the vaccine and providing authoritative information."

353. Upon information and belief, that means ensuring that posts departing from the government's messaging on vaccines are censored and de-amplified through the Facebook algorithm, while those conveying the government's message are amplified.

354. On March 1, 2021, a Twitter employee wrote to Defendants Slavitt, Flaherty, Peck and Humphrey after a meeting that the company was escalating efforts to remove harmful content about Covid and introducing a strike system apparently the outcome of the discussion that had just occurred. This was following an email exchange in February of 2021 in which the same employee had sought to update the four about "additional measure[s] Twitter taking regarding covid [sic]."

355. Likewise, on April 26, 2020, Muhammed wrote to Facebook employees and asked them to take down Facebook pages, and deactivate associated accounts, misrepresenting themselves as Administration for Children and Families Program (ACF). One of those employees responded, "Absolutely." Id.

356. Shortly after the inauguration of President Biden, an individual who worked in private sector engagement connected a Facebook employee with Defendants Courtney Rowe and Joshua Peck, and saying that Defendants Flaherty and Humphrey would want to be in touch about misinformation and disinformation.

357. On February 24, 2021, a different Facebook employee wrote to Defendant Flaherty "Following upon your request for COVID-19 misinfo themes we are seeing," "we are removing these claims from our platforms[.]" Those themes were Vaccine Toxicity," "False Claims About Side Effects of Vaccine" (including that the vaccines may cause infertility), "Comparing the Covid Vaccine to the Flu Vaccine," and "Downplaying Severity of Covid-19." 358. Flaherty responded later that day, asking for a "sense of volume on these, and some metrics around the scale of removal for each[]," as well as "misinformation that might be falling outside of your

removal policies." The Facebook employee replied that she could "go into detail on content that doesn't violate like below but could contribute to vaccine hesitancy."

359. Similarly, on February 19, 2021, Defendant Flaherty, on an email between him, Humphrey, Defendant Courtney Rowe, and Defendant Joshua Peck, and several Facebook employees as well, asked to hear from the company about "mis and dis" and later stated that one of his questions was about "algorithmic productions." Flaherty also asked if "plans are in the works . . . to replicate the strategy you deployed around lockdowns — the `stay at home' stickers/promoted Instagram story." A meeting was apparently held pursuant to Flaherty's request shortly thereafter on March 1, with the subject being "Misinfo & Disinfo."

360. On May 20, 2021, Mina Hsiang of the Office of Management and Budget wrote to a Google employee, apparently following up on a conversation from the previous day that was "critically helpful for the nationwide vaccination effort." Hsiang suggested a change to results yielded by a search for "who can get vaccinated now."

361. The parties continued to collaborate on the subject, and eventually arranged a meeting that was apparently held on May 27, 2021 and scheduled by Defendant Joshua Peck. Defendant Andy Slavitt asked Peck and Hsiang to take his place on the call because he was "slammed."

362. Sheila Walsh of HHS exchanged emails with employees at YouTube about combating vaccine "misinformation," and arranged a meeting as well.

363. Defendant Christy Choi, Deputy Director in the Office of Communications within HHS had exchanges with Facebook asking it to change the name of a Facebook page providing "misleading information about vaccine" "[g]iven the administration's focus on getting more Americans vaccinated."

364. CISA, likewise, has aggressively embraced its "evolved mission" of screening complaints of social-media disinformation and then "routing disinformation concerns" to socialmedia platforms. CISA routinely receives reports of perceived "disinformation," often from state and local government officials, and forwards them to social-media companies for censorship, placing the considerable weight of its authority as a federal national-security agency behind its demands for suppression of private speech. CISA, therefore, serves as a government clearinghouse for expedited censorship of social-media speech disfavored by government officials.

365. Moreover, many of these substantive communications from federal officials flagging specific posts and content for censorship also appear to occur through alternative channels of communication. For example, Facebook trained CDC and Census Bureau officials on how to use a "Facebook misinfo reporting channel." Twitter offered federal officials a privileged channel for flagging misinformation through a "Partner Support Portal." YouTube has disclosed that it granted "trusted flagger" status to Census Bureau officials, which allows privileged and expedited consideration of their claims that content should be censored.

366. As alleged further herein, federal censorship efforts escalated after President Biden assumed office in January 2021.

367. The individually named White House Defendants and other Defendants were directly involved in communications with social-media platforms about censorship and suppression of speech on social-media.

368. For example, Humphrey requested that a Meta employee censor an Instagram parody account of Dr. Fauci, and Meta replied, "Yep, on it!" Soon thereafter, Meta reported that the account had been censored.

369. As another example, on May 28, 2021, a senior executive of Meta sent an email to Slavitt and Murthy reporting that Facebook had expanded its censorship policies, evidently to satisfy federal officials' demands made at a recent oral meeting. The email stated that a "key point" was that "We're expanding penalties for individual Facebook accounts that share misinformation."

370. As recently as June 13, 2022, Flaherty demanded that Meta continue to produce periodic "COVID-19 insights reports" to track so-called "misinformation" regarding COVID-19 on Meta's social-media platforms, expressing the specific concern that COVID vaccines for children under 5 would soon be authorized.

371. Meta got the message. It agreed to continue sending its censorship-tracking reports, and on June 23, 2022, Meta assured Flaherty that it was expanding its censorship of COVID-19 "misinformation" to ensure that speech critical or skeptical of COVID-19 vaccines for children under 5 years old—a highly controversial topic—would be censored. Notably, Pfizer's own data established that the vaccine does not stop infection or transmission in this age group, demonstrating the political nature of this censorship. See https://www.nytimes.com/2022/02/28/health/pfizervaccine-kids.html.

372. The White House Defendants were involved in many other communications regarding censorship as well. For example, in June and July of 2022, Flaherty, Manning, Salcido, and Cheema were included in the email chain with Meta in which Flaherty demanded that Meta continue providing biweekly "COVID-19 Insights" reports to ensure adequate censorship of speech on Facebook and Instagram "as we start to ramp up under 5 vaccines"—i.e., as vaccination of children under 5 for COVID-19 began. Wakana and Rowe were also involved in similar communications overseeing Meta's misinformation practices. 373. Again, for example, Flaherty, Wakana, Humphrey, and Rowe participated in a "Twitter // COVID Misinfo" meeting

with Twitter on or around March 1, 2021. And on April 21, 2021, Flaherty and Slavitt, along with White House Confidential Assistant Kelsey V. Fitzpatrick, participated in a meeting with Twitter at which those White House officials demanded greater censorship on Twitter and specifically demanded the de-platforming of Alex Berenson. The meeting invite for that meeting stated that "White House Staff will be briefed by Twitter on vaccine misinfo. Twitter to cover trends seen generally around vaccine misinformation, the tangible effects seen from recent policy changes, ... and ways the White House (and our COVID experts) can partner in product work."

374. A senior Meta executive repeatedly copied Slavitt on his emails to Surgeon General Murthy in which he assured the Surgeon General and the White House that Meta was engaging in censorship of COVID-19 misinformation according to the White House's demands. Among other things, the Meta executive insisted that "We've expanded penalties for individual Facebook accounts that share misinformation."

375. Likewise, on March 2, 2021, Meta sent an email assuring Slavitt, Flaherty, and Humphrey that the company is "[c]ombating vaccine misinformation and de-amplifying content that could contribute to vaccine hesitancy" by "improving the effectiveness of our existing enforcement systems (particularly focusing on entities that repeatedly post vaccine misinformation), mitigating viral content that could lead to vaccine hesitancy...."

376. Among many other reports, Meta reported to Rowe, Manning, Flaherty, and Slavitt that it has "labeled and demoted" "vaccine humor posts whose content could discourage vaccination" during January 2022. It also reported to the White House that it "labeled and demoted" posts "suggesting natural immunity to COVID-19 infection is superior to immunity by the COVID-19 vaccine."

377. Likewise, on November 4, 2021, Meta reported to Rowe, Flaherty, and other White House officials that "we updated our misinformation policies for COVID-19 vaccines to make clear that they apply to claims about children...."

378. On September 18, 2021, regarding a story in the Wall Street Journal about COVID19 "misinformation" circulating on Facebook, Flaherty demanded that Meta provide an explanation "as we have long asked for, [of] how big the problem is, what solutions you're implementing, and how effective they've been." Needless to say, the "solutions" evidently referred to policies to censor and suppress more private speech on Meta's platforms, and Meta promised to "brief" the White House on those.

379. In response to a third-party subpoena, Meta has identified Special Assistant to the President Laura Rosenberger, White House Partnerships Manager Aisha Shah, White House Counsel Dana Remus, and White House officials Slavitt, Flaherty, and Humphrey; HHS officials Waldo, Byrd, Choi, Lambert, Peck, and Muhammed; EAC officials Muthig and Robbins; CDC officials Crawford and Dempsey; DHS officials Masterson, Protentis, Hale, and Snell; and FDA officials Thorpe, Jefferson, Murray, and Kimberly, among others, as federal officials who may have "communicated with Meta regarding content moderation between January 1, 2020 and July 19, 2022 as it relates to: (i) COVID-19 misinformation; (ii) the Department of Homeland Security's proposed Disinformation Governance Board; (iii) the New York Post story from October 14, 2020 about Hunter Biden's laptop computer; and/or (iv) election security, integrity, outcomes, and/or public confidence in election outcomes (not to include issues of foreign interference or related issues)."

380. In response to a third-party subpoena, YouTube has identified Schwartz, Faught, Molina-Irizarry, Galemore, Wakana, Flaherty, and Waldo, among others, as federal officials

likely to have "communicated with the YouTube custodians about misinformation about COVID, the census, or elections."

381. In response to a third-party subpoena, Twitter has identified Crawford, Flaherty, Frisbie, Kimmage, Lambert, Murthy, Shopkorn, Slavitt, and Waldo as federal officials "with whom [Twitter] has had meetings or discussions between January 20, 2021 and August 4, 2022 about election integrity, vaccine/Covid misinformation, violent extremism, and similar content moderation issues."

381.1. On August 26, 2022, Mark Zuckerberg appeared on Joe Rogan's podcast and revealed that Facebook's censorship of the Hunter Biden laptop story had occurred as a result of communications from the FBI. Zuckerberg stated: "The FBI basically came to us" and told Facebook to be "on high alert" relating to "a lot of Russian propaganda.

**FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR VIOLATION OF PLAINTIFFS' FEDERAL CIVIL RIGHTS PURSUANT TO 42 USC 1983**

382. At all times herein mentioned, Plaintiffs' and the Putative Class's First Amendment rights were violated and will continue to be violated by virtue of Defendants' Censorship Scheme. In particular, the private party defendants have taken actions and engaged in conduct under color of law to do that which the Biden Administration is constitutionally prohibited from doing for itself – namely, censoring and suppressing lawfully protected speech of Plaintiffs, the Putative Class and other Americans with whom they disagree, for the purpose of punishing the political enemies of the Democratic Party and DNC.

383. At all times herein mentioned, Defendants were acting under color of law in collusion and lockstep with the federal government and current Biden Administration to cancel, censor, stifle and suppress the lawfully protected speech of conservative and other disfavored

speakers who challenged Biden Administration policies and dictates, in violation of their First Amendment rights.

384. Plaintiffs and the Putative Class were irreparably harmed and will continue to be irreparably harmed unless and until this Court issues a nationwide injunction to restrain and enjoin Defendants' actions and Defendants' Censorship Scheme.

385. Plaintiffs and each member of the Putative Class also sustained damages as a result of Defendants' censorship scheme.

386. Defendants' Censorship Scheme described and alleged herein was a substantial factor in causing Plaintiffs' and the Putative Class's harm.

**SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS**

**FOR VIOLATION OF THE CIVIL RIGHTS ACT OF 1964 AND THE**

**UNITED STATES CONSTITIUTION FOR ELECTION INTERFERENCE**

387. Plaintiffs and the Putative Class are guaranteed the right to vote by the Civil Rights Act of 1964 and the United States Constitution, including the 5th and 14th Amendments thereto.

388. At all times herein mentioned, Defendants and Defendants' Censorship Scheme interfered with Plaintiffs' and the Putative Class's voting rights and caused substantial harm by diluting the value of their vote in the 2020 and 2022 elections.

388.1 Unless and until restrained and enjoined by this Court, Defendants will continue to perpetrate their Censorship Scheme against Plaintiffs, the Putative Class and other Americans and thereby threaten to interfere with their vote in 2024 as well.

389. As a direct result of Defendants' Censorship Scheme and election interference, Plaintiffs and the Putative Class sustained damages and irreparable harm and will continue to be irreparably harmed unless and until this Court issues a nationwide injunction to restrain and enjoin Defendants' actions and Defendants' Censorship Scheme.

390.  At all times herein mentioned, Defendants' actions and their Censorship Scheme were a substantial factor in causing Plaintiffs' and the Putative Class's harm.

### THIRD CAUSE OF ACTION [FOR CALIFORNIA RESIDENT CLASS MEMBERS] AGAINST ALL DEFENDANTS FOR VIOLATING THE CALIFORNIA UHRUH ACT, CALIFORNIA CIVL CODE SECTION 51 ET SEQ.

391.    In addition to general damages and injunctive relief under 42 USC Section 1983 and the Civil Rights Act of 1964, the individual California resident Plaintiffs and members of the Putative Class who reside in California are also seeking statutory and general damages and injunctive relief under the California Unruh Act (California Civil Code section 51) as follows:

392.    The California Unruh Act (Civil Code section 51) guarantees every person in California full and equal" access to "all business establishments of every kind whatsoever" and imposes a duty on businesses establishments to serve all persons without arbitrary discrimination. Violations of the act may be redressed by private plaintiffs, like the Plaintiffs herein, who are aggrieved by the alleged unlawful conduct. Remedies include injunctive relief, damages and attorney's fees and costs (Civil Code section 52(a) – (c)).

393.    At all times herein mentioned, Defendants' discriminatory business practices and in particular, Defendant's unlawful and illegal Censorship Scheme – which deprived and continues to deprive Plaintiffs and other similarly situated persons with equal access to their internet platforms and school board meetings to express opposing political views, or views other than the opinions of the Democratic Party, aggrieved each and all of the Plaintiffs and the Class, in an amount to be shown at the time of trial in accordance with proof, including statutory damages in the amount of $4000 for each violation, and actual damages.

394.    Plaintiffs are also entitled to injunctive relief to enjoin and restrain defendants, and

each of them, from continuing the discriminatory practice of presenting only one political party's opinions, positions and views as opposed to a public forum for open and free expression under the First Amendment to avoid and prevent the continued detriment and irreparable harm to Plaintiffs – law abiding members of a rival political party whose only fault is that such members disagree with the opinions espoused by Defendants.

395. At all times herein mentioned, Plaintiffs were arbitrarily denied full and equal access to the private party Platform Defendants' goods and internet services and privileges by virtue of their Censorship Scheme simply because of their political affiliation and in particular, because they disagree with Biden Administration policies and mandates, are registered Republicans or have political opinions favored by conservatives rather than Left wing Democrats.

396. While "political affiliation" is not one of the enumerated grounds for relief under Civil Code section 51, the California Unruh Act is not limited to the categories expressly mentioned in the statute. Other forms of arbitrary discrimination by business establishments is prohibited. *In re Cox*, 3 Cal. 3d 205, 216 (1960); CACI 3020 (Use Notes).

397. At all times herein mentioned, Defendants and each of them deprived Plaintiffs and the Putative Class to full and equal access to the private party defendants' goods and services by censoring and suppressing what they were allowed to publish, sell, see, read or hear on Defendants' respective platforms and/or at public union and school board meetings as directed by the Biden Administration and its executive agencies.

398. A motivating reason for Defendants' discrimination and Censorship Scheme was Plaintiffs' and the Putative Class's political affiliation.

399. Plaintiffs and the Putative Class were harmed as a result of Defendants' violation of the Unruh Act, discrimination and Censorship Scheme.

400.  Defendants conduct and in particular their Censorship Scheme was a substantial factor in causing Plaintiffs' and the Putative Class's harm.

401.  Defendants AFT, NEA and NSBA who myopically follow and teach the Democratic Party's agenda, including the teaching of "Critical Race Theory" to public school students in lieu of more traditional "reading, writing and arithmetic," is but another form of illegal censorship and discrimination because it quashes any opposing views and leads to public distrust.  The Court should restrain and enjoin the use of any further public funds - such as the AFT's use of public funds to ensure and control our children's public-school curriculum, as a means to stifle, suppress and censor any views or opinions by conservative-leaning commentators or public figures that are not lock step with the DNC and now Biden Administration Platforms.  Simply stated, the private party defendants whom the DNC enlisted in early 2020 and have continued to use as "proxies" or "conduits" for the Democratic Party (with the mainstream media) to create a one-party system and most importantly, the ability and any government support they may need to quash, suppress and stifle any and all opposition.  Such discriminatory conduct violates the California Unruh Act (Civil Code section 51 et seq.).

**INJUNCTIVE RELIEF IS ALSO REQUIRED TO ENSURE THAT DEFENDANTS ARE ENJOINED FROM FALSELY FRAMING THE PUBLIC NARRATIVE AND TO PREVENT DEFENDANTS AND THE BIDEN ADMINISTRATION FROM ANY FURTHER GASLIGHTING OF ORDINARY AMERICANS**

398.  In addition to "de-platforming" opposing views to ensure that only the Democratic Party's and Biden Administration's Platform, policies and messaging are published or sold on the internet, the private party defendants continue to assert a false narrative to serve their own interests and remain in power.  Such public "gaslighting" includes the following false publicly stated matters:

- There were no "riots" or property damage that occurred during the Summer of 2020 that were instigated by democratic political organizations known as "Antifa" and "Black Lives Matter" in democratic controlled cities such as Minneapolis and Portland and New York;- just "peaceful protests";

- There was and is no "crisis" at the wide-open Mexican-United States border caused by the Biden Administration's open border policy, which in June 2021 alone saw 190,000 immigrants enter the United States illegally, at least 10 percent of whom have Covid 19 at the time they are released;

- Several credible, low-cost therapeutic drugs and medications that have been available for years that could actually lessen Covid 19 symptoms and cure the virus itself.  In fact, defendants called such miracle drugs "disinformation" and delisted any mention of them.  Defendants' censorship and suppression of such critically useful information and the FDA's subsequent direction to pharmacies and doctors that they were not to sell or use such drugs as a result thereof undoubtedly killed thousands of Americans unnecessarily;

- Falsely stating that President Trump and his lawyers provided "no evidence" of election fraud as opposed to truthfully stating that the only Democratic judges willing to hear the matter ruled that the litigants had "no standing."  Accordingly, the fact of the matter is that such judges, by design and proclamation, heard no evidence at all because no evidence was allowed to be presented.  As the Arizona legislative investigation has revealed, there was rampant fraud in Arizona's election.  Only time will tell whether the other critical "Swing states" also experienced fraud;

- Masks were unnecessary once you were vaccinated twice;

- Natural immunity is irrelevant to Covid 19 treatment;

- Unvaccinated persons cause other persons to catch Covid 19 while those who are vaccinated are safe to be in contact with; and

- Unvaccinated persons die at a greater rate than vaccinated persons from Covid 19.

399.    All of the referenced claims asserted in paragraph 398 above are demonstrably false.  However, Defendants continue to assert these claims and thereby create a false narrative that spurs unfounded racial attacks and division among ordinary Americans.

the alleged "disinformation" or "misinformation' allegedly communicated – always looked at through the prism of what message the Democratic Party are seeking to convey, effectively silencing any political opposition to the Democratic Party Platform, while hiding behind alleged immunities given to them years ago by a Congress that never intended such a tortured result.

## FOURTH CAUSE OF ACTION FOR INJUNCTIVE RELIEF

400.    The statutory provisions set forth above provide for the issuance of an injunction whenever the facts and circumstances warrant it.

401.    Virtually all of the facts alleged herein are undisputed.  More importantly, these undisputed facts show that injunctive relief is clearly justified under the circumstances because they establish that  Defendants, in collusion with the federal government and in particular the Biden Administration, have violated and will continue to violate Plaintiffs' and the Putative Class's civil rights in a manner that is inconsistent with federal and California laws, the United States Constitution and First Amendment thereto.   Thus, injunctive relief is warranted under the facts and circumstances in this case to prevent future harm.

402.    Moreover, Plaintiffs will continue to be irreparably harmed as a result of Defendants Censorship Scheme unless and until Defendants are permanently restrained and enjoined by the Court from perpetrating it.  Simply stated, unless the private party defendants are

restrained and enjoined by the Court, Defendants herein – proxies or "lackies" for the Biden Administration – will continue to unreasonably and unfairly discriminate against Plaintiffs and trample on the civil rights of the Plaintiffs and countless others who have similar views that Defendants and their cohorts find "distasteful" or "offensive."

403.     Accordingly, the Court should issue a temporary restraining order forthwith after notice and a hearing and further schedule a hearing and briefing schedule on an order to show cause re the issuance of a preliminary and permanent injunction that requires Defendants to show cause, if any they have, why the injunction requested by Plaintiffs herein should not be granted as prayed and enforced indefinitely.

**FIFTH CAUSE OF ACTION FOR DECLARATORY RELIEF**

404.     An actual controversy has arisen and now exists between the parties herein under the California and federal "Declaratory Relief Act(s)" in that Plaintiffs contend that Defendants are engaged in a vast, systemic illegal and unconstitutional Censorship Scheme to violate the civil rights of the individual Plaintiffs and Putative Class, as more particularly described in this Complaint, causing Plaintiffs irreparable harm and the right to injunctive relief, statutory and general damages for the harm caused by Defendants' acts and misconduct,  whereas Defendants dispute such contentions.

405.     As a result of the referenced unresolved dispute between the litigants and parties, An adjudication by this Court is necessary and appropriate at this time.

, and enter judgment in favor of Plaintiffs.

WHEREFORE, Plaintiffs and the Putative Class pray for judgment as follows:

1.   For general damages in an amount to be shown at the time of trial for Defendants' Censorship, interference with voting rights

2.   For statutory damages in the amount of $4,000 per day for each violation of the Unruh

1    Act, as provided by Code of Civil Procedure section 51;

2         3.   For a temporary restraining order and order to show cause re issuance of preliminary

3    and permanent injunction enjoining Defendants and each of them, from continuing to violate

4    Plaintiffs' constitutional rights by virtue of their Censorship Scheme in violation of 42 USC

5    Section 1983, the Civil Rights Act of 1964 and with respect to California residents, the Unruh Act

6    (California Civil Code section 51), or from otherwise causing irreparable harm to the Plaintiffs

7    herein;

8

9         4.   For a judicial declaration of the respective rights and remedies of the parties;

10        5.   For reasonable attorney's fees and costs; and

11        6.   For such other and further relief as the Court may deem just and proper.

12

13

14

15   DATED:  December 28, 2022          LAW OFFICES OF MICHAEL E. REZNICK
                                        A Professional Corporation
16

17

18                                      By:_____/s/ Michael E. Reznick_____
                                              Michael E. Reznick
19                                      Attorney for Plaintiffs RICHARD JACKSON,
                                        JULIE BRIGGS and GREGG BUCHWALTER,
20                                      individually and on behalf of all others similarly
                                        situated
21

22

23

24

25

26

27

28

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs and the Putative

Class hereby request a jury trial on all matters for which they are entitled to a jury.

DATED:  December 28, 2022          LAW OFFICES OF MICHAEL E. REZNICK
                                   A Professional Corporation


                                   By:_____/s/ Michael E. Reznick_____
                                        Michael E. Reznick
                                   Attorney for Plaintiffs RICHARD JACKSON,
                                   JULIE BRIGGS and GREGG BUCHWALTER,
                                   individually and on behalf of all others similarly
                                   situated

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28